UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER BINGAMAN,

Plaintiff,

-against-

REED ELSEVIER, INC.,

Defendant.

Case No. 07 CV 10673 (RWS)(FM)

**AFFIDAVIT OF JOHN A. SNYDER II IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

STATE OF NEW YORK   )
                        )   S.S.:
COUNTY OF NEW YORK  )

JOHN A. SNYDER II, being duly sworn, deposes and says:

1.      I am a Partner with the law firm of Jackson Lewis LLP, counsel for Defendant LexisNexis a division of Reed Elsevier, Inc. ("Defendant") in the above-captioned matter. As such, I am fully familiar with the facts set forth herein.

2.      This Affidavit is submitted in support of Defendant's Motion for Dismissal of Plaintiff's Complaint.

3.      A true and correct copy of the "Letter Agreement" referred to in Paragraph 17 of Plaintiff's Complaint (and referred to as the "Offer Letter" in Defendant's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint) is attached hereto as Exhibit "A."

4.      True and correct copies of the unreported decisions cited in Defendant's Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Complaint are attached hereto as Exhibit "B."

JOHN A. SNYDER II

Sworn to before me this
7TH day of February 2008

Notary Public

JOHN F DONOHUE
Notary Public, State of New York
No. 01DO5059383
Qualified in Nassau County
Commission Expires April 22, _____ 2010

# EXHIBIT A

**RECEIVED**

JAN 1 8 2006

**REI Benefits**

Drafted January 03, 2006

January 05, 2006

Peter Bingaman
47 Indian Hill Road
Wilton, Conn. 06897

Dear Peter:

I am delighted that you have accepted our verbal offer and I am now pleased to confirm the exact details to you in writing. The details of our offer of employment are outlined below.

**Position:** VP & Executive Managing Director – Small Law Marketing

**Reports To:** SVP, Small Law

**Starting Semi-Monthly Salary:** $10,961.54 (which equates to $285,000 annualized).

**Location:** You will be employed by LexisNexis and your position will be based in New York City at 125 Park Avenue, New York, NY 10017, which will be the location of your principal office. You will also be required to spend time among the Company's other locations and to engage in business travel as reasonably required in the performance of your duties.

**Start Date:** January ~~25/03~~, 2006. To be confirmed.

**Vacation:** Your vacation time will be 3 weeks, pro-rated in your first year of employment.

**Benefits:** Your offer also includes participation in the Company's benefit program, which allows you to design your benefit package to fit your needs. You may choose from a full range of benefit options including medical, dental, vision, employee and dependent life insurance, and long-term disability coverage. You will also be eligible based on the terms of each plan to participate in additional benefits that are available through our Salary Investment Plan (401(K)) and retirement plan.

**Replacement Payments:** Recognizing that you will forfeit certain bonuses by resigning from your current employer by January 4, 2006 and contingent on your resigning by that date, your offer also includes the following replacements payments: $50,000 (gross) for forfeited value of options and $45,800 (net) in recognition of monies you owe back to your employer as a result of your voluntary resignation. Both amounts will be paid to you within 30 days of you joining the company. Additionally, you will be eligible to receive three payments of $32,667 (gross) to compensate you for the loss of your 2005 incentive bonus. These payments will be made in the first payroll period following the end of the first, second and third calendar quarters of 2006. Should your current employer pay you any portion of your 2005 bonus, you agree to reimburse LexisNexis an amount equal to the amount paid to you as bonus.

In the event that you voluntarily terminate your employment with LexisNexis or your employment is terminated by the Company for reasons of unsatisfactory performance or cause prior to the completion of twelve (12) months of service, LexisNexis reserves the right to receive back from you the full amount of the replacement payments outlined above.

**Variable Compensation:** You will be eligible to participate in a Variable Compensation incentive plan which pays 63% of your annual salary for achievement of 100% of budgeted financial criteria and outstanding performance against individual key performance objectives.

Payments under this Plan are, of course, made at the discretion of the Reed Elsevier CEO and do not constitute a contractual entitlement, and the payment of any bonus is dependent on your being in the employment of the Company as at the bonus payment date.

Please note that in connection with the payment or determination of incentive compensation to you (including, but not limited to, the Variable Compensation), you agree to waive any claim against the Company and its Affiliates, and each of the Company's and its Affiliates' directors, officers, employees, agents, and representatives, individually and collectively, based on any allegation that the affairs of any business unit of the Company or any of its Affiliates to which you have been assigned during your employment with the Company and/or any other business operations of the Company or any of its Affiliates have not been conducted so as to maximize the incentive compensation payable to you for any particular period. You further agree that the Company and its Affiliates, as the owners of their respective businesses and assets, shall at all times have complete discretion and authority over the exploitation opportunities of their businesses and the preservation and/or enhancement of the value of their businesses.

**Executive Share Option Scheme:** You will receive an initial grant of Reed Elsevier stock options equal to 200% of your annual 2006 salary as a part of a confidential retention program. In addition, starting in February 2007, you will be eligible to participate in the Reed Elsevier Group plc Share Option Scheme (2003) (the "ESOS") in accordance with the terms and provisions of the ESOS. Pursuant to the ESOS, you will be eligible to receive, subject to the discretionary approval of the Board of Directors of Reed Elsevier Group plc or the Remuneration Committee thereof, an annual grant of options over shares of Reed Elsevier PLC and Reed Elsevier NV (collectively, "Shares"). The aggregate value of each such annual grant shall be determined by the Board of Directors of Reed Elsevier Group plc or the Remuneration Committee. Except as otherwise provided in the ESOS, these options vest and become exercisable three years after the date of grant. For the purposes of this offer letter, "Base Annualized Salary" means twenty-four times your base semi-monthly salary at the rate in effect as of the relevant date, determined before reduction for any employee-elected salary reduction contributions made to a Company-sponsored non-qualified deferred compensation plan or a Company-sponsored plan pursuant to Sections 401(k) or 125 of the Internal Revenue Code of 1986, as amended, and excluding bonuses, allowances, commissions, stock option grants, payments pursuant to long-term incentive plans, deferred compensation payments, and any other extraordinary remuneration.

**Reed Elsevier Retention Share Plan:** It is our intention to recommend you for participation in the Reed Elsevier Retention Share Plan at a grant amount of 100% of your base salary; however, LexisNexis cannot guarantee approval of the recommendation. In addition, starting in February 2007, you will be recommended for continued participation in the Reed Elsevier Retention Share Plan at a grant amount to be determined by the Board of Directors of Reed Elsevier Group plc or the Remuneration Committee. Such a recommendation must be approved by the Group Chief Executive Officer, and is then subject to the discretionary approval of the Board of Directors of Reed Elsevier Group plc or the Remuneration Committee thereof.

**Bonus Investment Plan:** Annually you will be eligible to participate in, subject to the discretionary approval of the Board of Directors of Reed Elsevier Group plc or the Remuneration Committee thereof, the annual Bonus Investment Plan which is governed by, the terms, provisions, and conditions the BIP and the terms, provisions and conditions of the attached Incentive Plan Agreement. You may elect to invest between 25% and 50% of your after tax bonus in Shares, which are then matched by the Company three years later, subject to certain performance criteria as set forth in each Plan. Potentially this enables you to double your investment in Shares, plus *(or of course minus)* any change that has taken place in the share price over the three year period.

**Termination of Employment**

The Company may terminate your employment at any time and for any reason; provided, however, that if the Company terminates your employment for any reason other than for Cause, your becoming Totally Disabled, or your death, or if you resign for "Good Reason," the Company shall pay you a lump sum severance payment equal to twelve (6) months base salary at your then current base salary (the "Severance Payment") subject to withholding and deductions in accordance with the Company's normal payroll practices and applicable law. Your offer is contingent upon the following:

- Signing and returning all new hire forms by January 9, 2006 which are being sent to your home under separate cover. Returning the completed paperwork by this time will ensure you receive your first paycheck for the first pay cycle completed after your start date.

- Completing the I-9 (Employment Eligibility Verification) form within your first 3 days of employment. Please review the "List of Acceptable Documents" contained on the enclosed I-9 form and bring the form plus its original document(s) that satisfy this federal requirement as specified on the form with you on your first day of employment. You must complete, sign and date Section 1 of the form in the presence of your immediate manager or a Company designee and present the required, original documentation, which is required under federal law, to establish your identity and employment authorization. If it is not possible to meet with your manager or his/her designee on your first day of employment to accomplish this, please contact Manpower Temporary Services (who serve as a Company-authorized designee) collect at 937-415-3768. Connie Johnston or Nicole Neal will direct you to a Manpower office near you to complete the form.

- Completion of a successful background check.

- During your employment and thereafter, you must keep all company business matters confidential as outlined in the enclosed Non-Compete/Non-Solicitation and Inventions Agreement. Both agreements must be signed and returned prior to your employment.

We have discussed a general outline of your prospective duties throughout the interview process. However, your title, duties, responsibilities and reporting relationships may evolve or change from time to time as the Company deems necessary and appropriate to its business circumstances and your relationship to them.

Please confirm your acceptance of this offer by signing and dating one copy of this letter and returning it along with your completed paperwork, in the enclosed, self-addressed envelope being sent with all new hire forms under separate cover, by January 9, 2006. The employees of LexisNexis div. Reed Elsevier Inc. are employees-at-will. This means that the employment relationship is for no fixed period and is terminable at will, at any time by either party. Both you and the LexisNexis div. Reed Elsevier Inc. are free to end the employment relationship at any time, with or without reason, and with or without notice. Also, please understand that your employment-at-will status may not be modified orally and that no management official is authorized to make any assurance or promise of continued employment.

Please keep in mind that you may have come in contact with confidential business information and/or trade secrets of your previous employer. This information may include, but is not limited to, marketing plans, customer related information, pricing information, product development plans, financial information and business strategy. We request that you refrain from using such information or disclosing any such information to us. We ask that you satisfy yourself that you have no documents containing such information at your home. We ask that you not bring any documents containing such information from your previous company. Also, we ask that you not bring your own personal records unless you have permission of your previous employer.

Further, should you believe at any time that you are in danger of disclosing any or all of that information to us because of any assignment or request that you have received, we request that you notify your manager immediately that to comply with such assignment or request would cause you to disclose trade secrets or confidential business information of your previous employer.

By accepting this offer of employment and signing below you represent and warrant that you are not bound by any agreement that may prevent you from accepting this position with LexisNexis div. Reed Elsevier Inc. and that you have disclosed all facts and circumstances relating to any restrictions you may have from working for LexisNexis div. Reed Elsevier Inc.

We very much look forward to you joining the LexisNexis div. Reed Elsevier Inc. team. We're sure your skills and experience will play an important role in our continued success. In turn, we hope to offer you many opportunities to achieve your professional goals. If you have any questions, please contact me at 937-865-1697.

Sincerely,

*Ann*

Ann Fullonkamp
SVP, Small Law
LexisNexis - North American Legal Markets

_____
Acceptance Signature

9-30-64
_____
Employee's Birth Date

_____January 5, 2006_____
Date

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
_____
(Please verify SS# above and make changes if necessary)

# EXHIBIT B

LEXSEE 1998 US DIST LEXIS 10481

**WILFRED R. CARON, Plaintiff, - against - THE TRAVELERS CORPORATION, Defendant.**

**96 Civ. 6236 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 10481; 14 I.E.R. Cas. (BNA) 292*

**July 13, 1998, Decided
July 15, 1998, Filed**

**DISPOSITION:**    [*1] Defendant's motion for summary judgment denied.

**COUNSEL:** For Plaintiff: Alfred U. Pavlis, Esq., David G. Rizzo, Esq., GAGE & PAVLIS, New York, New York.

For Defendant: Joel E. Cohen, Esq., Julie Y. Chen, Esq., McDERMOTT, WILL & EMERY, New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

**CHIN, D.J.**

At issue in this lawsuit is whether defendant The Travelers Corporation ("Travelers") fraudulently induced plaintiff Wilfred R. Caron ("Caron") into accepting employment as an appellate attorney by falsely representing that it had approved an "appeals project" to centralize all of Travelers's appeals in the State of New York within a single office to be headed by Caron. Plaintiff contends that he was lured away in the fall of 1990 from a position in the Office of Legal Policy at the U.S. Department of Justice ("DOJ") by defendant's representations. Specifically, Caron alleges that Travelers

falsely represented that: (1) it overwhelmingly supported the appeals project; (2) the project had been approved; and (3) a timetable had been established to create the office within six months. He also claims that Travelers wrongfully [*2] failed to disclose critical facts showing that it had not made a corporate decision to centralize and that it was financially unable to pursue the project.

Travelers, on the other hand, maintains that it had no motive to defraud Caron, that Caron proposed the appeals project himself and accepted the position knowing that by "centralization," Travelers meant simply that Caron would have the opportunity to solicit appellate work from Travelers Staff Law Offices ("SLO") throughout New York. Travelers also contends that, even assuming it made material misrepresentations or concealed crucial facts, Caron did not justifiably rely on its statements because he was "desperate" to leave DOJ and would have accepted the job anyway had he known the purported truth.

Travelers moves for summary judgment pursuant to *Fed. R. Civ. P. 56(b)* dismissing plaintiff's sole claim for fraudulent inducement. Travelers argues that there are no triable issues of fact as to any of the following: whether Travelers made any affirmative misrepresentations or fraudulent omissions; whether it acted with the requisite intent to defraud; whether Caron reasonably relied on such representations or omissions; and whether [*3] he suffered any damages.

Defendant thus challenges virtually every aspect of plaintiff's claim. Its criticisms may be justified in at least two respects. First, Caron's evidence of Travelers's intent

to defraud him is thin, for it would appear that Travelers had little or no motivation to fraudulently induce Caron to accept a job that he had proposed himself. Second, Caron's evidence that he reasonably relied on Travelers's purported fraudulent representations is also thin, for Caron accepted a job that he not only proposed, but that he pushed Travelers into creating. Nonetheless, defendant's arguments raise credibility issues that are more appropriately left to a factfinder. Accordingly, defendant's motion must be denied.

## BACKGROUND

Caron, who is an experienced trial and appellate litigator, joined the Office of Legal Policy at DOJ in 1988 as a senior attorney. Changes in the office's structure and goals, however, soon left Caron dissatisfied with his work. From September 1989 to mid-April 1990, Caron took an extended unpaid leave of absence, during which he embarked on an extensive job search. He applied for a wide range of positions in both the private and public sector.

[*4] At a 1990 New Year's Eve party, Caron ran into Samuel F. Simone, a long-time friend who at that time served as the managing partner of Travelers's White Plains SLO. Caron inquired about job opportunities with Travelers, and Simone agreed to look into the possibility of hiring Caron as an appellate attorney for Travelers. Several meetings soon took place, and at one of these meetings Caron pitched an idea to Simone: that Travelers consolidate all of its New York appellate work in a single office and hire Caron to run the office. Simone was apparently intrigued by the idea, and soon began discussing the appeals project with others at Travelers.

Negotiations over the terms of Caron's employment ensued, and discussions involving the appeals project continued. On or about September 7, 1990, Simone telephoned Caron and told him that Travelers had agreed to hire him and had approved implementation of the appeals project. Caron accepted the offer of employment, resigned from DOJ, and began working for Travelers on November 19, 1990. He allegedly then discovered that Travelers was in the midst of a severe corporate downsizing, and that management had never decided to direct all appellate [*5] work to a single office. Over the course of the next year, Caron handled only a handful of appeals.

In November of 1991, Travelers decided to eliminate

Caron's position. Caron was told that the appeals project was "dead" and that his caseload was not sufficiently high to make his continued employment cost-effective.

Caron filed the instant lawsuit on August 16, 1996, alleging fraudulent inducement and seeking compensatory and punitive damages.

This motion followed.

## DISCUSSION

### A. Standards

The principles governing summary judgment motions are well-settled. In evaluating such a motion, a court must determine whether, viewing the record in the light most favorable to the non-moving party, there are disputes as to any material fact. In so doing, the court must draw all reasonable "factual inferences in favor of the party against whom summary judgment is sought." *Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995).*

Where there is a dispute as to any material fact, defendant's motion must be denied. "On a motion for summary judgment, the court is not to weigh the evidence or . . . resolve issues of fact, but only to determine whether or not [*6] there are issues to be tried." *United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).*

To prevail on a claim of fraudulent inducement, a plaintiff must demonstrate that a defendant: (1) misrepresented or wrongfully concealed a material fact; (2) knew that fact to be false or intentionally concealed that fact; (3) intended to induce reliance on the misrepresentation or omission; and (4) in fact induced reliance. *See Skylon Corp. v. Guilford Mills, Inc., 864 F. Supp. 353, 358 (S.D.N.Y. 1994).*

To be actionable, misrepresentations must constitute "representation[s] of present fact." *Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992)* (quoting *Deerfield Communications Corp. v. Chesebrough-Ponds Inc., 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986)).* A "promissory statement as to what will be done in the future" does not give rise to a fraud claim unless the defendant knew at the time the promise was made that it did not intend to keep the promise. *Id.*

### B. Analysis

1998 U.S. Dist. LEXIS 10481, *6; 14 I.E.R. Cas. (BNA) 292

### 1. *Misrepresentations of Existing Fact*

Construing the evidence in the light most favorable to Caron, I conclude that he has identified actionable material representations [*7] of existing fact, including: (1) Simone's statement to Caron that nearly all of the managers of Travelers SLO's believed Caron's proposal to be a good idea and were "enthusiastic" about it, when in actuality they allegedly were either unaware of the plan or hostile to it; (2) Simone's statement that the appeals project, in the form Simone and Caron allegedly had discussed, that is, with its own separate office, budget, and staff, had been approved when in fact it had not been; and (3) Simone's alleged statement that Travelers's plan was to temporarily place Caron in Simone's office and to establish a separate appellate office within six months, when in truth no such timetable existed.

As to the first alleged misrepresentation, Travelers's support for the appeals project arguably would have been material to Caron's decision to accept the post. While Simone purportedly informed Caron that all but one of the SLO managers were enthusiastic about the project, at least four of the SLO managers testified under oath that they did not remember discussing the appeals project with anyone before Caron's hire or feeling enthusiastic or supportive about such a plan. (*See, e.g.,* deCicco Dep. [*8] at 9-10; Jackstadt Dep. at 9-10; Lawlor Dep. at 8; Salkaln Dep. at 20-21). Moreover, Simone himself admits to "shading the facts" about Travelers's supposed support for the project. (Simone Dep. at 147-48). Hence, plaintiff has raised an issue of fact as to whether Simone misrepresented Travelers's support for the appeals project.

As to the second and third alleged misrepresentations, Travelers argues that they were not false because an appeals project in fact had been given the green light. But the issue of falsity turns not on whether some project had been approved, but whether the project, in substantially the same form as understood in communications between Caron and Travelers, had actually been approved and whether a six-month plan had been set at the time the representations were made.

There is substantial evidence in the record supporting plaintiff's understanding of the appeals project. Simone, for example, recommended Caron for employment as an associate counsel for "the special appeals project" geared toward creating a "central appeals unit for [Travelers's

offices within] the State to help reduce referrals to panel counsel." (Def. Exh. N). In a memorandum to Oliver [*9] B. Dickins, Jr., dated November 30, 1990, Simone states that the "primary goal is to establish a separate, self-sufficient appellate office in White Plains," and that "it now becomes necessary (1) to settle the responsibilities of that office, (2) to plan its organization and budget, and (3) to begin as soon as possible with the implementation of that plan." (Def. Exh. R.).

On the other hand, some of Caron's own correspondence with Travelers after accepting the post suggests that he may have accepted the job knowing that the project was in progress and that actual centralization had not been approved. (*See, e.g.,* Letter to Dickins and Kevin T. Hughes, Def. Exh. Y (arguing that "substantial business and legal reasons justify, if not mandate, a vigorous centralized staff appellate capability.")). Additionally, Simone states in his affidavit:

> At no time did I or any other Travelers representative tell Mr. Caron that Travelers would direct all its New York appellate work to him. To the contrary, I made clear to Mr. Caron that the ultimate success of his position would depend on his ability to convince the staff counsel offices to give him their appellate work.

(Simone [*10] Aff. P 9). If this evidence is construed in the manner urged by defendant, a jury could find that Caron knew that the appeals project was never anything more than an experiment. For these reasons, there is a triable issue as to the precise nature and status of the appeals project as the parties understood it at the time Caron was hired. [1]

---

1  Travelers argues that it had no duty to disclose the fact that Caron would have to solicit all of his own appellate work because "it did not know that Caron had mistakenly assumed that Travelers would direct appeals to him." (Def. Mem. at 18). A duty to disclose omitted facts in the course of business negotiations can arise from one party's superior knowledge, not readily available to the other, coupled with that party's awareness that the other is laboring under a mistaken understanding. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984).* The record in this case suggests very strongly that

Page 4

1998 U.S. Dist. LEXIS 10481, *10; 14 I.E.R. Cas. (BNA) 292

Travelers was aware of Caron's understanding of the appeals project and that Caron would not have been privy to Traveler's internal policies regarding centralization and downsizing. The real dispute seems to be whether Caron was actually acting under a mistaken belief.

[*11]  The record also supports a reasonable inference that Travelers never intended to centralize and, in fact, did not have the resources to do so. *See Stewart, 976 F.2d at 89* ("if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact") (quoting *Sabo v. Delman, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906 (1957)).* Oliver B. Dickins, to whom all of the SLO managers reported, testified that he had "an ongoing standing policy of not centralizing anything," and had told Simone that he could not "go off and have some sort of centralized operation, clear as a bell." (Dickins Dep. at 145, 164). It is unclear whether this internal policy or Dickins's sentiment was ever communicated to Caron.

Furthermore, at the time that Caron's terms of employment were being negotiated and the appeals project was being discussed, Travelers allegedly failed to disclose that it was experiencing significant financial strain, had recently laid off attorneys and legal staff, was considering freezing all hiring and prohibiting the opening of new offices, [2] and had begun a review of attorneys' caseloads [*12] with an eye toward further downsizing. [3] Thus, Caron has offered evidence raising an issue of fact as to whether Travelers made statements that it knew were false or promises that it never intended to fulfill.

2   On October 10, 1990, several weeks before Caron began working for Travelers, Travelers imposed a hiring freeze and prohibited any more new office openings.

3   Simone contends that he told Caron that "things were tight" at Travelers. (Simone Dep. at 121). Caron, on the other hand, explicitly denies being told by Simone or any other person affiliated with Travelers before accepting the job that Travelers was undergoing severe financial difficulties. (*See* Caron Aff. P 6). This contradiction in testimony presents a credibility determination for the jury.

Defendant argues that a September 25, 1990 offer

letter from Simone to Caron precludes this action. That letter, which briefly discusses plaintiff's responsibilities, contains the following sentence:

> Your primary responsibility will be [*13] to handle all appeals in cases assigned to our firm from the New York offices of Travelers, with a view to developing a centralized, statewide appellate capability here in White Plains.

(Def. Exh. Q). Defendant insists that this letter shows that it never promised to create a separate appellate unit. The letter, however, is consistent with either party's interpretation of the appeals project. It is certainly consistent with defendant's position that centralization of all appeals was simply a goal. The letter does not, however, purport to explicate all of the terms of, or representations associated with, the appeals project, and does not foreclose plaintiff's contention that he was told that the creation of a single appeals bureau had been approved, and simply needed to be implemented or phased in. Thus, defendant's attempt to secure summary judgment on the basis of this document fails.

### 2. Fraudulent Intent

As to the issue of fraudulent intent, "such questions . . . are usually inappropriate for disposition on summary judgment." *National Union Fire Ins. Co. of Pittsburgh v. Turtur, 892 F.2d 199, 205 (2d Cir. 1989).* There is, in any event, sufficient evidence [*14] in the record to support a finding that Travelers acted with the requisite intent. The absence of any strong evidence of motivation on the part of defendant to defraud plaintiff does undercut his theory of fraud, given that Travelers apparently did not affirmatively recruit Caron, that it was not actively seeking appellate lawyers, and that the idea for the appeals project apparently originated with Caron himself.

Nevertheless, plaintiff has submitted evidence, including the deposition testimony of various Travelers employees and correspondence between Caron and Travelers, suggesting that defendant was aware of plaintiff's understanding of the appeals project but withheld the facts that it never intended to create a separate office or to consolidate its appellate work and was in no financial condition to do so. In addition, there is some evidence, minimal as it may be, that Simone may have been motivated to misrepresent the status of the

1998 U.S. Dist. LEXIS 10481, *14; 14 I.E.R. Cas. (BNA) 292

appeals project to Caron by a desire to reduce operating costs, increase the billable hours of the White Plains SLO, and thus improve his stead with Travelers. (*See, e.g.*, Pl. Exh. V). From this evidence, a reasonable factfinder could conclude [*15] that Travelers misled Caron about the centralization plan, failed to inform him that it could not and would not be fulfilled as it had been discussed, and, accordingly, that Travelers acted out of "conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).*

### 3. *Justifiable Reliance*

As defendant points out, substantial evidence exists to suggest that plaintiff did not justifiably rely on defendant's representations even if they were fraudulent. Caron was apparently unhappy at DOJ, he was on an extended leave of absence, and he was actively seeking new employment. Still, he swears that he would have rejected Travelers's offer of employment and returned to DOJ had he known Travelers's true intentions concerning the appeals project. It is up to a jury to accept or reject his testimony.

Travelers further argues that Caron, as an experienced attorney, had a duty to inquire as to the details of implementation of the appeals project, *i.e.*, whether defendant intended to require its SLO managers throughout the state to send Caron appellate work. Caron, on the other hand, avers that a corporate decision to consolidate was [*16] implicit and integral to the

"centralization" project, and denies that he was ever put on notice of Travelers's true intentions. On these facts, whether Travelers put Caron on notice of its actual intentions, by word or deed, is also for the jury to decide.

### 4. *Damages*

Finally, defendant asserts that, even assuming plaintiff can meet the other elements of fraudulent inducement, he has suffered no quantifiable damages. While the evidence strongly suggests that Caron would have left DOJ at some point in the near future, there is an issue of fact as to how much longer he would have stayed on at DOJ but for Travelers's alleged fraudulent conduct. Hence, summary judgment on the ground that Caron suffered no damages, or merely speculative damages, is inappropriate.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied. The parties shall appear for a pretrial conference on July 24, 1998 at 10:00 a.m.

SO ORDERED.

Dated: New York, New York

July 13, 1998

DENNY CHIN

United States District Judge

LEXSEE 2002 US DIST LEXIS 12977

**PETER CLIFTON, Plaintiff, -v.- VISTA COMPUTER SERVICES, LLC, Defendant.**

**01 Civ. 10206 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 12977*

**July 16, 2002, Decided**
**July 16, 2002, Filed**

**DISPOSITION:**    [*1] Defendant's motion to dismiss granted. Defendant's motion for attorneys' fees granted.

**COUNSEL:** For Peter Clifton, PLAINTIFF: Michael A Bucci, II, Michael A Bucci II, Esq, Lachmont, NY USA.

For Vista Computer Services, LLC, DEFENDANT: Ivan F Blejec, Share & Blejec, LLP, New York, NY USA.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

JOHN S. MARTIN, Jr., District Judge:

This diversity action arises out of the termination of a contractual relationship between Plaintiff, Peter Clifton, and his employer, Vista Computer Services. Plaintiff filed a complaint asserting breach of contract, fraud, negligent misrepresentation, and breach of fiduciary duty and self-dealing. Plaintiff has also moved for attorney's fees and punitive damages. Defendant has moved to dismiss all but Plaintiff's contract claim pursuant to *Fed. R. Civ. P. 9(b)* and *12(b)(6)*. For the reasons set forth below, Defendant's motion is granted.

**Factual Background**

Pursuant to an employment agreement, Defendant hired Plaintiff on or about January 26, 1998 to run Defendant's PubEasy business. PubEasy was a division of Vista that created and sold software and services for electronic ordering in the global publishing industry. (Compl. P 9.)

On [*2] May 10, 1999, Plaintiff and Defendant entered into a second employment agreement. Under the second agreement, Plaintiff continued to act as CEO of the PubEasy Division. (Compl. P 22.) In August 1999, Defendant informed Plaintiff that it was considering operating PubEasy as a separate corporation. Plaintiff asked Defendant to modify his employment agreement.

In August, 2000, Defendant agreed to enter into a third employment agreement (the "Employment Agreement"). Plaintiff was to be employed as CEO of the PubEasy Division until such time as those assets were transferred to a new entity, called PubEasy Delaware. (Compl. P 29.) Prior to the signing of the Employment Agreement, Defendant formed PubEasy.com, Inc., a Delaware Corp. (Compl. P 30), and told Plaintiff that Defendant would transfer the assets of the Division into the new entity. (Compl. P 33.) Defendant also represented that the company was about to secure $ 3 million in financing to fund PubEasy. (Compl. P 34.) They told Plaintiff that these funds would be available to PubEasy Delaware and could be "used solely to finance, grow and develop" PubEasy Delaware. (Compl. P 35.) Defendant also stated that Plaintiff would receive [*3] 5% of the shares of PubEasy Delaware. (Compl. P 38.)

In reliance on these representations, Plaintiff signed the Employment Agreement and worked in the company until April 11, 2001, when he was discharged. (Compl. P 40.)

Case 1:07-cv-10673-RWS    Document 10    Filed 02/08/2008    Page 15 of 24

Page 2
2002 U.S. Dist. LEXIS 12977, *3

**Discussion**

Defendant's motion to dismiss can be granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957))*. The factual allegations set forth in the complaint must be accepted as true, *Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990)*, and all reasonable inferences must be drawn in favor of the plaintiff. *See Thomas v. City of New York, 143 F.3d 31, 37 (2d Cir. 1998)*. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)*.

**I. Fraud**

Plaintiff [*4] alleges that he was fraudulently induced to enter the Employment Agreement when representatives of Vista stated "that Defendant was about to secure a $ 3,000,000 financing commitment to fund the Business." (Compl. P 34.) Defendant also represented "that the proceeds of the Committed Financing would be available to PubEasy Delaware and used solely to finance, grow and develop the Business and PubEasy Delaware." (Compl. P 35.) Plaintiff alleges that Defendant knew these "representations were false and fraudulent when made" (Compl. P 91) and were made "with the intent to induce Plaintiff to enter into the Third Employment Agreement." (Compl. P 87.)

It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996)*. A claim for fraud is actionable, however, if a "party made a misrepresentation, collateral or extraneous to the contract, that induced plaintiff to enter into such a contract." *Four Star Capital Corp. v. Nynex Corp., 183 F.R.D. 91, 109 (S.D.N.Y. 1997)*.

To maintain a claim [*5] for fraud, a plaintiff must allege: "1) the defendant made a material false representation, 2) the defendant intended to defraud the plaintiff thereby, 3) the plaintiff reasonably relied on the representation, and 4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale*

*D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)*.

Applying the liberal pleading rules required on a motion to dismiss, Plaintiff makes out three of the four basic elements of a fraud claim. Plaintiff alleges that Defendant made a material false representation when representatives of Defendant misstated their intention to acquire funding and to give Plaintiff sole discretion to manage it. (Compl. P 34-35.) There is a distinction between "promissory statement[s] as to what will be done in the future, which give rise only to a breach of contract claim, and . . . false representation[s] of present fact, which give rise to a separable claim of fraudulent inducement." *Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992)* (internal citations omitted). Although the promise to allow plaintiff to direct the $ 3 million in [*6] financing seems to be a future promise, "if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact" upon which a fraudulent inducement action may be predicated. *Stewart, 976 F.2d at 89* (citing *Sabo v. Delman, 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906 (1957))*. Liberally construed, Plaintiff's complaint alleges that Vista's promises were false at the time they were made and that Vista had no intention of performing them. Plaintiff also alleges intent (Compl. P 87) and damages (Compl. P 92). Plaintiff also alleges reliance. (Compl. P 88.) [1]

> 1  As discussed below, because the promises on which Plaintiff relied were not extraneous to the contract, Plaintiff cannot prove any set of facts to show his reasonable reliance.

In addition to the basic four elements of a fraud claim, when the fraud is committed to induce someone to sign a contract, Plaintiff must also allege [*7] one of three additional elements to ensure that the party breaching the contract engaged in "deceit independent of the contract." *Volk v. Liggett Group, Inc., 1997 U.S. Dist. LEXIS 2600, 1997 WL 107458, at *3 (S.D.N.Y.). See also Bridgestone/Firestone, 98 F.3d at 19-20*. A plaintiff must allege either "1) a legal duty separate and apart from the contractual duty to perform, 2) a fraudulent representation collateral or extraneous to the contract, or 3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages." *Papa's-June Music, Inc. v.*

*McLean, 921 F. Supp. 1154, 1161 (S.D.N.Y. 1996)* (citations omitted).

In order to determine whether the alleged promises are "collateral or extraneous to the terms of the parties' agreement," the Court needs to look at the contract. [2]

> 2   Although this is a motion to dismiss and the complaint does not have the contract attached, both parties have submitted it; it is referred to extensively in Plaintiff's complaint and the Court can deem it incorporated by reference. *See e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 808-09 (2d Cir. 1996).*

[*8]   The promises that allegedly induced Plaintiff to sign the contract are based on the same facts and subject matter as Plaintiff's claim for breach of contract. *See McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 574 N.Y.S.2d 58, 59 (2d Dept. 1991)* (finding no fraud claim when representations are not collateral to contract). Plaintiff states that he signed the contract because of the promise that he would manage $ 3 million in the PubEasy business. (Compl. P 88.) The contract expressly acknowledges the possibility of acquiring the funding: "the parties hereto acknowledge that Vista and the Company expect that Vista and the Company will succeed in obtaining, directly or indirectly, additional financing in the amount of approximately $ 3,000,000 from existing shareholders of Vista . . . ." Employment Agreement P 3(b)(ii). The contract states that Defendant "expects" to obtain the financing, not that they have already acquired or that they will acquire it. The contract even explicitly deals with the possibility that Vista will not transfer the PubEasy division assets into a new company, and if that eventuality is realized how Plaintiff will be compensated:   [*9]

> In the event that Vista does not transfer the assets and intellectual property of its PubEasy.com division to a new legal entity as contemplated herein and that Vista sells, transfers or otherwise disposes of any or all of its interest in its PubEasy.com division or the assets thereof during the term of this Agreement or within (6) six months after the expiration of the term of this Agreement or the date on which this Agreement is earlier

terminated by Vista or the Company other than for Cause or by the Employee for Good Reason, the Employee shall be entitled to receive 5% of the gross proceeds thereof.

Employment Agreement P 8(d).

The only alleged promise that comes close to being collateral to the subject matter of the contract is the promise that the $ 3 million in financing "would be available to PubEasy Delaware and used solely to finance, grow and develop the Business and PubEasy Delaware." (Compl. P 35.) Nonetheless, a promise that the financing will be available solely to PubEasy depends on there being financing. The contract specifically deals with the possibility that there will not be financing. If the contract acknowledges the possibility that there will be [*10] no financing, a promise about what will happen to that financing cannot be "extraneous" to the contract.

In a similar case, *Advanced Marine Techs., Inc. v. Burnham Sec., Inc., 16 F. Supp. 2d 375, 382 (S.D.N.Y. 1998)*, Judge Kaplan found that when a company promised to find investors and failed to live up to its promise, plaintiff had "merely append[ed] allegations about [defendant's] state of mind to the claim for breach of contract." (citing *Met. Transp. Auth. v. Triumph Adv. Prods., Inc., 116 A.D.2d 526, 497 N.Y.S.2d 673, 675 (1st Dept. 1986).* But when the company also stated that they had investors who had responded positively, this statement went beyond a best efforts promise and the alleged misrepresentation was sufficiently collateral at the pleading stage to maintain the claim. *Advanced Marine, 16 F. Supp. 2d at 383.* In the instant case, Plaintiff alleges only that Defendant said they were about to secure the financing and that Plaintiff would have control over it. There are no allegations of collateral promises made that went beyond what was specifically stated in the contract expressing the company's belief and expectation [*11] that it was about to obtain financing. (Compl. P 34.)

When a promise is not extraneous to the terms of the contract, a plaintiff with this level of business sophistication cannot make out a claim that he reasonably relied on those promises. *Republic Nat'l Bank v. Hales, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999), aff'd HSBC Bank v. Hales, 4 Fed. Appx. 15, 2001 WL 99830 (2d Cir. )*("any reliance by . . . a sophisticated businessman, upon

representations contrary to the plain language of the agreements he was signing would therefore be patently unreasonable"). "Under New York law, reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" *Republic Nat'l Bank, 75 F. Supp. 2d at 315* (citing *Villa Marin Chevrolet v. General Motors Corp., 1999 U.S. Dist. LEXIS 17972, 1999 WL 1052494,* *5 (E.D.N.Y.). See also Emergent Capital Invest. Mgmt, LLC v. Stonepath Group, 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001)*(citing *Harsco Corp. v. Segui, 91 F.3d 337, 345 (2d Cir. 1996); Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 94-95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985)*. [*12] This Plaintiff cannot maintain a claim for reasonable reliance on an oral representation that he would be solely responsible for managing the $ 3 million dollars in soon-to-be obtained financing when the contract includes a provision detailing what will happen if the company does not obtain the financing.

Because Plaintiff's promises are not extraneous to the contract and he cannot, as a reasonably sophisticated businessman, rely on them, Plaintiff fails to make out the initial reliance element of his fraud claim. The Court does not need to reach whether he alleges either of the other two extra elements--a duty separate from the contract or special damages--of a fraudulent inducement claim, because he has failed to make out the reliance element of his fraud action. For this reason, Defendant's motion to dismiss Plaintiff's fraudulent inducement claim is granted.

## II. Negligent Misrepresentation

Plaintiff alleges that Defendant misrepresented that Vista was about to obtain $ 3 million in funding. When the alleged misrepresentation is a promise and not a statement of fact, "a special relationship must exist between the parties in order for a promissory misrepresentation to [*13] give rise to a justiciable claim." *Philips Credit Corp. v. Regent Health Group, Inc., 953 F. Supp. 482, 523 (S.D.N.Y. 1997)*(citing *Frutico, S.A. de C.V., Inc. v. Bankers Trust Co., 833 F. Supp. 288, 300 (S.D.N.Y. 1993)). See also Stewart, 976 F.2d at 90.* Plaintiff has alleged no facts to support a claim of a fiduciary relationship between the parties and Defendant's motion is granted.

## III. Punitive Damages

Defendants also move that Plaintiff's claim for punitive damages be dismissed. The prevailing standard is set out in *Rocanova v. Equitable Life Assurance Soc'y of the United States, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994).* Punitive damages are not available for ordinary breach of contract. "Where the breach of contract also involves a fraud evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, punitive damages are recoverable if the conduct was aimed at the public generally." *Rocanova, 83 N.Y.2d at 613.* Plaintiff has failed to state a claim for fraud and Plaintiff has alleged no [*14] facts indicating a harm to the public generally. Therefore, Defendant's motion with respect to punitive damages is granted.

## IV. Breach of Fiduciary Duty and Self-Dealing

Plaintiff also alleges a breach of fiduciary duty. The complaint states that "defendant, as the majority shareholder in PubEasy Delaware, was required to adhere to fiduciary standards of conduct and exercise its responsibilities in good faith when undertaking the Asset Transfers." (Compl. P 102.) Plaintiff further alleges that Defendants transferred assets from PubEasy Delaware to PubEasy Limited and assigned less than the fair market value for those assets.

Under Delaware law, if a claim alleges a breach of fiduciary duty resulting in a loss of stock value to a company, "the alleged wrongdoing harms the corporation and therefore--because they own the corporation--the shareholders derivatively." *Weinberger v. Lorenzo, 1990 Del. Ch. LEXIS 169, 1990 WL 156529,* at *2 (Del. Ch.). In order to assert a direct action, a shareholder must allege "special injury." *In re Ionosphere Clubs, Inc. v. Am. Nat'l Bank & Trust Comp., 17 F.3d 600, 604 (2d Cir. 1994).* Special injury has [*15] evolved into a two-prong test under *Moran v. Household Int'l, Inc., 490 A.2d 1059, 1070 (Del. Ch.), aff'd 500 A.2d 1346 (1985).* The plaintiff must either allege "(1) an injury which is separate and distinct from that suffered by other shareholders, or (2) a wrong involving a contractual right of a shareholder, which exists independent of any right of the corporation." *Weinberger, 1990 Del. Ch. LEXIS 169, 1990 WL 156529,* at *3. See also, In re Ionosphere, 17 F.3d at 604; Byington v. Vega Biotechnologies, Inc., 869 F. Supp. 338, 344 (D. Md. 1994).*

While Plaintiff did suffer an injury that the majority shareholders did not suffer in that the majority shareholders owned the corporation into which the

PubEasy Delaware assets were transferred, this does not constitute a "special injury" under Delaware law. Delaware law is clear that when plaintiff's "primary claim is that defendants' actions reduced the value of their stock and stock options," the remedy is a shareholder derivative action. *Byington, 869 F. Supp. at 344*. In *In re Ionosphere Clubs, Inc.,* the Second Circuit, applying Delaware law, faced a strikingly [*16] similar situation. In that case, plaintiffs tried to allege special injury by alleging that the transfer of assets impacted them differently from other shareholders because other shareholders had an interest in the company into which the assets were transferred. *In re Ionosphere Clubs, 17 F.3d at 604*. The court found that because all the shareholders suffered the same injury "in their role as shareholders," the action had to be brought derivatively. *Id. at 603-04*. It did not matter that some of the shareholders might have recouped their loss in their role in another company; as the shareholder in the transferring company all shareholders were harmed with the loss in value of their stock. *Id. at 604*. *See also, Moran v. Household Int'l, Inc., 490 A.2d 1059, 1070 (Del. Ch. 1985); Solow v. Stone, 994 F. Supp. 173, 179 (S.D.N.Y. 1998)*("if the harm is to the corporation and therefore affects the entire corporate structure, an individual plaintiff has not suffered a particularized injury"). Plaintiff, therefore, does not have an individual action for breach of fiduciary duty.

### V. Attorney's Fees

[*17]  Defendant has moved to have Plaintiff's claim for attorney's fees dismissed. The Employment Contract states that:

> The Company and Vista agree to pay, to the full extent permitted by law, all legal fees and expenses which the Employee may reasonably incur as a result of any litigation brought by the Company and/or

> Vista contesting the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereunder.

Employment Agreement P 10.

Defendant argues that the paragraph is unambiguous and an obligation to pay fees only arises if the Company instigates the litigation. Plaintiff argues that such a reading makes no sense because there is no reason why the Defendant would bring an action against Plaintiff. Plaintiff argues that to give meaning to the paragraph, one has to read the contract to say that Vista is liable for attorney's fees "as a result of any litigation brought **[by reason of]** the Company and/or Vista contesting . . . liability under . . . the contract."

The Court finds this argument unconvincing. The Employment Agreement includes a covenant not to compete, thus providing a plausible explanation [*18] for why Vista might sue the Plaintiff. When the language of the contract is unambiguous, the Court should not add language to change the meaning. *Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000)*(citing cases). Therefore, Defendant's motion is granted with respect to attorney's fees.

For the reasons stated above, Defendant's motion is granted.

### SO ORDERED.

Dated: New York, New York

July 16, 2002

JOHN S. MARTIN, JR., U.S.D.J

LEXSEE 2004 US DIST LEXIS 14382

**CONCORDE FINANCIAL CORP., Plaintiff, -v- VALUE LINE, INC. and JEAN B. BUTTNER, Defendants.**

**03 Civ. 8020 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 14382*

**July 26, 2004, Decided**
**July 28, 2004, Filed**

**SUBSEQUENT HISTORY:** Related proceeding at *Concorde Funds, Inc. v. Value Line, Inc., 2004 U.S. Dist. LEXIS 24676 (N.D. Tex., Dec. 8, 2004)*

**PRIOR HISTORY:** *Concorde Fin. Corp. v. Value Line, Inc., 2004 U.S. Dist. LEXIS 2040 (S.D.N.Y., Feb. 10, 2004)*

**DISPOSITION:**    [*1] Defendant's motion to dismiss granted in part and denied in part.

**COUNSEL:** For Concorde: Martin E. Karlinsky, Esq., Katten Muchin Zavis Rosenman, New York, NY.

For Concorde: Hugh Edward Hackney, Esq., Locke Liddell & Sapp LLP, Dallas, TX.

For Value Line: Joel Miller, Esq., Miller & Wrubel, PC, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

*MEMORANDUM and ORDER*

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

Concorde Financial Corporation ("Concorde") brought suit against Value Line, Inc. ("Value Line") and Jean B. Buttner ("Buttner"), President and Chief Executive Officer of Value Line, for breach of contract and fraud. [1] These claims arose out of a proposed transaction in which Value Line was to become investment advisor for the Concorde Value Fund (the "Fund"), a fund originally managed and advised by Concorde, while Concorde was to become sub-advisor to the fund. Value Line moved to dismiss Concorde's breach of contract claim on the grounds that it fails to adequately state a claim, and moved to dismiss Concorde's fraud [*2] claim on the grounds that it is not sufficiently distinct from Concorde's breach of contract claim and that it is not pled with sufficient particularity. Oral argument on defendants' motion to dismiss was heard on July 14, 2004. For the reasons set forth below, defendants' motion is granted in part and denied in part.

1    There are currently three lawsuits, including this one, concerning the dispute that is the subject of this Memorandum and Order. As explained in *Concorde Fin. Corp. v. Value Line, Inc., 2004 U.S. Dist. LEXIS 2040, No. 03 Civ. 8020 (NRB), 2004 WL 287658 (S.D.N.Y. Feb. 11, 2004)* ("*Concorde I*"), Concorde's suit against Value Line in this District was shortly preceded by an action of Value Line's against Concorde (seeking various declarations) initiated in the Supreme Court of the State of New York. That state suit was removed by Concorde to this District a day after Concorde filed this instant action against Value Line. Value Line's action against Concorde

Case 1:07-cv-10673-RWS    Document 10    Filed 02/08/2008    Page 20 of 24

Page 2
2004 U.S. Dist. LEXIS 14382, *2

is docketed at 03 Civ. 8035 (NRB). Value Line's effort to have its suit remanded to the state court and Concorde's action consequently dismissed for procedural reasons was rejected in *Concorde I.* The third lawsuit involving Value Line and the transaction underlying this action was brought by Concorde Funds, Inc., in the Northern District of Texas, Dallas Division, in April of 2003 (*see Concorde Funds v. Value Line, Inc., et al.,* 3-04-CV-678D (N.D. Tex.) (the "Texas Action"). An application to stay the Texas Action was denied by this Court during a phone conference on May 19, 2004. The parties have represented that a motion to transfer venue to this District is currently pending in the Texas Action.

[*3] *BACKGROUND*

**A. Concorde's Allegations**

The following facts are drawn from Concorde's Amended Complaint and are taken to be true for the purposes of this motion. On October 31, 2002, Value Line and Concorde executed a written agreement, the "Fund Advisors Agreement" providing that Value Line would assume operational and accounting responsibilities for the Concorde Value Fund pursuant to a subsidiary agreement, the "Investment Advisory Agreement," while Concorde would manage the assets of the Fund pursuant to a different subsidiary agreement, the "Sub-Advisory Agreement." Specifically, Section 2.1 of the Fund Advisors Agreement provides that:

> Value Line shall execute with the Fund an Investment Advisory Agreement attached hereto as Exhibit A (the "Investment Advisory Agreement"), and pursuant to the Investment Advisory Agreement but subject to the Sub-Advisory Agreement referred to in Section 2.2 of this Agreement, Value Line will assume all operational and accounting responsibilities for the Fund.

Compl., Ex. A, Fund Advisors Agreement § 2.1. And Section 2.2 of the Fund Advisors Agreement states:

> Value Line and Concorde shall execute a Sub-Advisory [*4] Agreement with the Fund attached hereto as Exhibit B (the "Sub-Advisory Agreement"), and

Concorde, pursuant to the Sub-Advisory Agreement, will manage the assets of the Fund.

Compl., Ex. A, Fund Advisors Agreement § 2.2.

The obligations of both parties under Sections 2.1 and 2.2 are conditioned on approval from the Fund's shareholders and board. For this reason, the parties agreed to use commercially reasonable efforts to obtain the approval of the Fund's shareholders and board. Compl., Ex. A, Fund Advisors Agreement § 2.3.

The Fund Advisors Agreement also contains a section on indemnification which states, "in the management of the Fund pursuant to the Advisory Agreement and Sub-Advisory Agreement ... [each party] shall indemnify the other from and against judgments and associated legal costs ... resulting from the indemnifying party's acts or omissions." Compl., Ex. A, Fund Advisors Agreement § 2.7. With regard to liability, the attached "Sub-Advisory Agreement" states that "in the absence of willful misfeasance, bad faith, gross negligence or reckless disregard of obligations or duties hereunder on the part of the Sub-Advisor, Sub-Advisor shall not be liable for any [*5] act or omission." [2] Comp., Ex. B, Sub-Advisory Agreement P 10.

> [2] The Sub-Advisory Agreement was signed by both parties, but according to Concorde it was signed in error since one of the signatories to the agreement, the "Value Line Value Fund", had not even come into existence.

Concorde claims that the standard of indemnification was an important and material issue, and that throughout negotiations Buttner repeatedly agreed that Concorde would only be required to indemnify the Fund for acts of gross negligence. Concorde contends that after the execution of the Fund Advisors Agreement, Concorde attempted to comply with the terms of the contract, expending considerable time and money to place itself in a position to proceed and preparing to elicit shareholder approval of the management changes. [3] First Am. Compl., P 20. Despite these efforts, Value Line refused to proceed with the agreement, and instead informed Concorde that it would not complete the transaction unless Concorde agreed to change the standard [*6] of indemnification in the Sub-Advisors Agreement from gross negligence to negligence. First Am. Compl., P 21.

2004 U.S. Dist. LEXIS 14382, *6

3    In addition, Concorde claims that Buttner required it to shut down a second fund it managed, the Concorde Income Fund, as a condition precedent to entering the Fund Advisors Agreement. First Am. Compl., P 19. Concorde does not allege that any of the written agreements obligated Concorde to close its Income Fund.

**B. Concorde's Claims**

Concorde alleges that Value Line's refusal to proceed constitutes breach of contract because: 1) Value Line failed to become the investment advisor to the Fund; 2) Value Line did not allow Concorde to become the sub-advisor to the Fund; and 3) Value Line did not allow Concorde to earn advisory fees as sub-advisor to the fund. First Am. Compl., PP 27, 28.

Furthermore, Concorde alleges that Value Line committed fraud because it never intended to accept gross negligence as the standard of indemnification for Concorde. Rather, during negotiations Value Line said [*7] it would accept gross negligence as the standard in order to induce Concorde to execute the Fund Advisors Agreement. However, once Concorde had executed and detrimentally relied on the agreement, Value Line intended to, and did in fact refuse to proceed unless Concorde accepted the negligence standard instead. In other words, Concorde argues that Value Line misrepresented its intentions at the time of contracting, and if Concorde had known the true state of Value Line's intentions, it would never have entered into the contract.

Value Line moves to dismiss both claims on the grounds that neither is adequately pled and the fraud claim duplicates the contract claim.

*DISCUSSION*

**I. Standard for Motion to Dismiss**

In considering a motion to dismiss, we accept as true all material factual allegations in the complaint. *Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).* We may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* [*8] In addition to the facts set forth in the complaint, we may

also consider documents attached thereto and incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 67 (2d. Cir. 1998).*

**II. Adequacy of Concorde's Contract Claim**

Value Line moves to dismiss Concorde's breach of contract claim on the grounds that it is vague and conclusory and therefore fails to state a cause of action. Specifically, Value Line contends that Concorde fails to allege any provision of the contract that Value Line breached or any action by Value Line in breach of the contract, that Concorde failed to perform its obligations under the contract and is therefore precluded from bringing a breach of contract claim, and that Concorde fails to specifically allege how it has been damaged by Value Line's breach.

To establish a claim for breach of contract under New York law a plaintiff must allege four elements: "(1) formation of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff." [4] *Bonnie & Company Fashions, Inc. v. Bankers Trust Company, 945 F. Supp. 693, 711 (S.D.N.Y.1996).* [*9]

4    The parties do not dispute that a contract, the Fund Advisors Agreement, existed between them.

The parties most seriously dispute the performance elements of Concorde's claim: performance by Concorde and non-performance by Value Line. Concorde contends that it did everything within reason to perform its contractual obligations and "expended considerable time and money... to place itself and the Fund in a position to proceed as promised, including preparing to solicit shareholder approval of the management changes." First Am. Compl., P 20. Furthermore, Concorde alleges that Value Line breached the Fund Advisors Agreement by refusing to proceed with the transaction. According to Concorde, "Buttner advised Concorde that Value Line would not perform... unless Concorde would, among other things, change the agreed upon indemnification standard." First Am. Compl., P 21. Furthermore, Value Line failed to perform specific obligations required by the contract, such as become the investment advisor to the Fund. First [*10] Am. Compl., PP 27, 28.

Concorde's pleadings sufficiently allege non-performance by Value Line. However, it requires

2004 U.S. Dist. LEXIS 14382, *10

closer scrutiny to determine whether the performance Concorde claims to have undertaken is sufficient to support its breach of contract claim. Value Line contends that Concorde itself failed to perform because it failed to actually solicit shareholder approval for the agreement. According to Value Line, since shareholder approval was a condition precedent to performance by Value Line, Concorde's failure relieved Value Line of any duty to proceed with the transaction and prevents Concorde from bringing this contract claim. Def. Mem. at 10.

However, under New York law, "where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent." *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc., 135 A.D.2d 891, 522 N.Y.S.2d 292, 293 (3d Dep't 1987)* (holding that plaintiff had no duty to perform the remaining condition precedent and could establish breach by defendant when defendant "refused to perform according to the terms of the agreement.") *See also* [*11] *Allbrand Discount Liquors, Inc., Respondent, v. Times Square Stores Corp., 60 A.D.2d 568, 399 N.Y.S.2d 700; 60 A.D.2d 568, 399 N.Y.S.2d 700, 701 (2d Dep't 1977); Special Situations Fund III, L.P. v. Versus Tech., 227 A.D.2d 321, 642 N.Y.S.2d 894 (1st Dep't 1996); Palazzetti Import/Export, Inc. v. Morson, 2001 U.S. Dist. LEXIS 20243, at *27-29 (S.D.N.Y Dec. 6, 2001)* (concluding that under New York law, plaintiff is not required to satisfy conditions precedent when defendant makes clear it will only perform if "extracontractual" conditions are satisfied.) [5]

5   Value Line cites to *A.H.A. Gen. Constr. v. New York City Hous. Auth., 92 N.Y.2d 20, 31, 699 N.E.2d 368, 677 N.Y.S.2d 9 (1998)* for the proposition that the "relevant inquiry is ... whether the [defendant's] misconduct prevented or hindered" the plaintiff's performance of the condition precedent. Under this proposition the relevant question becomes: what types of actions on the part of the defendant are deemed to 'prevent or hinder' performance of conditions precedent? The court in *A.H.A. General Construction* found that the defendant's possible misconduct with respect to a few provisions (of a contract that was largely performed by both parties) was not severe enough to excuse the plaintiff's non-compliance with contractual notice and reporting requirements. *Id. at 33-34.* However, as explained above, New York courts

hold that when a defendant completely refuses to perform under the terms of the contract, the defendant's behavior does excuse a plaintiff from satisfying conditions precedent.

[*12]   At this stage, Concorde's allegation of Value Line's refusal to perform sufficiently establishes that its own performance of the condition precedent would have been futile. Furthermore, as a matter of policy, once one party has made clear it will not proceed with the contract there is no reason to require the other party to perform obligations that would be futile or even injurious. Had Concorde proceeded to solicit shareholder agreement knowing that Value Line intended to breach the contract, it might have wasted considerable time and money, eroded the confidence of its shareholders and further damaged its reputation. [6] A plaintiff should not be required to doggedly pursue a contract that is no longer viable when doing so would, at the very least, cause embarrassment and difficulty for the plaintiff while achieving nothing useful.

6   *See* First Am. Compl., P 24. ("By reason of the acts and omissions of defendants, Concorde has sustained... great damage to its outstanding reputation in the investment community.").

[*13]   Neither New York law nor policy considerations required Concorde to solicit shareholder approval in order to sustain its contract claim. Concorde has sufficiently alleged both that it performed and that Value Line failed to perform.

Finally, Concorde adequately alleges damages, the fourth element of its breach of contract claim. Concorde asserts that it incurred substantial costs in preparing to meet its contractual obligations, in preparing to elicit shareholder approval, and in closing down its other fund, the Concorde Income Fund. First Am. Compl., PP 19, 20, 23, 29. According to Concorde, these losses totaled at least $ 5,000,000. *Id.,* P 29.

For the above reasons, Concorde has adequately pled its claim for breach of contract and Value Line's motion to dismiss the claim is denied.

### III. Adequacy of Concorde's Fraud Claim

Value Line moves to dismiss Concorde's fraud claim on the grounds that is not sufficiently distinct from its breach of contract claim and it is not pled with the

2004 U.S. Dist. LEXIS 14382, *13

specificity required by *Fed. R. Civ.P. 9(b)*.

To prove fraud under New York law, "a plaintiff must show that (1) the defendant made [*14] a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)* (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Sys., Inc., 98 F.3d 13 (2d Cir. 1996))*. In addition, a fraud claim must be "sufficiently distinct from the breach of contract claim," *Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996)*, and "a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise." *Id. at 1160* (citing cases). When a fraud claim is brought based on the same circumstances that give rise to a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract ... or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract ... or (iii) seek special damages that [*15] are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, 98 F.3d 13, 20* (omitting citations). On the other hand, in some circumstances "a misrepresentation of a present fact that induces a party to enter into a contract is actionable as fraud." *Gulf Coast Dev. Group v. Lebror, 2003 U.S. Dist. LEXIS 21740, at *18 (S.D.N.Y. Dec. 3, 2003)*.

Concorde maintains that Value Line committed fraud by falsely claiming that it would only require Concorde to indemnify the Fund for acts of gross negligence, while knowing that once Concorde had executed and detrimentally relied on the Fund Advisors Agreement, it would refuse to proceed with the transaction unless Concorde agreed to change the standard to simple negligence. In other words, Value Line was supposedly untruthful because it said it intended to perform even if the indemnification standard were gross negligence, when really it intended to breach if the indemnification standard remained gross negligence. Value Line's harmful act was not that it requested a change to the indemnification standard, but that it refused to proceed with the agreement. Concorde's allegation [*16] fails to establish fraud as it is only a slightly more elaborate way of saying that Value Line misrepresented its willingness and intent to perform the contract. *See Papa's-June*

*Music, Inc., 921 F. Supp. 1154, 1162*.

Furthermore, Concorde's fraud allegation is distinguishable from those in which one party misrepresents its state of mind with regard to actions other than those explicitly covered by the contract. *See Buy This, Inc. v. MCI Worldcom Communications, Inc., 209 F. Supp.2d 334 (S.D.N.Y. July 16, 2002)* (allowing fraud claim when plaintiff alleged that defendant failed to disclose its intent to resell airtime minutes, the contract between the parties did not forbid reselling minutes, and plaintiff did not allege breach of contract); *Deerfield Communications Corp. v. Chesebrough-Ponds Inc., 68 N.Y.2d 954, 502 N.E.2d 1003, 510 N.Y.S.2d 88 (1986)* (allowing fraud claim when defendant falsely claimed that it would not sell plaintiffs products in certain markets, the contract between the parties did not contain any geographical restrictions, and plaintiff's contract claim for violating the geographical restrictions was dismissed). In those cases the misrepresentations [*17] were collateral or extraneous to the contracts, as were the alleged bad acts of the defendants, and therefore the fraud claims did not duplicate breach of contract claims. Here, the alleged misrepresentation concerns a contractual provision, and the defendants' only harmful act was refusing to proceed with the contract. Defendants' conduct therefore supports a contract but not a tort claim.

Concorde's claim is also distinguishable from those in which the defendant misrepresented facts (about things other than its state of mind) in circumstances where the defendant had a legal duty independent of its duty to perform the contract. *See Tomoka Re Holdings, Inc. v. Loughlin, 2004 U.S. Dist. LEXIS 8931, 2004 WL 1118178, at *5 (S.D.N.Y. May 19, 2004)* (allowing fraud claim when defendant may have had a duty to disclose potential liability of company under reinsurance agreement); *RKB Enterprises Inc. v. Ernst & Young, 182 A.D.2d 971, 972, 582 N.Y.S.2d 814 (1992)* (upholding fraud claim when "defendants were deliberately misleading and fraudulent" and "defendants knew plaintiff was relying upon their special knowledge and skill when they rendered their opinions"). When an independent duty [*18] exists, a fraud claim may arise even when the alleged misconduct also supports a claim for breach of contract. *See Pfizer, Inc. v. Stryker Corp., 2003 U.S. Dist. LEXIS 11974, 2003 WL 21660339, *1 (S.D.N.Y. July 15, 2003)* ("Where, as here, a party warrants and represents a present existing fact, there simply is no reason why it should not have a remedy in

2004 U.S. Dist. LEXIS 14382, *18

contract for breach of the warranty and a remedy in tort for deliberate, fraudulent misrepresentation ...").

New York law recognizes three situations in which a party has an independent duty to be truthful, "first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Tomoka, 2004 U.S. Dist. LEXIS 8931, 2004 WL 1118178, at *4* (citing *Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993))*. None of these circumstances apply to the [*19] present arms-length transaction, and Value Line did not have any independent duty to be truthful about its intentions regarding the indemnification standard or its willingness to proceed with the transaction.

Since Concorde does not allege misrepresentations independent or collateral to its contract with Value Line, its fraud claim is not sufficiently distinct from its breach of contract claim, and is therefore dismissed. [7]

7   Because we conclude that Concorde's fraud claim is not sufficiently distinct from its breach of contract claim we do not examine whether it is stated with the particularity required by *Fed. R. Civ. P. 9(b)*.

## CONCLUSION

For the foregoing reasons, Value Line's motion to dismiss with respect to Concorde's contract claim is denied, and its motion to dismiss with respect to Concorde's fraud claim is granted. The parties are directed to submit for so ordering a discovery schedule consistent with that proposed in plaintiff's counsel's letter to [*20] the Court of July 2, 2004.

**IT IS SO ORDERED.**

DATED: New York, New York

July 26, 2004

NAOMI REICE BUCHWALD

United States District Judge

LEXSEE 2007 US DIST LEXIS 12557

**ALLAN GREEN, HANA GREEN, WHITE BUFFALO, LLC, DEAN JANSSEN, KATHLEEN JANSSEN, JAMES MICHAEL DUNIGAN, NENA M. DUNIGAN, ABILENE TRADING, LLC, CHRIS MALETIS, SUSAN E. MALETIS, JAMES D. INGSTAD, VICTORIA S. INGSTAD, THOMAS E. INGSTAD, FARGO TRADING, LLC, and TEI TRADING, LLC, Plaintiffs, -against- ANDREW D. BEER and SAMYAK C. VEERA, Defendants.**

06 Civ. 4156 (KMW)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 12557; 99 A.F.T.R.2d (RIA) 1207*

February 18, 2007, Decided
February 22, 2007, Filed

COUNSEL: [*1] For Allan Green, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Allan Green, Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Allan Green, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Allan Green, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Allan Green, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Hana Green, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Hana Green, Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Hana Green, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Hana Green, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Hana Green, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Dean Janssen, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Dean Janssen, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, [*2] Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Dean Janssen, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Dean Janssen, Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For Dean Janssen, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Kathleen Janssen, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Kathleen Janssen, Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Kathleen Janssen, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

2007 U.S. Dist. LEXIS 12557, *2; 99 A.F.T.R.2d (RIA) 1207

For Kathleen Janssen, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Kathleen Janssen, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For James Michael Dunigan, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For James Michael Dunigan, Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For James Michael Dunigan, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco [*3] @ Canada, LLP, Dallas, TX.

For James Michael Dunigan, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For James Michael Dunigan, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Nena M. Dunigan, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Nena M. Dunigan, Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Nena M. Dunigan, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Nena M. Dunigan, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Nena M. Dunigan, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Abilene Trading, L.L.C., Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Abilene Trading, L.L.C., Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Abilene Trading, L.L.C., Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Abilene Trading, L.L.C., Plaintiff: Othni Lathram, LEAD [*4] ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Abilene Trading, L.L.C., Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Chris C. Maletis, III, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Chris C. Maletis, III, Plaintiff: Jeffrey H. Daichman, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Chris C. Maletis, III, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Chris C. Maletis, III, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Chris C. Maletis, III, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Kristine K. Maletis, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Kristine K. Maletis, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Kristine K. Maletis, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Kristine K. Maletis, Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For Kristine K. Maletis, Plaintiff: [*5] Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Thomas M. Maletis, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Thomas M. Maletis, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Thomas M. Maletis, Plaintiff: Othni Lathram, LEAD

2007 U.S. Dist. LEXIS 12557, *5; 99 A.F.T.R.2d (RIA) 1207

ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Thomas M. Maletis, Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For Thomas M. Maletis, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Susan E. Maletis, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Susan E. Maletis, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Susan E. Maletis, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Susan E. Maletis, Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For Susan E. Maletis, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For James D. Ingstad, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco [*6] @ Canada, LLP, Dallas, TX.

For James D. Ingstad, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For James D. Ingstad, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For James D. Ingstad, Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For James D. Ingstad, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Thomas E. Ingstad, Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Thomas E. Ingstad, Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Thomas E. Ingstad, Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Thomas E. Ingstad, Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For Thomas E. Ingstad, Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Fargo Trading, L.L.C., Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For Fargo Trading, L.L.C., Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, [*7] Dallas, TX.

For Fargo Trading, L.L.C., Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For Fargo Trading, L.L.C., Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For Fargo Trading, L.L.C., Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For TEI Trading, L.L.C., Plaintiff: David R. Deary, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For TEI Trading, L.L.C., Plaintiff: Jeven R. Sloan, LEAD ATTORNEY, Deary Montgomery Defco @ Canada, LLP, Dallas, TX.

For TEI Trading, L.L.C., Plaintiff: Othni Lathram, LEAD ATTORNEY, Whatleydrake, L.L.C., Birmingham, AL.

For TEI Trading, L.L.C., Plaintiff: Jeffrey H. Daichman, Kane Kessler, P.C., New York, NY.

For TEI Trading, L.L.C., Plaintiff: Othni J. Lathram, Kane Kessler, P.C., New York, NY.

For Andrew D. Beer, Defendant: Robert Alan Abrams, LEAD ATTORNEY, Katsky Korins, LLP, New York, NY.

For Samyak C. Veera, Defendant: Megan Lynn Brackney, LEAD ATTORNEY, Kostelanetz & Fink, LLP, New York, NY.

**JUDGES:** Kimba M. Wood, United States District Judge.

**OPINION BY:** KIMBA M. WOOD

2007 U.S. Dist. LEXIS 12557, *7; 99 A.F.T.R.2d (RIA) 1207

## OPINION

OPINION AND ORDER

KIMBA M. WOOD, U.S.D.J.:

[*8] Plaintiffs, thirteen individuals and four limited liability corporations, invested in a tax-shelter scheme promoted by Defendants Andrew D. Beer and Samyak C. Veera. Defendants allegedly advised Plaintiffs that the scheme would generate both real profits and lawful capital losses. The IRS disallowed Plaintiffs' claimed tax savings, however, and it forced Plaintiffs to pay a substantial settlement. Plaintiffs have now filed suit, alleging unjust enrichment, breach of fiduciary duty, fraud, negligent misrepresentation, and civil conspiracy.

Both Defendants have moved to dismiss all counts, pursuant to *Federal Rules of Civil Procedure 9(b), 12(b)(1), 12(b)(6),* and *12(b)(7).* For the following reasons, the motions are granted in part and denied in part.

### *BACKGROUND*

The Court assumes the following facts, drawn from the Complaint, to be true for purposes of these motions to dismiss. Plaintiffs are individuals and corporations residing in California, Delaware, Florida, North Dakota, Oregon, Texas, and [*9] Canada. [1] (Compl. PP 4-12.) In 2000, associates of Defendants (either Deutsche Bank or various accounting firms) approached Plaintiffs with an investment proposal known as the "COINS Strategy." (*Id.* PP 15 n.2, 36.) After Plaintiffs expressed initial interest, the firms arranged meetings between Plaintiffs and Defendants to explain the strategy in greater detail. (*Id.* P 36.) Defendants described the COINS Strategy as a legitimate type of foreign currency transaction that bore little risk of loss but had the potential to generate large profits and significant tax advantages. [2] (Id. P 36-37.) Defendants offered Plaintiffs an opinion letter from a tax law firm to confirm the legality of the transaction; Plaintiffs accepted, and paid the law firm a large fee. (*Id.* P 41.) Relying on Defendants' assurances, Plaintiffs then agreed to engage in the strategy. (*Id.* P 28.) The strategy, however, was designed principally to reap large fees from Plaintiffs. (*Id.* PP 30, 79.) Defendants knew or should have known that, in reality, the COINS Strategy was a transaction without economic substance that had no reasonable possibility of turning a genuine profit. (*Id.* P

27.) They [*10] also knew or should have known that the IRS considered the COINS Strategy improper and would disallow Plaintiffs' claimed tax losses. (*Id.* PP 60-64.)

> 1    The Complaint does not clearly specify the principal places of business of Plaintiffs Abilene Trading, LLC and White Buffalo, LLC. Any Amended Complaint should more precisely state the citizenship of all Plaintiffs.
>
> 2    Although the intricacies of the COINS Strategy are not relevant to this motion to dismiss, some background may be helpful for understanding Plaintiffs' claims. The strategy is one of a family of tax shelters commonly known by the name "Son of BOSS." COINS investors bought and sold offsetting pairs of options related to foreign currency exchange rates on given future dates. The investments were designed to ensure that the gain to the investors from the first option was matched by the loss to the investors from the second option, resulting in zero actual profit or loss. The investors then transferred the options to a partnership, increasing the basis of their partnership interest by the value of the option purchased but *not* decreasing it by the value of the option sold. After the expiration of the options, the investors asked to be redeemed out of the partnership in exchange for stock. They then sold the stock and claimed the resulting drop in basis as a capital loss. *See* Compl. PP 17-19, 22-25, 39-40. *See generally* Susan Cleary Morse, *The How and Why of the New Public Corporation Tax Shelter Compliance Norm, 75 Fordham L. Rev. 961, 995 (2006)* (explaining Son of BOSS transactions).

[*11] Plaintiffs engaged in the COINS Strategy between June and December 2000, executing various options contracts with Deutsche Bank and following the steps of the strategy with directions from Defendants and others. (*Id.* PP 42-59.) When the IRS reiterated its anti-COINS stance in an official notice in August 2000, an accounting firm working with Defendants wrote to some Plaintiffs, with Defendants' knowledge, to reassure them that the tax shelter would withstand IRS scrutiny. (*Id.* P 65.) Two years later, Defendants and their associates failed to advise Plaintiffs to take advantage of an IRS amnesty program. (*Id.* P 76.)

Plaintiffs were ultimately audited by the IRS. (*Id.* P

Case 1:07-cv-10673-RWS   Document 10-2   Filed 02/08/2008   Page 5 of 22

Page 5

2007 U.S. Dist. LEXIS 12557, *11; 99 A.F.T.R.2d (RIA) 1207

74.) They settled with the Service in 2004 for the full amount of back taxes owed plus penalties. (*Id.* P 88.)

### STANDARD OF REVIEW

"A motion to dismiss should not be granted unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff[s] can prove no set of facts which would entitle [them] to relief." *United States v. Baylor Univ. Med. Ctr., 469 F.3d 263, 267 (2d Cir. 2006)* (internal quotation marks omitted). The Court must [*12] accept all allegations in the Complaint as true and draw any inferences in the light most favorable to Plaintiffs. *Id.*

### DISCUSSION

### I. Unjust Enrichment

The First Claim of the Complaint alleges that because Defendants recommended that Plaintiffs employ the COINS Strategy even though they knew it would not turn a profit or pass muster with the IRS, Defendants' receipt of fees from Plaintiffs constitutes unjust enrichment. [3]

> 3   The First Claim also requests a declaratory judgment that Plaintiffs' options contracts with Deutsche Bank were unenforceable. Defendants moved to dismiss the declaratory judgment demand pursuant to *Federal Rules of Civil Procedure 12(b)(1), (6),* and *(7).* Plaintiffs now concede that the request for a declaratory judgment is untenable (*see* Pls.' Mem. in Opp'n to Veera Motion 1 n.2.), and it is therefore dismissed.

"To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) [*13] at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Citibank, N.A. v. Walker, 12 A.D.3d 480, 787 N.Y.S.2d 48, 49 (App. Div. 2004)* (quoting *Paramount Film Distrib. Corp. v. State, 30 N.Y.2d 415, 285 N.E.2d 695, 698, 334 N.Y.S.2d 388 (N.Y. 1972))* (alteration in original). Unjust enrichment does not depend on performance of a wrongful act, however, and even innocent parties may be unjustly enriched. *Cruz v. McAneney, 31 A.D.3d 54, 816 N.Y.S.2d 486, 491 (App. Div. 2006).* Here, Plaintiffs have alleged that they paid fees to Defendants (Compl. PP 87, 94),

satisfying the first two elements of unjust enrichment. They have also alleged that Defendants' sales pitch and subsequent advice to Plaintiffs contained misrepresentations and omissions intended to induce Plaintiffs to pursue the COINS Strategy. (*Id.* PP 26-28, 30, 61, 64-68, 71-73, 75, 77-79, 85, 93-94). If a jury were to find those allegations to be true, it could reasonably decide that equity and good conscience militate against Defendants' retaining the fees paid.

Defendants argue that the unjust enrichment claim [*14] is precluded by the existence of express agreements governing the payment of fees. They have submitted copies of currency management agreements ("CMAs") between ten [4] of the seventeen Plaintiffs and Equilibrium Currency Trading, LLC ("Equilibrium"), a company founded by Defendants, as well as copies of investment management agreements ("IMAs") between three of those Plaintiffs and Bricolage Capital, LLC ("Bricolage"), another of Defendants' companies. [5] (*See* Beer Aff. Exs. 1-8.) Each of the CMAs and IMAs was signed by either Defendant Beer or Defendant Veera on behalf of Equilibrium and Bricolage; each contains a section entitled "Fees" that describes the method by which currency- and investment-management fees shall be calculated and paid. [6] (*Id.* Exs. 1-8, P 4.) Defendants contend that these fee clauses constitute a written agreement encompassing the subject matter of the dispute, barring any unjust enrichment claim.

> 4   Neither party has stated whether similar agreements exist with respect to every Plaintiff.
> 5   The Court may properly consider the CMAs and IMAs without converting this motion to a motion for summary judgment. Although Plaintiffs did not attach these documents as exhibits to the Complaint, the Court may consider any document on which a plaintiff "solely relies and which is integral to the complaint." *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).* A document is integral to a complaint if the complaint "relies heavily upon [the document's] terms and effect." *Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)* (internal quotation marks omitted). Here, the Complaint is replete with allegations concerning the COINS Strategy. Plaintiffs appear to have entered into the CMAs and IMAs for the purpose of carrying out that strategy. (*See* Pls.' Mem. in Opp'n to Beer Motion 9 ("Plaintiffs have alleged

Page 6

2007 U.S. Dist. LEXIS 12557, *14; 99 A.F.T.R.2d (RIA) 1207

that they entered into the [COINS] Strategy and, consequently, the Bricolage and Equilibrium Agreements . . . .").) The Complaint can thus be said to rely heavily on the effect of the CMAs and IMAs.

[*15]

6    Defendant Beer argues, in passing, that because the agreements require the Plaintiff-signatories to pay fees to Equilibrium and Bricolage rather than directly to Defendants, Plaintiffs cannot maintain a claim against Beer. (Beer Mem. of Law 3.) This distinction is irrelevant to an unjust enrichment claim so long as Defendants profited unfairly at Plaintiffs' expense, as Plaintiffs allege. *Cruz, 816 N.Y.S.2d at 491; see also Simonds v. Simonds, 45 N.Y.2d 233, 380 N.E.2d 189, 194-95, 408 N.Y.S.2d 359 (N.Y. 1978)* (permitting unjust enrichment claim against unwitting beneficiary of decedent's broken promise to plaintiff).

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653 (N.Y. 1987).* But the existence of a contract does not require dismissal of an unjust enrichment claim where the claim "is based on alleged wrongdoing not covered by the [*16] contract." *EBC I, Inc. v. Goldman Sachs & Co., 7 A.D.3d 418, 777 N.Y.S.2d 440, 444 (App. Div. 2004); see also Niagara Mohawk Power Corp. v. Freed, 265 A.D.2d 938, 696 N.Y.S.2d 600, 602-03 (App. Div. 1999)* (holding unjust enrichment claim not precluded where plaintiff alleges contract was induced by fraud). Here, because Plaintiffs' claim is rooted in the allegation that Defendants misrepresented and concealed material information, Plaintiffs' agreements with Equilibrium and Bricolage do not preclude an unjust enrichment claim.

Defendant Veera further argues that the claim must be dismissed because Deutsche Bank is indispensable to its resolution. The First Claim initially alleged that Plaintiffs' options contracts with Deutsche Bank should be declared illusory or unenforceable because the contracts had no possibility of turning a profit. Plaintiffs concede that a motion for such a declaration would require Deutsche Bank's participation. However, Plaintiffs have also alleged wrongful acts by Defendants

that are unrelated to the Deutsche Bank contracts' lack of economic substance -- notably, Defendants' intentional misrepresentation of the likely IRS [*17] treatment of the COINS Strategy. (Compl. PP 61, 64-68, 71-73, 75, 85.) While the First Claim of the Complaint is not worded with perfect clarity, Defendants have nonetheless alleged facts that, if taken as true, would state a claim for unjust enrichment without the need to join any absent party.

## II. Breach of Fiduciary Duty

The Second Claim alleges that Defendants breached a fiduciary duty to Plaintiffs. In New York, a cause of action for breach of fiduciary duty has three elements: (1) breach by a fiduciary of a duty owed to plaintiff, (2) defendant's knowing participation in the breach, and (3) damages. *SCS Communs., Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004).* The test for whether parties enjoyed a fiduciary relationship is fact-specific, but the main question is whether "a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Wiener v. Lazard Freres & Co., 241 A.D.2d 114, 672 N.Y.S.2d 8, 14 (App. Div. 1998); see also Penato v. George, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-05 (App. Div. 1976).* However, under New York law, "the requisite high degree of dominance [*18] and reliance must have existed prior to the transaction giving rise to the alleged wrong, and not as a result of it." *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Int'l Ltd., 251 A.D.2d 137, 674 N.Y.S.2d 648, 649 (App. Div. 1998)* (citing *Elghanian v. Harvey, 249 A.D.2d 206, 671 N.Y.S.2d 266, 266 (App. Div. 1998)); see also Weis v. Selected Meat Packers, Inc., 91 A.D.2d 1085, 458 N.Y.S.2d 313, 314-15 (App. Div. 1983).* [7] Here, Plaintiffs have not alleged that they enjoyed a relationship of trust with Defendants before the advent of the tax-shelter transaction. Accordingly, Plaintiffs have not properly alleged the existence of a fiduciary relationship. [8] The Second Claim must therefore be dismissed.

7    Although Plaintiffs try to distinguish the facts here on the ground that Defendants "designed a fraudulent scheme and then lured the Plaintiffs into the scheme" (Pls.' Mem. in Opp'n to Veera Motion 11), none of the cases cited turns on, or even mentions, whether the defendants proposed a business transaction to the plaintiffs or vice versa.

[*19]

Case 1:07-cv-10673-RWS    Document 10-2    Filed 02/08/2008    Page 7 of 22

Page 7

2007 U.S. Dist. LEXIS 12557, *19; 99 A.F.T.R.2d (RIA) 1207

8  Plaintiffs' recitation of the elements of a duty to disclose is not relevant. A fiduciary relationship is a necessary element of a cause of action for fraudulent failure to disclose, *Wirsing v. Donzi Marine Inc., 30 A.D.3d 589, 818 N.Y.S.2d 148, 150 (App. Div. 2006)*, but a party's superior knowledge does not itself create a fiduciary relationship, *Bd. of Managers v. East/West Ventures, 278 A.D.2d 55, 717 N.Y.S.2d 563, 564 (App. Div. 2000)*.

## III. Fraud

The Third Claim alleges that Defendants' purported misrepresentations and omissions constituted fraud. "To recover damages for fraud, a plaintiff must prove (1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury." *Ozelkan v. Tyree Bros. Envtl. Servs., Inc., 29 A.D.3d 877, 815 N.Y.S.2d 265, 267 (App. Div. 2006)* [*20] (internal quotation marks omitted). These elements must be proven by clear and convincing evidence. *Gaidon v. Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 725 N.E.2d 598, 607, 704 N.Y.S.2d 177 (N.Y. 1999)*. "In addition, a cause of action to recover damages for fraudulent concealment requires . . . an allegation that the defendant had a duty to disclose material information," *Ozelkan, 815 N.Y.S.2d at 267* (internal quotation marks omitted) (omission in original), although "such a showing is not required where in addition to nondisclosure of material facts, [one] uses artifice, wiles, or deceptive conduct designed to throw the other party off his guard and lull him into a false sense of security," *Small v. Lorillard Tobacco Co., 176 Misc. 2d 413, 672 N.Y.S.2d 601, 610 (Sup. Ct. 1997), rev'd on other grounds, 252 A.D.2d 1, 679 N.Y.S.2d 593 (App. Div. 1998)* (internal quotation marks omitted) (alteration in original); *see also Mobil Oil Corp. v. Joshi, 202 A.D.2d 318, 609 N.Y.S.2d 214, 215 (App. Div. 1994)* (noting that silence is not fraudulent concealment "without some act which deceived" plaintiff). A duty to disclose [*21] may arise either from a fiduciary relationship or from one party's superior knowledge of essential facts whose nondisclosure would render a transaction inherently unfair. *Jana L. v. W. 129th St. Realty Corp., 22 A.D.3d 274, 802 N.Y.S.2d 132, 134 (App. Div. 2005)*.

Defendants argue that Plaintiffs have not satisfied the heightened pleading standards for fraud. *Federal Rule of Civil Procedure 9(b)* requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Fed. R. Civ. P. 9(b)*. The Second Circuit has specified that, where a claim is subject to *Rule 9(b)*, "the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990)*. Moreover, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the [*22] fraud." *DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); see also Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)* ("*Rule 9(b)* is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants'.").

The allegations of fraud in the Complaint can be divided into two types: (1) those attributed to "the Defendants and the Other Participants," whom the Complaint defines as Deutsche Bank, the law firm that prepared opinion letters for Plaintiffs, and the accounting firms that promoted the strategy (Compl. P 15 n.2.); and (2) those attributed to "Defendants" alone or to Beer or Veera individually. The allegations in the first category impermissibly lump Defendants together with an unspecified number of non-party entities. Because of this lumping, these allegations fail to provide Defendants with fair notice. *See DiVittorio, 822 F.2d at 1247*.

As for the allegations in the second category, district courts are divided on whether a complaint may allege elements of fraud against "defendants" in the aggregate if only two defendants are present in the case. [*23] *Compare Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006)* ("The Complaint . . . fails to identify which of the two Defendants made each statement or omission."), *with Gelles v. TDA Indus., Inc., No. 90 Civ. 5133 (MBM), 1991 U.S. Dist. LEXIS 3135, 1991 WL 39673, at *6 (S.D.N.Y. Mar. 18, 1991)* ("When there are only two defendants, who are alleged to have had identical roles in a clearly defined scheme[,] . . . a requirement that plaintiff attribute each recitation of a misstatement to a particular defendant at an exact time and location would violate the liberal pleading

Case 1:07-cv-10673-RWS    Document 10-2    Filed 02/08/2008    Page 8 of 22

Page 8

2007 U.S. Dist. LEXIS 12557, *23; 99 A.F.T.R.2d (RIA) 1207

requirements of the Federal Rules."). The Court need not decide this question, however, because the allegations in this group, notably those in paragraph 103 of the Complaint, are fatally deficient in other ways. [9] Paragraph 103 purports to list forty-eight "knowingly false affirmative representations and intentional omissions of material facts" made by "Defendants." (Compl. P 103.) These forty-eight subparagraphs are reproduced identically in the Second Claim (alleging breach of fiduciary duty) and the Fourth Claim (alleging negligent misrepresentation). Many contain sweeping generalizations, [*24] [10] others do not relate to the elements of fraud, [11] and none states time, place, or speaker with particularity. Moreover, a number of the actions attributed to "the Defendants" in paragraph 103 are attributed to "the Defendants and the Other Participants" elsewhere in the Complaint. [12] These flaws render the allegations deficient under *Rule 9(b)*. The Third Claim is therefore dismissed. [13]

9 Without the support of the allegations in paragraph 103, the scattered portions of the Complaint that refer only to "Defendants" or to Beer or Veera individually are insufficient to state a claim for fraud.

10 (*E.g.,* Compl. P 103(1) ("[t]aking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the COINS Strategy"); *id.* P 103(10) ("[c]reating, designing, implementing, promoting, advising, recommending, and selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS").)

11 (*E.g.,* Compl. P 103(4) ("[c]harging and collecting unreasonable, excessive, and unethical fees"); *id.* P 103(26) ("[f]ailing to learn the facts as to whether the FX Contracts were appropriate for the Plaintiffs, either as an investment or as part of a tax strategy").)

[*25]

12 (*Compare, e.g.,* Compl. P 103(14) ("[T]he Defendants . . . [a]dvis[ed] Plaintiffs that the losses created by the COINS Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations . . . ."), *with id.* P 41 ("The Defendants and Other Participants advised Plaintiffs that the losses created by the COINS Strategy were legitimate and in accordance with all applicable tax laws, rules, and regulations . . . .").)

13 Defendant Beer argues that Plaintiffs' fraud claims are precluded by express provisions in the CMAs and IMAs with Bricolage and Equilibrium. The Court need not address these arguments in order to resolve this motion. Furthermore, it is prudent not to do so, because Beer did not develop them fully until his reply brief. *See generally United States v. Gigante, 39 F.3d 42, 50 n.2 (2d Cir. 1994)* ("Arguments may not be made for the first time in a reply brief.").

## IV. Negligent Misrepresentation

The Fourth Claim of the Complaint alleges that Defendants are liable to Plaintiffs for negligent misrepresentation. [*26] "[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992); accord Thomas v. McLaughlin, 276 A.D.2d 440, 715 N.Y.S.2d 388, 389 (App. Div. 2000).* As explained above, the Complaint does not allege that Plaintiffs enjoyed a relationship of trust with Defendants before the advent of the tax-shelter transaction; accordingly, Plaintiffs cannot establish that Defendants owed them a fiduciary duty. The negligent misrepresentation claim is therefore dismissed.

## V. Civil Conspiracy

The last count of the Complaint charges Defendants with civil conspiracy. In New York, plaintiffs alleging conspiracy must prove (1) a corrupt agreement between two or more people, (2) an overt act, (3) defendants' intentional participation in the furtherance of a plan or purpose, and (4) damage. *Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986)* (citing *Suarez v. Underwood, 103 Misc. 2d 445, 426 N.Y.S.2d 208, 210 (Sup. Ct. 1980)).* Moreover, Plaintiffs must properly plead some underlying tort, because New [*27] York does not recognize an independent tort of conspiracy. *See Crigger v. Fahnestock & Co., 443 F.3d 230, 237 (2d Cir. 2006).*

For the reasons already explained, Plaintiffs' breach of fiduciary duty, fraud, and negligent misrepresentation claims must be dismissed. Therefore, as Plaintiffs concede, the

conspiracy claim must also be dismissed. (*See* Pls.' Mem. in Opp'n to Veera Motion 13 (noting that conspiracy claim is supported by "underlying torts of

2007 U.S. Dist. LEXIS 12557, *27; 99 A.F.T.R.2d (RIA) 1207

fraud, breach of fiduciary duty, and negligent misrepresentation").) [14]

> [14] Although Plaintiffs properly alleged a claim of unjust enrichment, unjust enrichment sounds not in tort but in quasi contract. *See,e.g., Goldstein v. CIBC World Markets Corp., 6 A.D.3d 295, 776 N.Y.S.2d 12, 14 (App. Div. 2004)*.

## VI. Leave to Amend

Plaintiffs have requested leave to amend the Complaint to attempt to cure any deficiencies. Leave to amend should be "freely given when justice so requires," *Fed. R. Civ. P. 15(a)* [*28] , and it is therefore "the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)*. Plaintiffs are granted leave to replead within twenty days of this Opinion and Order in a manner consistent with this Opinion.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the declaratory judgment, breach of fiduciary duty, fraud, negligent misrepresentation, and conspiracy claims are GRANTED. Defendants' motions to dismiss the unjust enrichment claim are DENIED. Plaintiffs' request for leave to amend is GRANTED.

SO ORDERED.

Dated: New York, New York

February 18, 2007

Kimba M. Wood

United States District Judge

LEXSEE 2007 US DIST LEXIS 69104

**Liberty Mutual Insurance Company Plaintiff, - against - WAWA Tours, Inc.
William Ruiz Fairmont Insurance Brokers, Ltd., Defendants.**

**CV-07-0880 (CPS)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK**

*2007 U.S. Dist. LEXIS 69104*

**September 18, 2007, Decided
September 18, 2007, Filed**

**SUBSEQUENT HISTORY:**    As Amended September 19, 2007.

**COUNSEL:**    [*1] For Liberty Mutual Insurance Company, Plaintiff: Jeffrey R. Krantz, LEAD ATTORNEY, Bennett, Giuliano, McDonnell & Perrone LLP, New York, NY.

For Fairmont Insurance Brokers LTD, Defendant: Jack Babchik, LEAD ATTORNEY, James E. Musurca, Babchik & Young, LLP, White Plains, NY.

**JUDGES:**    Charles P. Sifton, United States District Judge.

**OPINION BY:** Charles P. Sifton

**OPINION**

AMENDED MEMORANDUM OPINION AND ORDER

SIFTON, Senior Judge.

Plaintiff Liberty Mutual Insurance Company ("Liberty") brings claims for breach of contract, negligent misrepresentation, and intentional misrepresentation against Defendants WAWA Tours, Inc. ("WAWA"), William Ruiz ("Ruiz"), and Fairmont Insurance Brokers, Ltd. ("Fairmont"). Now before this court is Fairmont's motion to dismiss for failure to state a claim. [1] For the reasons set forth below, Fairmont's motion is granted in part and denied in part.

1  Though Fairmont's reply papers were received after the date set for their submission, I grant its request, by letter dated September 7, 2007, that they be accepted.

**Background**

Except as otherwise noted, the following facts are taken from plaintiff's complaint and are presumed to be true for the purposes of these motion, as required by applicable case law. *See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).*

Liberty [*2] is a Massachusetts corporation and is an insurance company authorized to transact business and to issue and service commercial automobile liability insurance polices and other insurance coverage in the State of New York.

Defendant WAWA is a corporation organized and existing under the laws of the State of New York with its principal place of business at 81-14 Baxter Avenue, Apt. 5C, Jackson Heights, New York. Defendant Ruiz is the owner of WAWA and resides at the same address as WAWA's place of business.

Defendant Fairmont is a domestic business corporation organized and existing under the laws of the State of New York, with its principal place of business at 1600 60th Street, Brooklyn, New York.

The New York Automobile Insurance Plan (the "Plan") is an unincorporated entity that was established pursuant to *N.Y. Ins. Law § 5301 et seq.* [2] The Plan was

2007 U.S. Dist. LEXIS 69104, *2

established to provide coverage to individuals and/or businesses unable to obtain coverage in the voluntary insurance market. New York residents who are eligible for but unable to obtain automobile insurance may submit an application to the Plan. The Plan then assigns applicants to automobile insurers licensed to do business in the State [*3] of New York who, in turn, are required to accept assignments from the Plan. The Plan provides for coverage of public transportation vehicles, defined as including taxis, limousines, school, church and urban buses, medical transportation vehicles and other similar vehicles.

2  *N.Y. Ins. Law §5301* provides:

(a) All insurers licensed to write motor vehicle insurance in this state shall subscribe to and participate in the reasonable plan or plans, approved, or which may be approved, by the superintendent after consultation with such insurers, for equitable apportionment among such insurers of applicants for such insurance who are in good faith entitled to but are unable to procure it through ordinary methods.

(b) Amendments to the plan may be made by the committee designated to administer the plan, subject to the approval of the superintendent, or shall be made at the direction of the superintendent.

In providing for coverage of such vehicles, the Plan provides for the equitable distribution of risks assigned to insurance companies. Thus, prospective insureds, and their brokers, complete and submit a form New York Automobile Insurance Plan Application (the "Application") for coverage in the [*4] Plan. The Application is signed by both applicants and brokers. At the time of the submission of the Application, the applicant and broker 3 do not know which insurance carrier will be assigned and required to issue a policy since the application is submitted to the Plan itself. The Plan then assigns the insured to an insurance company,

which is required by the Plan to issue a policy unless the applicant fails an eligibility requirement.

3  The broker is required to ensure that the Application is fully completed and includes all necessary information to rate and write the insurance policy.

Liberty is a servicing carrier for the Plan. With limited exceptions, as a servicing carrier for the Plan, Liberty must issue policies to applicants seeking coverage through the Plan. Applicants, among other requirements, must certify that they have attempted, and were unable, to obtain coverage in the voluntary insurance market.

Pursuant to prescribed formulas established by New York law and contained in the Plan, the premium for public automobile transportation companies is in part based on the following rating factors:

1. Territory in which any and all driving occurs, which the Plan calls "Rating [*5] Territory";

2. Type of service, such as airport limo or school bus, which the Plan calls "Rating Classification";

3. Radius or zones of operation;

4. Number of vehicles owned or operated by the insured.

The change of a single rating factor may significantly impact the premium to be paid by the insured.

As is set forth in the Plan, the Rating Territory is based on the highest rated territory in which the public vehicle is operated. The highest rated territory rule does not apply, however, if the vehicles operates on a long distance, which the Plan calls "Zone Basis." The Zone Basis applies when the radius of operations is over 200 miles. The premium for a Zone Basis rating is usually substantially less expensive than either a local (50 mile radius) or intermediate (51-200 mile radius) territorial rating.

Initial premiums charged for policies issued pursuant to the Plan are estimated by the servicing carrier based on information and codes provided to the servicing carrier in

the Application. The Application states in part, "The Applicant understands that the premium shown on this application is an estimated premium. The carrier reserves the right to adjust the premium either prior to or after [*6] the issuance of the policy, whenever applicable."

Brokers and applicants must sign the Application. By its signature on the Application, the applicant attests that "[t]o the best of Applicant's knowledge and belief that all statements contained in this application are true and that these statements are offered as an inducement to issue the policy for which the Applicant is applying." Brokers attest, by their signatures, on the Application that, "I have read the New York Automobile Insurance Plan, have explained the provisions to the applicant, and have included in this application all required information given to me by the applicant." [4]

> 4    Though the Application does not explicitly require the broker to certify the truthfulness of the information contained therein, courts have recognized that the Plan and the common law impose upon brokers the duty that statements of fact in the Application "must be to the best of the [broker's] knowledge," Plan Sec. 15A(l)(e), and "correct." *Panepinto v. Allstate Insurance Co., 108 Misc.2d 1079, 1081, 439 N.Y.S.2d 240 (Sup. Monroe, 1981); see also Liberty Mutual Ins. Co. v. Grand Trans., Inc., No. 06 CV 3433 (JG), 2007 U.S. Dist. LEXIS 17112, 2007 WL 764542, at *2-3 (E.D.N.Y. March 12, 2007) (citing [*7] Plan Secs. 15A(1)(a) and 15A(l)(e) and Panepinto).*

On November 13, 2003 Fairmont and WAWA submitted an application to the Plan on behalf of WAWA. The Plan assigned the application to Liberty. On this application, Fairmont and WAWA attested that WAWA had two vehicles. They further attested that WAWA operated one long distance charter service vehicle and one long distance social service vehicle, both in the Eastern to New England Zone. In the application, an individual from Fairmont signed after the following statement:

> I do hereby attest that I am a licensed broker/agent in the State of New York and I am currently certified by the Plan. I have read the New York Automobile Insurance Plan, have explained the positions to the applicant, and have included in this

application all required information given to me by the applicant. I acknowledge that I am acting on behalf of the Applicant in submitting this application and have no authority to establish or revise the terms or conditions of coverage.

Applying the Plan's formula to Fairmont and WAWA's application, Liberty determined the applicable, initial premiums. Liberty issued Policy No. AS1-321-091023-014 and Policy No. AS1-321-091023-015 [*8] (the "Policies"), providing commercial automobile insurance to WAWA based upon zone rated charter bus service. Liberty did not use the social service classification proposed by WAWA as WAWA did not provide the required documentation for the classification.

Since issuing the Policies, Liberty has obtained information that contradicts the information provided by defendants in their application. Notably, Liberty audited WAWA's dispatch logs and learned that WAWA provided charter service from Brooklyn to Atlantic City, not just New England charters. This new information demonstrated that WAWA did not operate on a Zone Basis but rather within a 200-mile radius, or intermediate basis. With this new information, Liberty re-determined the premiums for the Policies pursuant to the Plan. For the first policy, Liberty determined the additional premium due was $ 219,826.00 and for the second $ 73,166.20. Liberty invoiced WAWA for the additional premiums. Liberty has made a demand for payment, but defendants have refused to pay the additional premiums.

## Discussion

In considering a motion pursuant to *Rule 12(b)(6)*, a court should construe the complaint liberally, "accepting all factual allegations in [*9] the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)),* although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994).* Indeed, conclusory allegations "will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002).* On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the

claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).*

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly, -- U.S. --, 127 S.Ct. 1955, 1970, 167 L.Ed.2d 929 (2007).* Although the complaint need not provide "detailed factual allegations," *id. at 1964; see also ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 n. 2 (2d Cir. 2007)* (applying the standard of plausibility outside *Twombly's* [*10] anti-trust context), it must "amplify a claim with some factual allegations . . . to render the claim *plausible." Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)* (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11). The test is no longer whether there is "no set of facts" that plaintiff could prove "which would entitle him to relief." *Bell Atlantic, 127 S.Ct. at 1969 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))* ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard"). Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient to raise a right to relief above the speculative level.'" *ATSI Commc'ns, 493 F.3d at 98 (quoting Bell Atlantic, 127 S.Ct. at 1965).*

*Claim I - Breach of Contract*

Liberty has alleged a claim for breach of contract against Fairmont. Of course, in an action for breach of contract, plaintiffs must show the existence of a contract. *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).* [*11] Plaintiff concedes that there is no contract between Liberty and Fairmont and that its breach of contract claim is against WAWA and Ruiz. Pl.'s Mem. in Opp. at 5. Thus, Liberty's first cause of action against Fairmont is dismissed.

*Claim II - Negligent Misrepresentation*

Fairmont argues the Court must dismiss Liberty's cause of action for negligent misrepresentation because Liberty does not have a relationship "sufficiently approaching privity" with Fairmont and because Liberty cannot demonstrate that it relied upon the false statements

in the Application. [5]

    5 Fairmont does not argue that Liberty has otherwise failed to allege the facts necessary to plead a cause of action for negligent misrepresentation.

Under New York law, a cause of action for negligent misrepresentation, which has produced only economic injury, "requires that the underlying relationship between the parties be one of contract or the bond between them so close as to be the functional equivalent of contractual privity." *Ossining Union Free Sch. Dist. v. Anderson, 73 N.Y.2d 417, 419, 539 N.E.2d 91, 541 N.Y.S.2d 335 (1989).* The New York Court of Appeals has set forth this requirement in an effort to curb "the breathtaking possibilities for liability in negligence [*12] cases involving economic injury". *Liberty Mutual Ins. Co. v. Grand Trans., 2007 U.S. Dist. LEXIS 17112, 2007 WL 764542, at *6.* In *Ultramares Corp v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931),* Chief Judge Cardozo held that a public accounting firm owed no duty of care to third parties not in privity with the firm who were damaged by their reliance upon the firm's inaccurate financial statements. As the New York Court of Appeals discussed in *Ossining,* ". . . in *Ultramares,* the court chose to circumscribe defendants' liability for negligent misstatements by privity of contract or its equivalent, because of concern for the indeterminate nature of the risk" assumed by the defendant in *Ultramares.* Further, "the range of potential plaintiffs was as indefinite and wide as the possibilities of the business that was mirrored in the summary' so `[i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Ossining, 73 N.Y.2d at 423 (quoting Ultramares, 255 N.Y. at 179-80).*

The New York Court of Appeals has articulated various methods [*13] to determine whether a defendant owed a duty of care to a third party such that the "functional equivalent of contractual privity" exists. One test would find such a duty when reliance by the plaintiff was "the end and aim of the transaction." *Ossining, 73 N.Y.2d at 425 (qciting Glanzer v. Shepard, 233 N.Y. 236, 238-39, 135 N.E. 275 (1922)).* More recently, the New York Court of Appeals has stated a relationship sufficiently approaching privity requires "(1) an

Case 1:07-cv-10673-RWS    Document 10-2    Filed 02/08/2008    Page 14 of 22

Page 5
2007 U.S. Dist. LEXIS 69104, *13

awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Parrott v. Coopers & Lybrand, LLP, 95 N.Y.2d 479, 484 (2000)* (citations omitted).

Fairmont argues that there was no reliance by plaintiff because under *N.Y. Ins. Law § 5301(a)* all insurance carries licensed to write motor vehicle liability insurance in New York must participate in the Plan. However, Liberty does not allege it issued the policy in reliance upon Fairmont's and WAWA's application, but that it estimated its premiums in reliance upon the [*14] application.

Fairmont also argues that the third prong of the test discussed in *Coopers Lybrand* is not satisfied - that Liberty and Fairmont lack the required conduct linking the parties to establish a relationship sufficiently approaching privity. There is, however, significant case law in New York that suggests a broker/insurer relationship such as those that arise under the Plan does have the required conduct linking the parties. *See Glanzer, 233 N.Y. at 238-39* (Public weighers, retained by bean seller, had duty to prospective buyer, despite the absence of privity between them, because the certificates issued by weighers had been issued for the very purpose of inducing action on the part of the buyer); *Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 385, 605 N.E.2d 318, 590 N.Y.S.2d 831 (1992)* (lawyer who, at the direction of his client, provides a letter to a potential lender for the client assuring the lender that the client's mortgage documents represented legal, valid and binding obligations which, once recorded, would be enforceable against the client in accordance with [their] respective terms, may be said to have breached a duty owed to the lender if these assurances prove to [*15] be inaccurate) (internal quotation marks omitted); *Ossining Union Free Sch. Dist. v Anderson LaRocca Anderson, 73 N.Y.2d at 425* (school district permitted to proceed with a negligent misrepresentation claim against engineering consultants although the engineers had been hired, not by the school district, but by an architectural firm conducting an evaluation of districts buildings, because engineers knew that their reports and opinions had been sought for the sole purpose of providing that information to the school district); *Rodin Prop. Shore Mall v. Ullman, 264 A.D.2d*

367, 368-69, 694 N.Y.S.2d 374 (1st Dep't 1999) ("When a professional . . . has a specific awareness that a third party will rely on his or her advice or opinion, the furnishing of which is for that very purpose, and there is reliance thereon, tort liability will ensue if the professional report or opinion is negligently or fraudulently prepared"); *see also Point O'Woods Ass'n v. Those Underwriters at Lloyd's, London, 288 A.D.2d 78, 733 N.Y.S.2d 146 (1st Dep't 2001)* (J. Saxe dissenting).

Further, several district courts in this circuit have held that insurance brokers, under the Plan, may be liable to insurance carriers, where the Application submitted to [*16] the plan contains false or misleading information. *See Liberty Mutual Ins. Co. v. Grand Trans., 2007 U.S. Dist. LEXIS 17112, 2007 WL 764542, at *6-7* (Plan does not preclude a misrepresentation cause of action by an insurer against a broker or insured and plaintiff's allegations establish functional privity between plaintiff and defendant broker); *Liberty Mut. Ins. Co. v. Ben's Luzcury Car & Limousine Serv., Inc., No. 06 Civ. 3430 (ERK), 2007 U.S. Dist. LEXIS 70255, *10-14 (E.D.N.Y. Feb. 15, 2007)* (the Plan does not preclude a misrepresentation cause of action by an insurer against a broker); *see also N.Y. Auto Ins. Plan v. All Purpose Agency & Brokerage, Inc., No. 97 Civ. 3164 (KTD), 1998 U.S. Dist. LEXIS 15645, 1998 WL 695869, at *7 (S.D.N.Y. Oct. 6, 1998)* (granting insurers' summary judgment motion against brokers for common law fraud).
6

6   Fairmont cites three cases in support of its contention that Liberty cannot adequately plead functional privity because of the lack of conduct linking the parties. All three cases are inapposite as they involve insurers, who failed to discover the misrepresentation until after an event requiring the insurer to act under the policy, claiming the entire amount of the insurer's loss. *Point O'Woods Ass'n v. Those Underwriters at Lloyd's London, 288 A.D.2d 78, 79, 733 N.Y.S.2d 146 (1st Dep't 2001)* [*17] (payment for flood damages); *Utica First Ins. Co. v. Floyd Holding, 294 A.D.2d 351, 741 N.Y.S.2d 710 (2d Dep't 2002)* (fees for defense of insured); *Merchants Insurance Co. Of New Hampshire v. The Gage Agency, 21 A.D.3d 1332, 1334, 801 N.Y.S.2d 859 (4th Dep't 2005)* (payment on automobile insurance policy). Moreover, in *Merchants,* the only representation made by the broker was that

the insured's signature was bona fide. Here, by contrast, Liberty seeks only the difference in premiums resulting from the misrepresentation, and it was Liberty's own investigation that uncovered the misrepresentation, before any event requiring disbursement under the policy.

Additionally, the concerns of the New York Court of Appeals in *Ultramares* and its progeny are not present here. The liability of a Plan broker is limited to a determinate amount, the difference between premiums paid and the amount that should have been paid, and to a single determinate party, the Plan insurance carrier. *Liberty Mut. Ins. Co. v. Grand Trans., 2007 U.S. Dist. LEXIS 17112, 2007 WL 764542, at * 7.* Thus public policy concerns do not militate against allowing this claim for negligent misrepresentation to proceed.

Liberty contends that it has alleged facts sufficient to show the "functional [*18] equivalent of contractual privity" does exist. [7] Liberty's allegations satisfy both the "end and aim" test and the three prong test for determining functional privity discussed in *Parrot.* Liberty alleges that Fairmont, in the application it and WAWA submitted to the Plan, acknowledged that Fairmont was certified by the Plan and that the broker signing on behalf of Fairmont had read the Plan. And Liberty has alleged that Fairmont was responsible for ensuring the application was fully completed and included all necessary information to rate and write the insurance policies. Thus, it was clearly the "end and the aim" of the transaction that an insurance carrier assigned by the Plan, in this case Liberty, [8] would rely on the information in the Application in setting the estimated premiums. [9] Moreover, since Liberty alleges that Fairmont acknowledged in the Application that it had read the Plan, Liberty has sufficiently alleged that Fairmont was aware the statements in the application would be used for a particular purpose, namely to determine the initial premiums on the issued policies. Indeed, Liberty alleges that it, as an insurer participant in the Plan, issued a policy based on the [*19] Application at a rate calculated in reliance upon the statements by Fairmont and WAWA. Finally, Liberty alleges Fairmont included all the necessary information in the application and submitted the application to the Plan.

7 As Liberty has conceded that no contract exists

between it and Fairmont, it does not contend here that contractual privity exists.

8 I note that despite the uncertainty of which insurance carrier would be assigned by the Plan, Liberty was a known party under New York Law. *White v. Guarente, 43 N.Y.2d 356, 361, 372 N.E.2d 315, 401 N.Y.S.2d 474 (1977)* (a party sufficiently known to a defendant where its statements "were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components.").

9 Fairmont also argues that Liberty had a responsibility to promptly investigate the accuracy of any potential insured's statements and that it was the burden of the insurer not the insurance broker to investigate the application's accuracy. In support, Fairmont cites to *Panepinto, 108 Misc.2d 1079, 439 N.Y.S.2d 240* But *Panepinto*is inapposite, as the case concerned Allstate's failure to promptly investigate and, when it did, [*20] its failure to do so properly. Here it was Liberty's investigation that uncovered the misrepresentation. Moreover, Allstate cross-claimed against the insurance broker for its entire loss, i.e. its payment under the insurance policy to the insured. In its discussion of Allstate's cross-claim, the *Panepinto* Court acknowledged that "damages, if any, would be limited to the difference between the actual premiums and the premiums which should have been paid", the relief sought by Liberty. *Id. at 1082.* Similarly, in *Aetna Casualty & Surety Co. v. O'Connor, 8 N.Y.2d 359, 364-65, 170 N.E.2d 681, 207 N.Y.S.2d 679 (1960),* the Court held that Aetna could not rescind a policy obtained under the Plan by fraud, after payment under the policy was due, because Aetna had failed to discover the fraud during an investigation. The Court noted "[t]he effect of the Plan is to enforce upon the insurer the necessity to discover fraud at the earliest possible moment, before an accident occurs and the rights of innocent injured third parties have intervened. In this respect, the Plan merely reflects the oft-repeated legislative recognition that liability insurance is not the concern solely of the insured and his insurer." *Id. at 364.* Thus *Aetna* [*21] is inapposite because Liberty did uncover the misrepresentation in its investigation.

Fairmont admits as much when it states "An insurance carrier cannot claim reliance on the insurance broker *when the insurer failed to conduct its own thorough investigation* of statements in the insurance application." Def. Mem. at 5 (emphasis added). Insofar as Fairmont may argue that Liberty did not promptly investigate, or that Liberty's own negligence is the proximate cause of its damages, the resolution of factual claims is not the subject of a motion to dismiss.

Thus, for the reasons set forth above, Liberty has sufficiently pleaded a claim for negligent misrepresentation against Fairmont.

*Claims III and IV - Intentional Misrepresentation*

A fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. [10] *See Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 1116, 585 N.E.2d 377, 578 N.Y.S.2d 128 (1991).* There are heightened pleading standards where fraud is concerned, as *Rule 9(b) of the Federal Rules of Civil Procedure* requires that "the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b).* [*22] However, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See id.*

10    A claim for intentional misrepresentation is the equivalent of a fraud cause of action under New York Law. *Chen v. U.S., 854 F.2d 622, 628 (2d Cir. 1988).*

Fraud allegations in a complaint therefore must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).* [11] Although the scienter requirement need not be plead with particularity, "[i]n order to avoid abuse . . . plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655, 663 (2d Cir. 1997).* The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness. *Shields, 25 F.3d at 1128.* Defendant [*23] argues that plaintiff has failed to sufficiently allege scienter and reliance.

11    I note that Liberty has adequately pleaded these requirements.

Plaintiff has not alleged any facts with respect to defendant Fairmont that give rise to a "strong inference of fraudulent intent." Plaintiff's allegations are conclusory and, in most cases, fail to distinguish between defendants. *See, e.g.* Compl. P 70-71 ("Defendants intentionally and materially misrepresented the true scope of WAWA's radius of operation. Defendants made the material misrepresentations knowing them to be false or in reckless disregard of their accuracy.") Indeed, in the cause of action for Intentional Misrepresentation by Fairmont, Plaintiff alleges "Fairmont and/or WAWA" submitted the application knowing it to contain false information and with the intent to defraud. Compl. P 78-79. There are no particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent.

Plaintiff also fails to plead scienter by showing motive and opportunity. Plaintiff alleges that, by inducing Liberty to issue the insurance policy at reduced rates, "Fairmont sought and did earn brokerage commissions and possibly [*24] other compensation." Compl. P 74. Insofar as Liberty was compelled to issue an insurance policy to WAWA under the Plan, Fairmont may very well have earned some brokerage commission regardless of the rates obtained from Liberty. This sole allegation from the Complaint that relates to Fairmont's motivation fails to establish a "strong inference."

Though I have determined that plaintiff failed to adequately allege scienter, I note again that Fairmont's argument that there was no reliance by plaintiff because under *N.Y. Ins. Law § 5301(a)* all insurance carries licensed to write motor vehicle liability insurance in New York must participate in the Plan is misplaced. Liberty does not allege it issued the policy in reliance upon Fairmont's and WAWA's application, but that it estimated its premiums in reliance upon the Application.

Thus, for the reasons set forth above, Liberty's causes of action for intentional misrepresentation against Fairmont are dismissed.

2007 U.S. Dist. LEXIS 69104, *24

**Conclusion**

For the reasons set forth above, defendant Fairmont's motion to dismiss is granted in part and denied in part. The clerk is directed to transmit a copy of the within to all parties and to Magistrate Judge Pollak.

SO ORDERED.

Dated : Brooklyn, New York

September 19, 2007

By: /s/ Charles P. Sifton (electronically signed)

United States District Judge

LEXSEE 2001 US DIST LEXIS 1903

**RICHARD METZLER., Plaintiff, -against- HARRIS CORPORATION, Defendant.**

**00 Civ. 5847 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 1903; 143 Lab. Cas. (CCH) P59,209; 17 I.E.R. Cas. (BNA) 588*

**February 23, 2001, Decided**
**February 26, 2001, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss granted with respect to plaintiff's claim for wrongful termination and fraudulent and negligent misrepresentation. Defendant's motion to compel arbitration as to plaintiff's first and second claim granted.

**COUNSEL:** For RICHARD METZLER, plaintiff: Daniel L. Schwartz, Day, Berry & Howard, L.L.P., Stamford, CT.

For RICHARD METZLER, plaintiff: Patricia M. Canavan, Day Barry & Howard LLP, Stamford, Ct.

**JUDGES:** Harold Baer, Jr., U.S.D.J.

**OPINION BY:** Harold Baer, Jr.

**OPINION**

**OPINION & ORDER**

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff Richard Metzler ("Metzler") brings this action for breach of contract, violation of New York Labor law, wrongful discharge, breach of the covenant of good faith and fair dealing, fraudulent and negligent misrepresentation, promissory estoppel, quantum meruit, and unjust enrichment. Defendant Harris Corporation ("Harris") has moved to compel arbitration on plaintiff's claims for breach of contract and violation of New York Labor law and to dismiss the remaining claims or to stay discovery if plaintiff's claims are arbitrable. For the

following reasons, defendant's motion to compel arbitration is granted and the scope of [*2] discovery will be decided by the arbitrators, its motion to dismiss is granted as to plaintiff's claims for wrongful discharge and fraudulent and negligent misrepresentation.

**BACKGROUND**

Richard Metzler accepted a position as Major Accounts Manager for the Harris Corporation in 1993. In this position, a substantial portion of his income was derived from commissions on sales. The amount of and schedule for plaintiff's commissions was governed by yearly employment agreements that covered a fiscal year from July through June. These commission agreements were not employment contracts, and Metzler was no more than an at-will employee.

This dispute arises from plaintiff's claim for commissions for a contract he procured in December 1998 with the New York City Board of Education ("BOE"). The contract provided that the BOE would purchase telephone equipment from Harris Corporation over the five year period from January 1, 1999 to December 31, 2004, with an option to renew. Two successive agreements governed plaintiff's right to receive commissions on this contract. [1] The first, in effect at the time that the BOE contract was signed, was the FY99 Sales Incentive Plan, effective from [*3] July 1, 1998 through June 30, 1999. The second, the FY00 Sales Incentive Plan, was effective from July 1, 1999 through June 30, 2000. The FY00 agreement differed from the FY99 agreement in one relevant respect -- the FY00 agreement included an arbitration clause. The clause reads in pertinent part that if any dispute,

2001 U.S. Dist. LEXIS 1903, *3; 143 Lab. Cas. (CCH) P59,209;
17 I.E.R. Cas. (BNA) 588

arises out of or relates to this Plan or the breach and termination or validity thereof, or the compensation provided to the employee in accordance with Plan provisions, the parties agree to settle the dispute by binding arbitration in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association . . . which shall be the sole and exclusive jurisdiction for the settlement of such disputes.

It is undisputed that Metzler received a copy of the FY00 agreement and that he signed a separate agreement on August 19, 1999, that read, "I have received a copy of the FY00 Harris Corporation Worldwide Sales Incentive Compensation Plan and I understand and agree to the provisions of that document which is hereby incorporated by reference in its entirety." Hughes Aff. Ex. 1.

  1  In plaintiff's complaint, he alleges that Harris failed to pay him all of the commissions that accrued during the term of the FY00 agreement. However, since the filing of the complaint, defendant paid Metzler these commissions that claim has been abandoned.

[*4] In June, 2000, Harris Corporation sold the unit in which plaintiff worked to another corporation and, shortly after that, plaintiff was terminated. Thereafter, plaintiff sought commissions that would have accrued to him if he were still employed with Harris. Pursuant to the terms of the FY00 agreement, plaintiff filed an internal grievance. The review board found that by the terms of that agreement he was not entitled to commissions that accrued beyond the date of his termination. He appealed that decision to the internal appeals board, but the initial decision was affirmed. The plaintiff then brought this action.

## DISCUSSION

### A. Defendant's Motion to Dismiss

Defendant has moved to dismiss seven of plaintiff's claims. For the following reasons, defendant's motion is granted with respect to plaintiff's claim for wrongful termination and fraudulent and negligent misrepresentation. As to the balance of plaintiff's claims, arbitration is appropriate.

### 1. Wrongful Termination

Plaintiff claims that defendant wrongfully terminated him in order to avoid paying him commissions under the BOE contract. It is well established that New York law does not recognize a claim for [*5] wrongful termination. See Murphy v. American Home Products Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 233, 448 N.E.2d 86 (1983). However, plaintiff relies upon Wakefield v. Northern Telecom, Inc. 769 F.2d 109 (2d Cir. 1985), to argue that New York law does recognize a claim for wrongful termination where an employer terminates an employee to avoid the payment of commissions. Wakefield does not support plaintiff's argument. Rather, the court in Wakefield allowed the plaintiff to maintain his claim that his employer had terminated him to avoid paying him commissions on the theory of the implied covenant of good faith and fair dealing inherent in the employment agreement. The court did not find that plaintiff's allegation stated a claim for wrongful termination. Furthermore, unlike Wakefield, there is no employment contract in this case. As plaintiff has offered no other support for his argument, this claim must be dismissed.

### 2. Implied Covenant of Good Faith and Fair Dealing

Plaintiff also relies on Wakefield to support his claim for breach of the implied covenant of good faith and fair dealing. While the New York Court of Appeals [*6] held that "this state neither recognizes a tort of wrongful discharge nor requires good faith in an at-will employment relationship." DePetris v. Union Settlement Ass'n Inc., 86 N.Y.2d 406, 633 N.Y.S.2d 274, 276, 657 N.E.2d 269 (1995), the Second Circuit's decision in Wakefield clouds that holding so that, at this stage of the litigation, the motion to dismiss must be denied.

### 3. Fraudulent and Negligent Misrepresentation

Metzler claims that the defendant engaged in fraudulent or negligent misrepresentation by inducing him to leave a secure job and accept employment at Harris Corporation based on the representation that he would receive commissions for any business he generated. Employees can recover for fraudulent statements that induce them to accept positions by showing "(1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage

2001 U.S. Dist. LEXIS 1903, *6; 143 Lab. Cas. (CCH) P59,209;
17 I.E.R. Cas. (BNA) 588

as a result of such reliance." *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., 98 F.3d 13, 19-20 (2d Cir. 1996)* (citations omitted).

However, New [*7] York law does not recognize claims that are essentially contract claims masquerading as claims of fraud. *See Metropolitan Transportation Authority v. Triumph Advertising Productions, Inc., 116 A.D.2d 526, 497 N.Y.S.2d 673*, (N.Y. App. Div. 1986) ("The courts of this State have consistently held . . . that a cause of action for fraud does not arise when the only alleged fraud relates to a breach of contract."). Therefore, unless plaintiff's fraud claims are "collateral or extraneous to the terms of the parties' agreement a cause of action sounding in fraud does not lie." *McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 574 N.Y.S.2d 58, 59 (N.Y. App. Div. 1991)* (dismissing plaintiff's claim that defendant "fraudulently induced him with business advice by promising to hire him as chief executive officer and to sell him a substantial ownership interest").

Here, I find that plaintiff's fraud claim is merely a disguised contract claim as the gravamen of the fraud claim is that defendant promised to pay him commissions and failed to do so. Therefore, this claim must be dismissed. [2] *See Saleemi v. Pencom Sys. Inc., 2000 U.S. Dist. LEXIS 6645, *12, No. 99 Civ. 667, 2000 WL 640647 [*8] (S.D.N.Y. May 17, 2000)* ("A defendant's intentionally false statements regarding his intent to perform a contractual obligation cannot in themselves constitute fraud . . . nor can a defendant's failure to perform promises which would be encompassed by the covenant of good faith and fair dealing in every contract constitute fraud.") (*citing Bridgestone/Firestone, 98 F.3d at 19* and *New York University v. Continental Ins. Co., 87 N.Y.2d 308, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763 (N.Y. 1995)*.

> 2 Although I need not reach the issue of whether plaintiff's fraud claim would survive defendant's challenge that is not actionable because it is a promissory statement, I note that under *Stewart v. Jackson & Nash, 976 F.2d 86 (2d Cir. 1992)*, this claim would survive such a challenge. *Jackson & Nash*, however, does not effect the analysis or the conclusion under *Bridgestone/Firestone* since in *Jackson & Nash* the court was not presented with a claim where there was a contract claim in addition to the fraud claim.

[*9] As to plaintiff's claim for negligent misrepresentation, I find that it must be dismissed as well. "Under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992)*. Here, plaintiff has not alleged, nor do I find there to be, a fiduciary relationship between him and the defendant. Therefore, this claim must be dismissed.

4. Promissory Estoppel, Quantum Meruit, and Unjust Enrichment

Metzler alleges that defendant is liable under the equitable doctrines of promissory estoppel, quantum meruit, and unjust enrichment for its failure to pay him post-termination commissions. Defendant responds that these equitable doctrines are inapplicable when there is a written agreement that governs the relationship of the parties. While it is true that plaintiff cannot prevail on his equitable claims if he prevails on his contract claims, plaintiff is entitled to plead in the alternative. Therefore, defendant's motion to dismiss these claims must be denied.

B. Defendant's Motion to Compel Arbitration

Plaintiff claims that defendant breached its [*10] contract with him and violated New York labor law when it failed to agree to pay him post-termination commissions on the remainder of the BOE contract, and defendant has moved to compel arbitration of these claims pursuant to the arbitration clause in the FY00 Sales Incentive Agreement. As most of plaintiff's claims survive defendant's motion to dismiss, I must consider whether they are arbitrable under the FY00 agreement.

It is undisputed that the FY00 agreement contains an arbitration clause, however, plaintiff argues that his claims fall outside the scope of the arbitration provision for two reasons: first, because they are based upon an oral agreement, not the FY00 agreement and, second, because they involve commissions to accrue after the expiration of the FY00 agreement. Alternatively, plaintiff argues that the arbitration clause in the FY00 contract is unenforceable as defendant did not provide adequate consideration or notice. I will discuss each argument in turn.

1. Plaintiff's Claims are Outside the Scope of the Arbitration Clause

2001 U.S. Dist. LEXIS 1903, *10; 143 Lab. Cas. (CCH) P59,209;
17 I.E.R. Cas. (BNA) 588

In considering a motion to compel arbitration, a court must first determine whether the parties agreed to arbitrate, and second, whether [*11] the scope of the agreement encompasses the claims asserted. *See Mehler v. The Terminix Int'l Co., 205 F.3d 44, 47 (2d Cir. 2000)*. In making this determination, a court will abide by the strong policy favoring arbitration and will "construe arbitration clauses as broadly as possible, resolving any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Oldroyd v. Elmira Savings Bank, 134 F.3d 72, 76 (2d Cir. 1998)*. This presumption becomes even stronger when, as here, the court finds that the agreement contains a "broad" arbitration clause. In that case, "the court must compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Mehler, 205 F.3d at 49* (citations omitted).

There is no question that the parties agreed to arbitrate and that the arbitration clause in the FY00 agreement is broad. Therefore plaintiff bears a heavy burden to show nonarbitrable. *See Collins & Aikman Products Co., 58 F.3d 16, (2d Cir. 1995)* ("The clause in this case, submitting to arbitration 'any claim or [*12] controversy arising out of or relating to the agreement,' is the paradigm of a broad clause.").

Plaintiff first argues that his claims for breach of contract and violation of New York Labor law are derived from an oral agreement with Harris. This argument fails on two fronts. First, an oral agreement to pay commissions over the life of the BOE contract is void under the statute of frauds as New York courts "have overwhelmingly found 'perpetual commission' contracts . . . to be contracts not performable within one year and thus subject to the Statute of Frauds." *See Murphy v. Gabelli, 1994 U.S. Dist. LEXIS 14517, *9, No. 93 Civ 1539, 1994 WL 560982, at *4 (S.D.N.Y. 1994).* [3] Any oral agreement is also inoperable as the FY00 agreement, like the FY99 agreement, explicitly supercedes any prior agreements for commissions between the employee and Harris.

    3    Plaintiff argues that he could have been
    terminated within the year, and been paid out for
    his commissions due at termination. However,
    plaintiff cannot overcome the hurdle, that, by the
    very nature of the commissions, they do not
    accrue, and cannot even be determined, until the

BOE makes purchases pursuant to the contract. Plaintiff cannot allege both that he is entitled to post-termination commissions and that the statute of frauds does not apply. He simply cannot have it both ways.

[*13] I now turn to plaintiff's argument that his claims are outside the scope of the arbitration provision because the FY00 agreement expired before the instant dispute arose. This claim too doesn't ring true.

In determining whether a particular claim falls within the scope of an arbitration agreement, a court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987).* "If these factual allegations 'touch matters' covered by the parties' contract, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* Furthermore, a court may compel arbitration of a dispute that arose after the expiration of the arbitration provision. *Fleck v. E.F. Hutton, 891 F.2d 1047, 1052-53 (2d Cir. 1989)* (holding that alleged defamatory statements made after termination were subject to an arbitration provision in the employment contract). In *Litton Fin. Printing v. NLRB, 501 U.S. 190, 115 L. Ed. 2d 177, 111 S. Ct. 2215 (1991)*, the Supreme Court held that post-expiration grievances that spring from the collective bargaining [*14] agreement may be arbitrable: (1) when the dispute "involves facts and occurrences that arise before expiration;" (2) when post-expiration action "infringes a right that accrued or vested under the agreement;" or (3) when "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id. at 206; see also CPR, Inc. v. Spray, 187 F.3d 245, 254 (2d Cir. 1999).*

Here, the gravamen of all of plaintiff's claims is that defendant failed to provide him post-termination commissions as it had promised. This clearly touches upon the terms of the FY00 agreement, and, in fact, the agreement appears to address the precise issue. Applying the standard in *Litton*, plaintiff's claims satisfy the first two categories permitting arbitration of post-termination disputes. First, plaintiff's claims do involve facts and occurrences that arose before expiration of the FY00 agreement as they rely upon plaintiff's procurement of the BOE contract and defendant's agreement to pay him commissions. Second, the post-expiration action, defendant's refusal to pay plaintiff future commissions,

2001 U.S. Dist. LEXIS 1903, *14; 143 Lab. Cas. (CCH) P59,209;
17 I.E.R. Cas. (BNA) 588

does infringe [*15] upon plaintiff's right to collect commissions that accrued under the FY00 agreement.

As I find all of plaintiff's claims stem from the same set of facts, together with the strong presumption in favor of arbitration, plaintiff's remaining claims must be arbitrated.

2. The Arbitration Agreement in the FY00 Agreement is Unenforceable

Alternatively, plaintiff argues that the arbitration provision in the FY00 agreement is unenforceable for lack of consideration and for a lack of notice. Both of these arguments fail. Plaintiff is unable to point to New York case law that supports his argument for a lack of consideration, and, quite to the contrary, it is now the law in New York that a court will compel arbitration even where an at-will employee was given no additional consideration for the insertion of an arbitration clause in his contract. *See Ahing v. Lehman Bros., Inc., 2000 U.S. Dist. LEXIS 5175*, No. 94 Civ. 9027, 2000 WL 460443, at *6-7 (S.D.N.Y. April 18, 2000).

As to the notice argument, New York presumes that a party who signs an agreement has read the contents of that agreement. *See Arakawa v. Japan Network Group, 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999)*. Here, [*16] it is undisputed that plaintiff signed an agreement that stated that he "understood and [had] agreed to" the provisions of the FY00 agreement. [4] Thus, as a matter of law, I must assume that plaintiff had notice of the terms of the FY00 agreement.

4    Plaintiff also relies upon *Snow v. BE & K Construction Co., 126 F. Supp. 2d 5 (D. Me.*

*2001)*, however this case is inapposite. In Snow, the court, applying Maine contracts law, held that the arbitration provision in a employment manual did not compel the plaintiff to arbitrate her sexual harassment claims. The court found that the arbitration agreement did not apply because the plaintiff had never consented to the terms of the employment manual; it had merely been sent to her. The court noted that the plaintiff never indicated her assent by signing anything that expressed her assent to the manual. In contrast, here plaintiff signed an agreement acknowledging his receipt and understanding of the plan.

## CONCLUSION

For the above reasons, defendant's motion [*17] to dismiss is granted with respect to plaintiff's claim for wrongful termination and fraudulent and negligent misrepresentation. Defendant's motion to compel arbitration as to plaintiff's first and second claim is granted and the balance of the plaintiff's claims being part and parcel of the alleged cause of action for breach of contract are arbitrable as well and the scope of discovery will be for the arbitrators. The clerk of court is instructed to close the case, if necessary, the parties may apply to reopen in order to confirm the award.

## SO ORDERED

New York, New York

February 23, 2001

Harold Baer, Jr. U.S.D.J.

LEXSEE

**CARMEL REDDINGTON, Plaintiff-Appellant-Cross-Appellee, -v.- STATEN ISLAND UNIVERSITY HOSPITAL and NORTH SHORE LONG ISLAND JEWISH HEALTH SYSTEM, Defendants-Appellees-Cross-Appellants.**

**Docket Nos. 06-4152-cv(L), 06-4179-cv(XAP)**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2007 U.S. App. LEXIS 28881; 26 I.E.R. Cas. (BNA) 1680*

**October 11, 2007, Argued**
**December 14, 2007, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at, U.S. certified question filed by *Reddington v. Staten Is. Univ. Hosp. & N. Shore Long Is. Jewish Health Sys., 2008 N.Y. LEXIS 2 (N.Y., Jan. 10, 2008)*

**PRIOR HISTORY:** [*1]
Employee brought claims against former employer for age discrimination, violation of whistleblower protection law, and breach of contract. The United States District Court for the Eastern District of New York, I. Leo Glasser, J., *373 F. Supp. 2d 177*, dismissed the whistleblower and contract claims. The parties agreed to dismiss the age discrimination claims with prejudice. Employee appealed the dismissal of her whistleblower and contract claims, and employer cross-appealed, seeking attorneys' fees.
*Reddington v. Staten Island Univ. Hosp., 373 F. Supp. 2d 177, 2005 U.S. Dist. LEXIS 12029 (E.D.N.Y., 2005)*

**DISPOSITION:** Affirmed in part and questions certified.

**COUNSEL:** JONATHAN BEHRINS, Behrins & Behrins, P.C., Staten Island, NY, for Plaintiff-Appellant-Cross-Appellee.

JAMES D. WILLIAMS, JR. (David O. Simon, on the brief), Epstein Becker & Green, P.C., New York, NY, for Defendants-Appellees-Cross-Appellants.

**JUDGES:** Before: KATZMANN, LIVINGSTON, Circuit Judges, and KORMAN, District Judge. *

*    The Honorable Edward R. Korman, Senior

District Judge, United States District Court for the Eastern District of New York, sitting by designation.

**OPINION BY:** LIVINGSTON

**OPINION**

LIVINGSTON, *Circuit Judge*:

Plaintiff-appellant Carmel Reddington appeals from a judgment of the United States District Court for the Eastern District of New York (I. Leo Glasser, J.) [*2] dismissing her claims against her former employer, defendants-appellees Staten Island University Hospital and North Shore Long Island Jewish Health System, Inc. (the "Hospital"), for termination in violation of New York's whistleblower protection law and for breach of an employment contract. This case calls upon us to resolve two significant questions arising under *section 740 of the New York Labor Law*, New York's general whistleblower protection law, and *section 741*, a whistleblower protection statute enacted in 2002 that provides certain protections to employees performing "health care services." For the reasons that follow, we believe these questions should be answered by the New York courts, and we accordingly certify them to the New York Court of Appeals.

The district court also held that Reddington failed to allege facts sufficient to show the existence of an employment contract between the parties and that Reddington had therefore failed to state a claim for breach of such a contract. As to this claim, we agree with the decision of the district court and accordingly affirm

2007 U.S. App. LEXIS 28881, *2; 26 I.E.R. Cas. (BNA) 1680

the judgment of dismissal. We retain jurisdiction to consider the Hospital's cross-appeal after we have [*3] learned the views of the New York Court of Appeals regarding the certified questions or that court declines certification.

## BACKGROUND

The following facts are taken from Reddington's amended complaint and supporting documents, which we must assume to be true in reviewing a *Fed. R. Civ. P. 12(b)(6)* dismissal. *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 165 (2d Cir. 2005)*.

Reddington was an employee of the Hospital from December 19, 1994, to October 30, 2002. She was hired as a Coordinator of Volunteer Services and in March 1998 received a promotion to Manager of Volunteer Services. In February 2002, Reddington attended a meeting at which Joseph Conte, one of the Hospital's Vice Presidents, discussed his plans to offer radiation treatment to cancer patients coming from Italy. After the meeting, Reddington told Conte that she spoke Italian, knew Italian culture and customs, and would be able to assist.

In May 2002, Conte invited Reddington to meet with him and Dr. Gilbert Lederman, the Hospital's Director of Radiation Oncology. At this meeting, Conte and Dr. Lederman told Reddington that several Italian families were at the Hospital and asked her if she would serve as a translator for them [*4] while continuing to perform her duties as Manager of Volunteer Services. Reddington agreed to do so until the Hospital hired a full-time employee to serve as a translator.

Upon meeting the Italian families for the first time, Reddington was "besieged with complaints of inadequate and non-treatment, abandonment, and failure to provide a translator." (Am. Compl. P 21.) Reddington reported these complaints to Dr. Lederman and later to Conte; nevertheless, the patients' complaints were not addressed and persisted for the next several days.

On May 21, 2002, Dr. Lederman asked Reddington to notify the Italian patients of an upcoming meeting. At this meeting, Reddington translated the patients' needs and concerns to Dr. Lederman and other officers of the Hospital.

In June 2002, Reddington served as a translator at another meeting attended by, among others, Conte, Dr. Lederman, and two supposed doctors from Italy. The attendees at this meeting discussed the possibility of opening a second office in Italy that would be managed by one of the Italian doctors. This doctor would receive a referral fee for each patient he referred to the Hospital for treatment, just as the other doctor was already [*5] receiving referral fees in connection with an existing Italian office. Reddington expressed concerns regarding the propriety and legality of this referral fee arrangement to Conte on several occasions, but he did not respond to these concerns or otherwise take any action.

Over the next two months, Reddington continued to work with the Hospital's Italian patients, and they continued to report concerns. In August 2002, Reddington met with Andrew Passeri, whose position with the Hospital is not alleged in the complaint, to again report the inadequate care being afforded the Italian patients. Passeri expressed surprise that Conte had not addressed the patients' concerns and then asked Reddington to be the director of a new International Visiting Patient Program. Reddington alleges that she inquired whether she would be able to return to her position as Manager of Volunteer Services if the opportunity did not work out favorably and that Passeri assured her that she would always be able to return to her former job.

Reddington met with Anthony Ferreri, the Hospital's Senior Vice President of Human Resources, on August 20, 2002, to discuss her new position. She reiterated her concerns about [*6] being able to return to her former position, and Ferreri gave her the same assurances she had received from Passeri. She also expressed concern that she was leaving for a vacation and would not be able to train the person who would be hired to replace her as Manager of Volunteer Services. Ferreri assured her that she should not be alarmed, for the Hospital already had a candidate for the job in mind.

Reddington returned from her vacation and, on August 30, 2002, received and signed a written job description for her new position as "Director -- International Patient Program," reporting to Conte. Her duties and responsibilities, as set forth in the job description, were as follows:

> 1. Coordinate arrival, transportation and lodging for international patients and

2007 U.S. App. LEXIS 28881, *6; 26 I.E.R. Cas. (BNA) 1680

ensure continuity with clinical services staff.

    2. Coordinate and develop with Chief Medical Officer and appropriate medical personnel, services to be offered to international patients.

    3. Coordinate marketing of the international patients program with Senior Staff.

    4. Manage and train personnel providing translation services and maintain an on-call schedule to ensure coverage.

    5. Maintain International Patients Welcome Center to promote [*7] positive image of Staten Island University Hospital and its services.

    6. Develop calendar of activities for international patients to further enhance their experience at Staten Island University Hospital.

    7. Maintain up to date data base on patients serviced.

    8. Distribute, collect and analyze patient satisfaction questionnaires to continually enhance services.

    9. Communicate with consulate to coordinate patient's letters of service.

In her new position, Reddington continued to report complaints to Conte. In September 2002, for example, one of the Italian physicians with whom the Hospital worked expressed to Reddington his frustration that he was required to send prospective patients' pathology slides to the Hospital. Conte explained to Reddington that the pathology slides were necessary because the Hospital, which had previously treated two patients who did not have cancer, was attempting to avoid unnecessary treatments. In October 2002, Reddington went to see Conte again to discuss concerns of inadequate patient care. Reddington complained that her management of the Program was being undermined by Elaine Burke, Ferreri's administrative assistant. Reddington later

reported this concern [*8] to Ferreri. Conte and Ferreri were unresponsive.

On October 25, 2002, Reddington received a phone call from Margaret D'Alto, a Vice President of Human Resources at the Hospital, asking Reddington to meet. At this meeting, Reddington related her concerns, including the concerns that she had previously expressed to Conte and Ferreri. D'Alto responded by saying that Reddington's concerns were legitimate and that D'Alto would investigate further. D'Alto also stated that Conte was very concerned that Reddington had spoken to Passeri's wife and told Reddington that in the future Burke would be the go-between if Reddington needed to contact Conte. Finally, D'Alto asked Reddington to meet again on October 30.

At the meeting on October 30, D'Alto accused Reddington of calling Conte directly after being told to contact Burke if she wished to reach Conte. Reddington replied that she had not understood that she was not permitted to call Conte and that she had done so to coordinate the transportation of a dead patient's body to England. D'Alto said that Reddington's job responsibilities related only to Italian patients, but Reddington replied that D'Alto's understanding was incorrect and that she [*9] had spent several hours during the previous day with the British patient's family. At the conclusion of this meeting, D'Alto dismissed Reddington from her job. Reddington asked if she could return to her former position as Manager of Volunteer Services, and D'Alto refused. Reddington asked what she had done wrong, and D'Alto replied that she had disobeyed orders.

In November 2002, Reddington contacted the New York State Department of Labor, which advised Reddington to obtain a written statement of the Hospital's reasons for terminating her. After several requests by Reddington, the Hospital sent her a letter dated December 10, 2002, stating that she was terminated for probationary failure, even though Reddington was never informed that her new position involved a probationary period.

After receiving a right-to-sue notice from the Equal Employment Opportunity Commission, Reddington filed a complaint in the United States District Court for the Eastern District of New York on March 16, 2004. In the complaint, Reddington alleged numerous causes of action: violations of federal, state, and municipal laws prohibiting age discrimination in employment; violation of the New York Whistleblower [*10] Law, *N.Y. Lab.*

2007 U.S. App. LEXIS 28881, *10; 26 I.E.R. Cas. (BNA) 1680

*Law § 740*; violation of the New York Health Care Whistleblower Law, *N.Y. Lab. Law § 741*; violation of the Fair Labor Standards Act; intentional infliction of emotional distress; and breach of contract. The defendants moved: (1) to dismiss the complaint for failure to state a claim and for lack of subject-matter jurisdiction; and (2) for an award of attorneys' fees under *N.Y. Lab. Law § 740(6)*. Reddington amended her complaint on August 24, 2004, withdrawing the claims arising under *N.Y. Lab. Law § 740* and the Fair Labor Standards Act, as well as her claim for intentional infliction of emotional distress. The defendants again moved to dismiss and for an award of attorneys' fees.

On June 21, 2005, the district court ruled on the defendants' motion. *Reddington v. Staten Island Univ. Hosp., 373 F. Supp. 2d 177 (E.D.N.Y. 2005).* The district court granted the motion in part, dismissing Reddington's claims under *N.Y. Lab. Law § 741* and for breach of contract, *id. at 187, 190*, and denied the motion in part, finding that Reddington had stated claims under federal, state, and municipal age discrimination laws. *Id. at 188*. The court declined to award attorneys' fees to the Hospital. [*11] *Id. at 189*. After discovery on the age discrimination claims, the parties stipulated to dismissal of these claims with prejudice, which led to the entry of final judgment. This appeal followed.

## DISCUSSION

"We review de novo a district court's dismissal of a complaint pursuant to *Rule 12(b)(6)*, construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).* Although "the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).* "To survive dismissal, the plaintiff must provide the grounds upon which [her] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)* (quoting *Bell Atl. Corp. v. Twombly,    U.S.    , 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)*).

### I. Jurisdiction

Before turning to the merits, we are obligated to satisfy ourselves that we have jurisdiction, even if the parties have not argued to the contrary. *Joseph v. Leavitt,*

*465 F.3d 87, 89 (2d Cir. 2006).* [*12] Reddington invoked the district court's federal-question jurisdiction by bringing a claim under the Age Discrimination in Employment Act of 1967, *29 U.S.C. § 626*, and the district court properly exercised its supplemental jurisdiction over Reddington's factually related claims under state and municipal law, *28 U.S.C. § 1367(a)*. At the time the district court dismissed Reddington's claims under *N.Y. Lab. Law § 741* and for breach of contract, the district court undoubtedly had jurisdiction over these supplemental claims. Subsequently, the parties agreed to dismiss the claims of age discrimination—a group that includes the sole federal claim in this case—with prejudice. The dismissal of these claims does not deprive us of subject-matter jurisdiction over Reddington's appeal. *See 28 U.S.C. § 1291; Rosado v. Wyman, 397 U.S. 397, 405, 90 S. Ct. 1207, 25 L. Ed. 2d 442 (1970)* ("We are not willing to defeat the commonsense policy of pendent jurisdiction . . . by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim ."); *Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp., 427 F.2d 499, 501 n.1 (2d Cir. 1970).* Moreover, because, as [*13] discussed below, we have decided to certify the novel questions of state law in this case to the New York Court of Appeals, we have no occasion to consider whether we may or should decline to exercise our jurisdiction on account of the novelty of these questions.

### II. *New York Labor Law § 741*

New York's Health Care Whistleblower Law prohibits an employer from, among other things, "tak[ing] retaliatory action against any employee because the employee . . . discloses or threatens to disclose . . . an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care." *N.Y. Lab. Law § 741(2)*. The statute defines "employee" to mean "any person who performs health care services for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration." *Id. § 741(1)(a)*.

The district court concluded that Reddington did not state a claim under *section 741*. It based its conclusion on two alternative grounds: first, that Reddington waived her claim under *section 741*, the health care whistleblower provision, by previously initiating an action under [*14]

section 740, New York's general whistleblower provision; and second, that Reddington was not an employee within the meaning of section 741. Reddington, 373 F. Supp. 2d at 185-87, 187 n.7. The Hospital urges each of these grounds as a basis for affirmance. We address them in turn.

*A. Did Reddington Waive Her Claim?*

The Hospital's principal argument is that Reddington waived her claim under section 741 by including an action under section 740, New York's general whistleblower provision, in her initial complaint. The statute of limitations applicable to a claim brought under section 740 is one year from the time of the alleged unlawful employment action, N.Y. Lab. Law § 740(4)(a), but the limitations period applicable to a claim brought under section 741 is two years, id. § 740(4)(d). Reddington filed her complaint almost eighteen months after the Hospital terminated her. She originally charged unlawful termination under both sections 740 and 741, but she omitted the section 740 charge from her amended complaint after the defendants moved to dismiss it as time-barred.

Section 740 contains an election-of-remedies provision that states as follows:

> Nothing in this section shall be deemed to [*15] diminish the rights, privileges, or remedies of any employee under any other law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law.

Id. § 740(7). Two relevant questions arise from this provision. First, did Reddington trigger this waiver provision by including a section 740 claim in her initial pleading? Second, if so, what causes of action did the waiver affect?

When we consider issues of New York law, our task is to determine how the New York Court of Appeals would decide them. Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000). We owe no deference to

the district court's interpretation of New York law. Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 370 (2d Cir. 1999). Decisions of New York's intermediate appellate courts are "helpful indicators" of how the Court of Appeals would decide, but we are not "strictly bound" by decisions of the Appellate Division, particularly when we have "'persuasive [*16] data'" that the Court of Appeals would "'decide otherwise.'" DiBella v. Hopkins, 403 F.3d 102, 112 (2d Cir. 2005) (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940)). For the reasons we describe below, we believe that it is appropriate for the New York Court of Appeals, if it so chooses, to address the state law issues regarding the scope of section 740 waivers that are raised by this case.

1. Did Reddington Trigger the Waiver?

The second clause of N.Y. Lab. Law § 740(7) provides, in relevant part, that the institution -- not the maintenance, pendency, or favorable resolution -- of an action in accordance with section 740 "shall be deemed a waiver of the rights and remedies available under any other . . . law." Several courts have suggested that the inclusion of a section 740 claim in a complaint triggers the waiver even if the section 740 claim is facially defective and even if the claim is promptly withdrawn.

For example, in Pipia v. Nassau County, 34 A.D.3d 664, 826 N.Y.S.2d 318 (App. Div. 2006), the plaintiff alleged a violation of section 740, as well as eight other causes of action, seven of which arose from an allegedly unlawful termination. He moved for leave to amend the complaint [*17] to withdraw the section 740 claim and replace it with a section 741 claim. The Appellate Division held that the amended complaint did not state a claim under section 741, and the court also dismissed the seven claims related to the termination because "[t]he mere commencement of an action under Labor Law § 740(4) . . . acts as an election of remedies, waiving other causes of action relating to the alleged retaliatory discharge, irrespective of the disposition of such claims." Id. at 320.

Similarly, in Hayes v. Staten Island University Hospital, 39 A.D.3d 593, 834 N.Y.S.2d 274 (App. Div. 2007), the plaintiff alleged a violation of section 740 and breach of contract. The Appellate Division held that the plaintiff could not proceed on her contract claim even after she withdrew her section 740 claim. See id. at 275 ("[T]he plaintiff's attempt to amend the complaint to

exclude the Labor Law § 740 cause of action did not nullify the waiver." (citations omitted)).

Other courts have adopted a somewhat more flexible reading, allowing plaintiffs a grace period within which they can withdraw *section 740* claims and nullify the effect of the waiver. *See, e.g., Nicholls v. Brookdale Univ. Hosp. Med. Ctr., No. 03-CV-6233 (JBW), 2004 U.S. Dist. LEXIS 12816, 2004 W L 1533831, at \*7 (E.D.N.Y. July 9, 2004)* [*18] ("The court will permit withdrawal of the whistleblower claims . . . by amendment within thirty days. Withdrawal will be deemed the equivalent [of] failing to file the claim."). The court in *Nicholls* interpreted the waiver provision to mitigate what it saw as a "harsh result." *Id.*

2. Does the *Section 741* Claim Fall Within the Waiver's Scope?

The two clauses of *section 740(7)* would seem potentially to contradict each other--the first assuring that "[n]othing in this section shall be deemed to diminish the rights . . . or remedies of any employee under any other law" and the second excepting that "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other . . . law." *N.Y. Lab. Law § 740(7).* As one federal district court has put it, "[o]n a plain reading of Clause Two, New York's whistleblower regime not only 'diminish[es]' other rights, but for employees who seek its shelter, it eviscerates them." *Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 262-63 (S.D.N.Y. 2001)* (second alteration in original).

Responding to this apparent incongruity, courts have adopted differing and sometimes contradictory [*19] limiting constructions of this waiver. New York state courts have generally held that the waiver applies to all causes of action that relate to the retaliatory discharge, which may include contract claims, *see*

*Hayes, 834 N.Y.S.2d at 275; Bordan v. N. Shore Univ. Hosp., 275 A.D.2d 335, 712 N.Y.S.2d 155, 157 (App. Div. 2000),* tort claims, *see Pipas v. Syracuse Home Ass'n, 226 A.D.2d 1097, 641 N.Y.S.2d 768, 768 (App. Div. 1996),* and claims arising under state antidiscrimination laws, *see Owitz v. Beth Israel Med. Ctr., 1 Misc. 3d 912A, 781 N.Y.S.2d 626, 2004 W L 258087, at \*3 (N.Y. Sup. Ct. 2004).* Federal district courts, in contrast, generally interpret the waiver as applying "only to rights and remedies concerning

whistleblowing," *Collette, 132 F. Supp. 2d at 274; see also Reddington, 373 F. Supp. 2d at 185-86; Nicholls, 2004 U.S. Dist. LEXIS 12816, 2004 W L 1533831, at \*6,* and therefore deem it not to apply, for example, to claims of employment discrimination. *Collette, 132 F. Supp. 2d at 274.* Additionally, federal courts have interpreted the provision not to waive or otherwise affect rights arising under federal law. *Id. at 266; Nicholls, 2004 U.S. Dist. LEXIS 12816, 2004 W L 1533831, at \*6; United States ex rel. Mikes v. Straus, 853 F. Supp. 115, 121 (S.D.N.Y. 1994).*

Whatever the proper [*20] scope of the *section 740* waiver, there is an additional consideration here related to the district court's conclusion that a claim under *section 741* falls within it. The waiver, by its terms, relates to "rights and remedies available under any *other*. . . law." *N.Y. Lab. Law § 740(7)* (emphasis added). Although *section 741,* the health care whistleblower provision, provides a set of rights distinct from the rights created by *section 740,* the general whistleblower law, an employee aggrieved by a violation of *section 741* can enforce his or her rights only in accordance with the remedial provisions of *section 740. See id. §§ 740(4)(d), 741(4).* It therefore seems arguable that *section 740's* waiver cannot affect rights created by *section 741* because the associated remedies are available under the same law, not "any other" law.

The logic of *Pipia* supports this reading. As discussed earlier, the court in *Pipia* dismissed claims related to an alleged retaliatory termination because they were waived by the institution of a *section 740* action, even though the plaintiff withdrew the *section 740* claim and replaced it with a *section 741* claim. As an alternative ground for this disposition, the court [*21] stated that "dismissal of the [related] causes of action would have been required even if the plaintiff's *[section 741* claim ] had been pleaded initially." *Pipia, 826 N.Y.S.2d at 320.* According to the court, "[b]ecause a claim alleging a violation of Labor Law § 741(2) is enforced pursuant to Labor Law § 740(4)(d), the same waiver is effected by the institution of a cause of action alleging a violation of Labor Law § 740(2)." *Id.* (citation omitted). Pursuant to this logic, because the waiver is triggered by "the institution of an action in accordance with this section"--namely, *section 740*--a claim under *section 741* is, by necessary implication, an action in accordance with *section 740* as well.

2007 U.S. App. LEXIS 28881, *21; 26 I.E.R. Cas. (BNA) 1680

*B. Does Section 741 Apply to Reddington?*

The Hospital argues that even if Reddington did not waive her *section 741* claim by instituting a claim under *section 740*, the district court correctly determined that Reddington failed to allege facts sufficient to support a claim that she was an employee--a person "who performs health care services for and under the control and direction of any public or private employer which provides health care services"--as defined in the health care whistleblower [*22] statute. *N.Y. Lab. Law § 741(1)(a)*. Accordingly, the Hospital urges that her *section 741* claim was properly dismissed.

*Section 741* was enacted in 2002, and it is therefore not entirely surprising that we are unable to find any reported decisions discussing its definition of employee. We begin with the text of the statute, giving words of ordinary import in the statute their plain meaning. *See* N.Y. Stat. Law § 232 ("Words of ordinary import used in a statute are to be given their usual and commonly understood meaning . . . ."); *id.* § 234 ("Dictionary definitions may be useful as guide posts in determining the sense with which a word was used in a statute . . . ."). In construing a New York law, we also look to legislative history in appropriate cases. *See id.* § 124 ("In ascertaining the purpose and applicability of a statute, it is proper to consider the legislative history of the act . . . .").

However, these sources provide no easily discernable answer in this case. It is not plain on the face of the statute whether health care services may include services beyond the provision of medical treatment. The legislative history may suggest so. *See, e.g.*, N.Y. Legis. Serv. Governor's Bill [*23] Jacket, 2003 A.B. 8017, ch. 505, at 3 ("Like other health care workers, pharmacists often encounter situations in which a regulation is ignored because of expediency[, which] jeopardize[s] patient safety."). The term "health care services" might be read to encompass, for example, a hospital's pharmacist, who would likely learn if a doctor at the hospital was illegally prescribing medication, or even a hospital's insurance claims processor. But the legislative history does not clearly indicate whether the definition extends to someone like Reddington whose job description includes functions such as: (1) "[c]oordinat[ing] and develop[ing] with Chief Medical Officer and appropriate medical personnel[] services to be offered to international patients"; (2) "[d]istribut[ing], collect[ing,] and

analyz[ing] patient satisfaction questionnaires"; and (3) "[m]anag[ing] and train[ing] personnel providing translation services." Neither do we find controlling guidance in other New York statutes that define "health care services" with greater precision, *see, e.g.*, *N.Y. Ins. Law § 4900(e)(2)*; *N.Y. Pub. Health Law § 4900(5)(b)*; *N.Y. Soc. Serv. Law § 369-ee(1)(e)*, for we interpret statutory terms equivalently [*24] only when the statutes refer to the same subject matter and have the same objectives, *see* N.Y. Stat. Law § 221; *Bridgestone/Firestone, Inc. v. Hartnett, 175 A.D.2d 495, 572 N.Y.S.2d 770, 773 (App. Div. 1991)*, which these statutes do not.

**C. Certification**

Pursuant to *Second Circuit Local Rule § 0.27* and New York Court of Appeals Rule § 500.27, "we may certify a question to the Court of Appeals when a question of New York law is 'determinative' of a claim before us and 'no controlling precedent of the Court of Appeals' resolves the question." *O'Mara v. Town of Wappinger, 485 F.3d 693, 698 (2d Cir. 2007)* (quoting *N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27*). In deciding whether to certify, we consider "three main issues: (1) 'the absence of authoritative state court interpretations of the state statute'; (2) 'the importance of the issue to the state' and whether the question implicates issues of state public policy; and (3) 'the capacity of certification to resolve the litigation.'" *Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 531 (2d Cir. 2006)* (citations omitted) (quoting *Green v. Montgomery, 219 F.3d 52, 60 (2d Cir. 2000)*).

Our analysis leads us to conclude that the issues in this case regarding [*25] the scope of *section 740*'s waiver provision and the meaning of health care services in *section 741* are appropriate for certification to the New York Court of Appeals. First, *section 741* has never been discussed, or even mentioned in passing, by the Court of Appeals. Moreover, as we have recounted above, there is a split of authority--between the lower New York state courts on the one hand and at least some federal district courts in New York on the other--on the scope of *section 740*'s waiver, which makes certification particularly appropriate. *See McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir. 1997)* (certification is appropriate when "there is a split of authority on the issue" (quoting *Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 51 (2d Cir. 1992)*)); *id. at 157-58* (Calabresi, J.,

dissenting) (certification is appropriate when the split of authority lies along federal/state lines because such a split would "lead[] to precisely the kind of forum shopping that *Erie R.R. Co. v. Tompkins* was intended to prevent" (citation omitted)). Second, laws applicable to health care workers, however defined, are of great importance to the public policy of New York, [1] and the question [*26] how to interpret essential procedural and substantive provisions of *section 741* is likely to recur. Finally, a decision from the New York Court of Appeals will resolve the *section 741* claim at issue in this case. Because all three factors favor certification, we conclude that it is appropriate to certify the following two questions to the New York Court of Appeals:

> (1) Does the institution of a time-barred claim pursuant to *New York Labor Law § 740* simultaneously with a claim pursuant to *New York Labor Law § 741* trigger *section 740(7)*'s waiver provision and thereby bar the *section 741* claim, even if the *section 740* claim is subsequently withdrawn?

> (2) Does the definition of employee in *New York Labor Law § 741* encompass an individual who does not render medical treatment, and under what circumstances?

1    "In 2004, the health care sector (public and private) in New York employed more than 1,000,000, and paid out almost $ 43 billion in wages . . . ." Kevin Jack, *Health Care Engine Drives New York State*, Emp. in N.Y. St. (N.Y. State Dep't of Labor, Albany, N.Y.), Jan. 2006, at 1, available at http://www.labor.state.ny.us/workforceindustrydata/PDFs/emp0106.pdf.

The New York Court of Appeals [*27] may, of course, reformulate these questions as it sees fit so as to better guide this court and others relying on its work. We reiterate, as we have in the past, *see, e.g., O'Mara*, 485 F.3d at 699, our appreciation for the Court of Appeals's guidance on these matters of state law.

### III. Breach of Contract

Reddington also claims that she had a contractual right to return to her former position as Manager of

Volunteer Services if her tenure with the International Visiting Patient Program did not work out. The Hospital argues that this claim is within the scope of *section 740(7)*'s waiver provision. We decline to decide whether Reddington waived her breach of contract claim because we agree with the district court's conclusion that Reddington does not sufficiently allege an employment contract of definite duration. We therefore affirm the district court's ruling dismissing Reddington's breach of contract claim.

Under New York law, "employment for an indefinite or unspecified term" is presumed to be "at will and . . . freely termina[ble] by either party at any time without cause or notice." *Horn v. N.Y. Times*, 100 N.Y.2d 85, 790 N.E.2d 753, 755, 760 N.Y.S.2d 378 (N.Y. 2003); *see also id.* at 759 ("We have consistently declined [*28] . . . to recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into employment contracts . . . ."). This presumption does not apply, however, when the employer and the employee are parties to an "agreement establishing a fixed duration." *De Petris v. Union Settlement Ass'n*, 86 N.Y.2d 406, 657 N.E.2d 269, 271, 633 N.Y.S.2d 274 (N.Y. 1995).

An agreement can establish a fixed duration even if its duration cannot be determined ab initio, *see Rooney v. Tyson*, 91 N.Y.2d 685, 697 N.E.2d 571, 575, 674 N.Y.S.2d 616 (N.Y. 1998) ("New York's jurisprudence is . . . not so rigid as to require that a definite duration can be found only in a determinable calendar date."), *answering questions certified by 127 F.3d 295 (2d Cir. 1997)*, as long as the duration "is delimited by legally and realistically cognizable boundaries." *Id.* at 574. For example, an offer of "permanent" employment does not specify a definite period, but employment for "life" does. *See id.* (citing *Arentz v. Morse Dry Dock & Repair Co.*, 249 N.Y. 439, 164 N.E. 342, 344 (N.Y. 1928)). In *Rooney*, for example, the court held that the plaintiff, who was promised that he would be employed as a trainer for the boxer Mike Tyson "'for as [*29] long as [Tyson] fights professionally,'" had an employment contract of definite duration because "the durational term was understandable . . . and reasonably determinable." *Id.* at 575, 576.

Relying principally on *Rooney*, Reddington argues that Passeri's and Ferreri's statements to her created an expectation of employment for a definite duration and that the Hospital breached its contract with her by failing to allow her to resume her former job as Manager of

2007 U.S. App. LEXIS 28881, *29; 26 I.E.R. Cas. (BNA) 1680

Volunteer Services when it terminated her from the position of Director of the International Visiting Patient Program. Specifically, Reddington alleges that: (1) Passeri "assured [her] that her former position as Manager of Volunteer Services would always be available to her" (Am. Compl. P 43); and (2) Ferreri "reiterated Mr. Passeri's assurances that [Reddington] would always be able to return to her former position" (Am. Compl. P 44).

These statements do not give rise to an understandable and reasonably cognizable duration of employment so as to overcome New York law's presumption of employment at will. *See Baron v. Port Auth. of N.Y. & N.J., 271 F.3d 81, 85 (2d Cir. 2001).* Rather, by promising that Reddington's old job would "always" [*30] be available, these assurances are akin to an offer of "permanent" employment, which New York law does not recognize to specify a definite period. Whatever the precise limits of the doctrine enunciated in *Rooney*, the statements made to Reddington clearly lie outside of them. *See Arentz, 164 N.E. at 344* ("An agreement to give a person permanent employment means nothing more than that the employment is to continue indefinitely and until one or the other of the parties wishes for some good reason to sever the relation."). Reddington has not alleged sufficient facts to suggest that she was not an at-will employee, and therefore she has not adequately alleged that the Hospital breached an employment contract by terminating her. We accordingly affirm the district court's dismissal of her contract claim.

**IV. Cross-Appeal**

New York's Whistleblower Law authorizes "[a] court, in its discretion, [to] order that reasonable attorneys' fees and court costs and disbursements be awarded to an employer if the court determines that an action brought by an employee under this section was without basis in law or in fact." *N.Y. Lab. Law § 740(6).* New York courts have awarded attorneys fees under this provision [*31] after finding "not only that there is no merit in the claim and that it should be dismissed as a matter of law, but also that it lacks even any arguable merit and that such lack of merit should have been apparent at the commencement of the action." *Rotwein v. Sunharbor Manor Residential Health Care Facility, 181 Misc. 2d 847, 695 N.Y.S.2d 477, 482 (Sup. Ct. 1999).* Whether Reddington's action was, at its commencement, without basis in law or fact will depend at least partially on how the certified questions are resolved. We therefore retain jurisdiction to consider the Hospital's cross-appeal.

**CONCLUSION**

We conclude that unresolved, important, and determinative issues of New York law are central to this case, and certification to the New York Court of Appeals is therefore appropriate. Accordingly, the judgment of the district court is AFFIRMED in part, and two questions are CERTIFIED to the New York Court of Appeals.

It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form set forth above, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will [*32] retain jurisdiction to consider all issues that remain on appeal once the New York Court of Appeals has either provided us with its guidance or declined certification. Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.

LEXSEE 2004 US DIST LEXIS 1415

**STEPHEN SIMAS, Plaintiff, -against- MERRILL CORPORATION, MERRILL COMMUNICATIONS LLC, and LISA DADY, Defendants**

**02 Civ. 4400 (RCC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 1415*

**January 29, 2004, Decided
February 4, 2004, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted in part and denied in part. Plaintiff's cross motion for summary judgment granted in part and denied in part.

**COUNSEL:** For Stephen Simas, PLAINTIFF: Brian L Gardner, Sullivan, Chester & Gardner, LLP, New York, NY USA.

For Merrill Corporation, Merrill Communicaitons LLP, Lisa Dady, DEFENDANTS: Clifford R Atlas, Jackson Lewis, LLP, New York, NY USA.

**JUDGES:** KEVIN THOMAS DUFFY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEVIN THOMAS DUFFY

**OPINION**

*MEMORANDUM AND ORDER*

KEVIN THOMAS DUFFY, U.S.D.J.

Stephen Simas ("plaintiff" or "Simas") seeks damages under *N.Y. Lab. Law § 198* (McKinney 2002) for defendant Merrill Corporation's ("Merrill") alleged willful refusal to pay him earned wages as required by *Article 6 of New York's labor law.* In connection with his labor law claim, plaintiff seeks damages for breach of contract, unjust enrichment, quantum merit, fraudulent inducement, and conversion. Finally, plaintiff brings a claim for defamation for statements allegedly made by defendant Lisa [*2] Dady ("Dady") following his resignation. Before the court are defendants' motion and plaintiff's cross motion for summary judgment. Defendants seek summary judgment on all of plaintiff's claims. Plaintiff, in turn, seeks summary judgment on his labor law, breach of contract, unjust enrichment and quantum merit claims. For the following reasons defendant's motion is granted as to plaintiff's unjust enrichment, quantum merit, fraudulent inducement, conversion and defamation claims. Defendant's motion is granted in part and denied in part as to the remaining labor law and breach of contract claims. Plaintiff's cross motion for summary judgment is granted in part solely with respect to his labor law and breach of contract claims but in all other respects, is denied.

BACKGROUND

Defendant Merrill is a document and communications services company. In 1995, plaintiff joined the operation department of Merrill's Document Management Services ("DMS") division (Def. Rule 56.1 Statement PP 1, 2). Sometime in either August or October of 1999, he transferred to the sales department where he worked as a commission salesman until his resignation in June of 2001. (Def. Rule 56.1 Statement PP 3-4).

[*3] As a sales representative, plaintiff's compensation package consisted of: a base salary, revenue based commissions, and a signing bonus incentive. (DMS Sales Compensation Plan ("DMS Plan") pg. 2). Sales representatives were eligible to receive 2%

Case 1:07-cv-10673-RWS    Document 10-3    Filed 02/08/2008    Page 11 of 26

Page 2
2004 U.S. Dist. LEXIS 1415, *3

commissions for accounts sold; these commissions to be calculated and paid quarterly on collected revenue over the course of an account's contract term. (DMS Plan pg. 2). Under the plan, however, management could review commissions for an account that performed below an 18.9% profit margin. (DMS Plan pg. 2). In addition, employees were eligible to receive signing bonuses, of up to 80% of a new account's monthly contractual base revenue. (DMS Plan pg. 3). [1] Half of this bonus was payable one month after the account was first sold. The remainder was paid at the end of the first year and adjusted for year-end margin results. (DMS Plan pg. 3). [2]

> 1    The actual percentage paid depended on two factors: the number of years a client signs on for and the account's "economic class designation." (DMS Plan pg. 3). When sold, accounts were initially classified according to their estimated gross margin. The higher the class designation and the longer the contract term, the higher the signing bonus paid. (DMS Plan pg. 3).

[*4]

> 2    For bonuses over $ 100,000, however, payments were made in installments with $ 100,000 paid the first year and the remaining balance paid equally over the remaining contract years. (DMS Plan pg. 3).

At issue here are allegedly earned, but unpaid commissions and signing bonuses for eight accounts. Specifically, plaintiff claims he is owed the second half of his signing bonus for the Jenkens & Gilchrist, Conde Nast, and Skadden Arps accounts. [3] Plaintiff also seeks approximately $ 696,943 in unpaid commissions [4] on the Conde Nast, Cowen Liebowitz, SG Cowen, Skadden Arps, Akin Gump, CIBC World Markets ("CIBC"), and Lockheed Martin accounts.

> 3    In total, plaintiff seeks to recover $ 79,220.65 in unpaid signing bonuses. (Def. Rule 56.1 Statement PP 20-22).
> 4    This includes commissions allegedly earned but not paid while Simas was still employed at Merrill as well as commissions following his resignation for the remaining terms of the accounts he was assigned to.

[*5] Two of these accounts - CIBC and Lockheed Martin - were not subject to the DMS Plan. As to CIBC, plaintiff claims Merrill orally agreed to pay him a 2% commission. (Pl. Rule 56.1 Statement P 38). Plaintiff,

however, was only paid commissions at a rate of 1.25%. (Pl. Rule 56.1 Statement P 39). [5] The Lockheed account, in turn, was a project based account for which plaintiff was to receive an 8% commission rate. (Def. Rule 56.1 Statement P 44). [6]

> 5    Except for three months in 2000 when he received 0.75%. (Gardner Decl. Exh. F).
> 6    The Lockheed commissions are also referred to as "reprographic" commissions.

Plaintiff further alleges that following his resignation, two Merrill employees - defendant Dady and Al McNee - defamed him to other Merrill employees and clients in the document services industry. Specifically, Simas claims that Dady told employees at manager meetings that he was in "cahoots" with clients to run up prices so that he could receive higher commissions and provide kickbacks. (Pl. Rule 56.1 [*6] Statement P 48). Plaintiff further alleges that Dady told Debra Reckseik of Conde Naste that "now that Steve is gone, things are going to get a lot better." (Pl. 56.1 Statement P 56). Finally, plaintiff claims that Al McNee made derogatory remarks about him in an employee meeting, and in a telephone call with another Merrill employee, referred to Simas as a "scumbag." (Def. Rule 56.1 Statement P 62). [7]

> 7    Although the initial complaint alleges that other statements were made, no such statements other then the ones detailed above are identified.

STANDARD OF REVIEW

Under *Federal Rule of Civil Procedure 56(c)*, summary judgment is appropriate where there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. "Genuine" facts are those facts that provide a basis for a "rational trier of fact to find for the nonmoving party. [*7] " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. A fact is "material" where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. All evidentiary material submitted must be viewed in the light most favorable to, and all inferences must be drawn in favor of, the non-moving party. *Oneida Nation of New York v. City of Sherrill, 337 F.3d 139, 174 (2d Cir. 2003)*.

2004 U.S. Dist. LEXIS 1415, *7

In opposing a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586.* In other words, an opponent cannot rest solely "upon [] mere allegations or denials of the adverse party's pleading" but rather, must come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e); see also Omnipoint Communications, Inc. v. City of White Plains, 175 F. Supp.2d 697, 711 (S.D.N.Y. 2001).*

MERITS

1. Labor Law and Breach [*8] of Contract Claims

Plaintiff's first claim is for violation of *New York Labor Law Article 6.* Pursuant to *N.Y. Lab. Law § 191(c)* (McKinney 2002), commission salesmen are to be paid in accordance with the agreed terms of employment. Thus, a claim under Article 6 rises and falls with plaintiff's claim for breach of contract. *See Tierney v. Capricorn Investors, L.P., 189 A.D.2d 629, 592 N.Y.S.2d 700, 703 (N.Y. Sup. Ct. 1993).* Failure to establish a contractual right to wages necessarily precludes a statutory claim under New York's labor law. *Tierney v. Capricorn Investors, L.P., 189 A.D.2d 629, 592 N.Y.S.2d 700, 703 (N.Y. Sup. Ct. 1993).*

As noted, plaintiff seeks; 1) commissions allegedly earned but not paid while at Merrill ("pre-resignation commissions"); 2) commissions for the remaining terms of those accounts he sold while at Merrill ("post-resignation commissions"); and 3) the second half of signing bonuses on certain accounts. Each will be dealt with in turn. [8]

> 8 Since the DMS Plan did not cover either the CIBC or Lockheed accounts, plaintiff's labor law and contract claims as to these accounts will be dealt with separately.

[*9] *Post Resignation Commissions*

Resolution of plaintiff's claim for post resignation commissions turns on when, under his contract, commissions are first earned. If earned while still employed at Merrill, his commissions *cannot* thereafter be forfeited. *Weiner v. Diebold Group, Inc., 173 A.D.2d 166, 167, 568 N.Y.S.2d 959 (N.Y. App. Div. 1st Dep't. 1991); Tuttle v. Geo. McQuesten Co., Inc., 227 A.D.2d 754, 756, 642 N.Y.S.2d 356 (N.Y. App. Div. 3rd Dep't.*

*1996) (forfeiture of vested wages violates public policy).*

Ordinarily, the meaning of a contract is a question of law. But if a term or clause is ambiguous and determination of the parties' intent rests on extrinsic evidence or a choice among inferences drawn from that evidence, it presents a question of fact not appropriate for resolution by summary judgment. *See O'Shea v. Bidcom, Inc., 2002 U.S. Dist. LEXIS 13225, 2002 WL 1610942, *4 (S.D.N.Y. 2002); Lerer v. City of New York, 301 A.D.2d 577, 756 N.Y.S.2d 217, 219 (N.Y. App. Div. 2d Dep't. 2003); Jackson Heights Medical Group, P.C. v. Complex Corp., 222 A.D.2d 409, 634 N.Y.S2d 721 (N.Y. App. Div. 2d Dep't. 1995).* [9] Summary judgment may still be appropriate, [*10] however, if after considering all the material evidence, a rational fact finder could only find for the movant. *Pryor v. USX Corp., 806 F. Supp. 460, 463 (2d Cir. 1992).*

> 9 Whether such an ambiguity exists in the first place, is a question for the court to decide. *O'Shea v. Bidcom Inc., 2002 U.S. Dist. LEXIS 13225, 2002 WL 1610942, *4 (S.D.N.Y. 2002).*

Summary judgment is appropriate here. Although the term "earned commissions" in the DMS plan is undefined, several other provisions concerning the calculation and payment of commissions make clear that commissions can only be earned *quarterly;* not, as plaintiff suggests, at the time of sale. *See Graff v. Enodis Corp, 2003 U.S. Dist. LEXIS 4899, 2003 WL 1702026 (S.D.N.Y. 2003).*

*Graff* is particularly on point. Plaintiff in *Graff* was an at-will employee whose compensation was pegged to sales commissions. *2003 U.S. Dist. LEXIS 4899, at *1.* Like Simas, plaintiff in *Graff* argued that it was his "understanding" that commissions were earned as of the date sales orders were placed. [*11] *Id.* An employee policy bulletin, however, provided that the "commissionable values" would be determined by the "net sales value for equipment actually shipped and invoiced." *Id.* (emphasis omitted). The same bulletin also provided for payment of commissions "during the last period of the month after the commission [was] earned." *Id.* Noted the court; the "only reasonable reading of this language is that commissions are earned when orders are shipped and customer is invoiced, with payment made the following month." *2003 U.S. Dist. LEXIS 4899 at *2.* Accordingly, the court found that the commissions were not earned at the time of sale and granted defendant's

2004 U.S. Dist. LEXIS 1415, *11

motion for summary judgment as to Graff's Article 6 and contract claims.

Here, just as in *Graff*, the DMS Plan explains how commissionable values are determined. Specifically, the plan states that commissions are to be calculated and paid quarterly "on collected revenue only." (DMS Plan pg. 2). 10 Also just as in *Graff*, the DMS Plan sets out a payment schedule; providing for payments in the quarter subsequent to performance. (DMS Plan pg. 4). Finally, the plan gives management the right to review commissions for accounts that perform [*12] below an 18.9% profit margin for any given *quarter*. (DMS Plan pg. 2) (emphasis added). In light of *Graff*, the only reasonable reading of these provisions is that commissions are earned quarterly.

    10    Collected revenue means "that invoices issued for sales have been paid in full." (DMS Plan pg. 2).

Accepting Simas' interpretation, in contrast, would read out these very provisions. In particular, it would render nonsensical the provision providing for payment in the quarter subsequent to performance. Plaintiff's reading of the DMS Plan, therefore, is unreasonable. *See O'Shea, 2002 U.S. Dist. LEXIS 13225, 2002 WL 1610942 at *5* (plaintiff's motion for summary judgment denied where his interpretation of the contract would read out provisions granting defendant the right to adjust revenue calculations on which commissions were based).

Plaintiff's interpretation, finally, would lead to absurd results. The commissions at issue are for contracts 3 or 5 years in length. (Def. Rule 56.1 Statement P 41) If commissions were [*13] earned at the point of sale, it would result in a windfall for plaintiff; entitling him to commissions several years beyond his resignation.

In short, commissions under the DMS plan cannot be earned at the time of sale. Plaintiff's claim to the contrary is nothing more then an assertion having no basis in the language of the plan or in practice. Since, by his resignation, plaintiff was no longer currently employed, he has forfeited any right to future commissions.

Accordingly, summary judgment is granted for defendant as to plaintiff's claim for post-resignation commissions.

*Pre-resignation commissions*

In light of the above discussion, plaintiff's claim for pre-resignation commissions on the Conde Nast, Cowen Liebowitz, Skadden Arps, Akin Gump, and SG Cowen accounts is easily disposed of. For each of these accounts, plaintiff did not receive commissions either because profitability fell below 18.9% or invoices were not paid.

Plaintiff claims that he is owed a 2% commission regardless of how his accounts actually performed. When sold, accounts are given a "class" designation based on a work-up of their expected profit margin. (Def. Rule 56.1 Statement P 31). Per the [*14] DMS Plan, commissions are not paid on "Class 1 accounts." [11] (DMS Plan pg. 2, Def. Rule 56.1 Statement P 30). According to plaintiff, since all the accounts he seeks commissions for were sold as a Class 2 or higher, he is entitled to the commissions.

    11    "Class 1" account are those with a 16-18.9% profit margin. "Class 2" accounts operate at a 19-25.9% margin. "Class 3" accounts operate at above a 25.9% margin. (DMS Plan pg. 3).

This ignores, however, the plain language of the contract (noted above) that clearly provides management the right to review commissions on accounts that perform below 18.9% for any given quarter. (DMS Plan pg. 2). So while an account may be sold at a particular class level, actual profitability determines whether an employee earns commissions. (Def. Rule 56.1 Statement P 31).

Plaintiff himself recognizes this. Although it was his "understanding" or "expectation" that he would be paid 2% commission regardless of the actual performance of his accounts, "in practice, [he] came to [*15] realize that if [the account] was operating at less then 18.9 [%] ... [he] did not receive payment because of that exact issue." (Simas Dep. at 52-53).

Moreover, commissions are paid only on *collected* revenue. Plaintiff claims that invoices were not paid as a result of Merrill's billing errors - something beyond his control. In these circumstances, he argues he is still entitled to commissions. (Simas Dep. at 33-34). Such an expectation, however, also has no basis in the language of the DMS Plan, which clearly states that commissions will be paid on collected revenue and does not excuse late payments resulting from billing errors beyond the salesperson's control. Again, practice bears this out; plaintiff admitted he never received payments for unpaid invoices even in those instances of billing errors. (Simas Dep. at 34-35).

Case 1:07-cv-10673-RWS    Document 10-3    Filed 02/08/2008    Page 14 of 26

Page 5
2004 U.S. Dist. LEXIS 1415, *15

In short, plaintiff has been paid all commissions due. His claim is for accounts that either under-performed or for which Merrill has not collected revenue. (Def. 56.1 Statement P 7, 34). Accordingly, under the clear and unambiguous language of the DMS plan, defendant had the discretion to deny commissions for the Conde Nast, Cowen Liebowitz, Skadden [*16] Arps, Akin Gump, and SG Cowen accounts.

*CIBC Commissions*

Plaintiff also seeks commissions for the CIBC Account; alleging that he had an agreement with defendant that he would be paid 2%. (Pl. Rule 56.1 Statement P 38). Specifically, plaintiff claims that prior to joining the sales department, he was told by Dady that if he sold the CIBC Account, he would receive the salesman commission. (Simas Dep. 256). Lisa Dady, however, could not recall such a conversation. Thus, she could neither confirm nor deny that she agreed to pay plaintiff 2% sales commission. (Dady dep. 163-64). Nevertheless, plaintiff was paid 1.25% (except for a 3 month period in which he was paid. 75%). (Gardner Decl. Ex. F).

As an at-will employee, "defendant was entitled to change the terms of [plaintiff's] employment agreement [] *prospectively*, subject to plaintiff's right to leave the employment if the new terms were unacceptable." *Gebhardt       v.       Time       Warner Entertainment-Advance/Newhouse, 284 A.D.2d 978, 726 N.Y.S.2d 534, 535 (N.Y. App. Div. 4th Dep't. 2001)* (emphasis added). Thus, Merrill could have later informed Simas that his commissions would be reduced to 1.25%. But if, as [*17] plaintiff suggests, there was an oral agreement to pay 2%, defendant could not thereafter refuse to pay him commissions already earned at that rate. Since the terms of the oral agreement are in dispute, however, summary judgment is not appropriate.

*Lockheed Martin Commissions*

Finally, plaintiff seeks commissions for the Lockheed Martin account. (Def. Rule 56.1 Statement P 42). Since the Lockheed account was "project" based, commissions were not subject to the DMS Plan. (Def. Rule 56.1 Statement P 42).

It is undisputed that the commission for project-based sales was 8%, there was a 120-day receivable requirement, and no revenue had been collected on the account until after plaintiff's resignation (Def. Rule 56.1 Statement P 44). It's unclear, however, as to what (if any) other terms there were, i.e., terms regarding the calculation and payment of commissions. Presumably Merrill has a written contract covering commissions for such accounts. Indeed, plaintiff was shown such a plan during his deposition. Plaintiff, however, could not recall ever receiving or seeing such a plan, (Def. Rule 56.1 Statement P 44), nor has defendant produced it for the court. Among the factual issues [*18] remaining, then, are when and how commissions are earned.

*Signing Bonuses*

In addition to the above commissions, plaintiff also seeks the second half of his signing bonus for several accounts. Defendant contends, however, that the signing bonuses were incentive compensation and thus subject to forfeiture. This argument is without merit.

Under New York labor law, wages are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." *N.Y. Lab. Law § 190(1)* (McKinney 2002). The statute, as explained in *Truelove v. Northeast Capital & Advisory, Inc., 95 N.Y.2d 220, 224, 738 N.E.2d 770, 715 N.Y.S.2d 366 (N.Y. 2000)*, "contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled." Thus, "discretionary additional remuneration, as a share in a reward to all employees for the success of the employer's entrepreneurship, falls outside the protection of the statute." *Id.*

The signing bonuses here do not constitute incentive compensation; they were guaranteed as a term of employment, tied to [*19] plaintiff's individual performance, and did not involve discretion on the part of Merrill. First, the DMS Plan specifically provided that "each sales representative *will* receive a DSC signing bonus for all new accounts" meeting certain length and economic parameters." (DMS Plan pg. 3) (emphasis added). Commission salesman, therefore, were guaranteed a signing bonus upon sale of a new account.

The amount owed, moreover, was clearly tied to the individual employee's performance and did not involve management discretion. Pursuant to the plan, employees were eligible to receive up to 80% of one month's base

Case 1:07-cv-10673-RWS    Document 10-3    Filed 02/08/2008    Page 15 of 26

Page 6
2004 U.S. Dist. LEXIS 1415, *19

revenue for contracts sold *by that individual.* Unlike other cases, in which courts have found bonuses were not wages, the signing bonuses here were not dependent upon firm or departmental performance. *Compare Truelove v. Northeast Capital & Advisory, Inc., 95 N.Y.2d 220, 224, 738 N.E.2d 770, 715 N.Y.S.2d 366 (N.Y. 2000)* (bonus not wages where payments not predicated upon plaintiff's own personal productivity but rather depended *solely* on employer's financial success) *and International Paper Co. v. Suwyn, 978 F. Supp. 506, 514 (S.D.N.Y. 1997) with Fiorenti v. Central Emergency Physicians, 187 Misc. 2d 805, 723 N.Y.S.2d 851, 855 (N.Y. Sup. Ct. 2001)* [*20] (bonuses were wages where the formula for determining the bonus amount accounted for the employee's own personal productivity). Finally, the contract clearly laid out the circumstances under which bonuses were to be paid; both how much and when. Although management had the right to "withhold, reduce or cancel payments" given an individual's day-to-day job performance, they did not have such unfettered discretion as to render the signing bonuses incentive compensation. *Compare Schutty v. Pino, 1997 U.S. Dist. LEXIS 9266, 1997 WL 36812, *3 (S.D.N.Y. 1997)* (bonuses wages where it was determined by a fixed formula based upon the gross fees earned by the firm for the year) *with Tischmann v. ITT/Sheraton Corp., 882 F. Supp. 1358, 1370 (S.D.N.Y. 1995)* (payments under incentive plan not wages where employer had right to determine what amount, if any, employees were owed); *Markby v. Painewebber Incorp., 169 Misc. 2d 173, 650 N.Y.S.2d 950 (N.Y. Sup. Ct. 1996).* In short the signing bonuses here were more directly tied to the work of the individual such that they can and should be considered wages. And as wages, they could not be forfeited if earned prior to his resignation. [*21] *Weiner, 173 A.D.2d at 167.* [12]

> 12    Defendant also argues that Simas is a bona fide executive who earns in excess of $ 600 a week and as such, has no right to a wage supplement under *N.Y. Lab. Law § 198(c)* (McKinney 2002) (Def. Mem. of Law at 10). This argument has no merit as *§ 198(c)*, which deals with criminal penalties for failure to pay a wage supplement, is not at issue here. In any event, defendant has already admitted that plaintiff is a commission salesman and the holding that his signing bonuses are wages resolves any claim that they may also be considered a wage supplement.

Plaintiff is thus entitled to partial summary judgment

on the issue of whether the signing bonuses were wages. Still in dispute, however, is when these wages were earned.

## 2. Fraudulent Inducement and Conversion Claims

Plaintiff also alleges that Merrill knowingly and falsely represented that it would "pay certain commissions and signing bonuses for sales generated by plaintiff." (Pl. [*22] Complaint P 39). Such a representation, however, is nothing more than an allegation that defendant intentionally planned to breach and had no intent to perform under the contract. Generally speaking, such a misrepresentation is insufficient to support a claim for fraud. *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19 (2d Cir. 1996).*

However, when a plaintiff claims that defendant intended to breach a contract, a claim for fraud may lie where; 1) defendant owes a legal duty to plaintiff apart from the duty to perform under the contract; 2) defendant makes a fraudulent statement that is collateral or extraneous to the contract; or 3) plaintiff seeks special damages unrecoverable as contract damages. *Bridgestone/Firestone v. Credit Services, Inc., 98 F.3d 13, 20 (2d Cir. 1996); Marriott International, Inc. v. Downtown Athletic Club of New York City, Inc., 2003 U.S. Dist. LEXIS 9570, 2003 WL 21314056, *6 (S.D.N.Y. 2003).*

Simas does not allege any extraneous or collateral misrepresentations to the contract. At issue is simply Merrill's obligation, under its compensation agreements, to pay Simas certain commissions and signing bonuses. [*23] There is also no allegation that Merrill owed a separate legal duty to Simas other then under the contract. And, most tellingly, Simas does not seek any special damages. Indeed, he seeks to recover only "contract" damages. (Pl. Complaint P 9).

For similar reasons, defendant's motion for summary judgment as to plaintiff's conversion claim is also granted. As with his claim for fraudulent inducement, plaintiff seeks only contract damages. Such a claim is redundant. *New York Racing Assoc., Inc. v. Meganews, Inc., 2000 WL 307378, *5 (E.D.N.Y. 2000); Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 884, 452 N.Y.S.2d 599 (N.Y. App. Div. 1st Dep't. 1982).*

## 3. Unjust Enrichment and Quantum Merit Claims

2004 U.S. Dist. LEXIS 1415, *23

In addition to his contract claims, plaintiff alleges that he rendered valuable services to defendant for which he should be compensated.

Unless there is a dispute over the existence of a contract or the contract does not cover the dispute at issue, a contract will not be implied in fact. *See Sugerman v. MCY Music World, Inc., 158 F. Supp.2d 316, 326 (S.D.N.Y. 2001)*. In other words, there can be no equitable relief where there is an express [*24] (written or oral) contract governing the subject matter at hand. *See Id.; Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (N.Y. 1987)* (it is "impermissible ... to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties").

Here, there is no dispute that there were valid contracts pursuant to which plaintiff was to be paid commissions and signing bonuses. The only dispute is over whether plaintiff was owed commissions and if so, how much. Accordingly, plaintiff cannot maintain a cause of action for equitable relief - whether as unjust enrichment or quantum merit.

4. Defamation Claim

To make out a claim for defamation, plaintiff must prove that there was; 1) a false statement of fact; 2) which was regarding him or herself; 3) published to a third party; 4) that caused injury. *See Stewart v. Florence Nightingale Health Center, 1999 U.S. Dist. LEXIS 3985, 1999 WL 179373, *10 (S.D.N.Y. 1999)*. Simas' claim for defamation, based on the alleged statements by Dady made at the site and [*25] area managers meetings, must fail as he has not proffered any non-hearsay evidence to show that defamatory statements were ever made.

Plaintiff himself never heard the alleged defamatory statements first hand (Simas Dep. 177). He claims that he found out about Dady's alleged statements only through other Merrill employees who participated in the meetings (Simas Dep. at 175). Specifically, plaintiff claims he was told of the statements by site managers Edward Dragone, Eugene Acevedo, John Bernard, and area manager Michelle Dragone (Simas Dep. at 177-78). Defendant Dady, however, denies making any such statements. (Dady Dep. at 77, 85). In sworn affidavits, moreover, Eugene Acevedo, Edward Dragone, John Bernard, and Michelle Dragone deny hearing Lisa Dady make the alleged defamatory remarks. (Acevedo Aff. P 4, Bernard Aff. P 3, E. Dragone Aff. P 3, M. Dragone Aff. P 4).

Accordingly, defendant has met its burden of establishing lack of publication. Plaintiff's claim that he was told, by several employees, that slanderous statements were made is nothing but hearsay and insufficient to create a triable issue of fact for the testimony of other workers, when relayed through plaintiff, is [*26] inadmissible. *See 1999 U.S. Dist. LEXIS 3985, [WL] at *11*.

Similarly, plaintiff's claim for defamation based on statements made by Dady to Reckseik at Conde Nast must fail. As with the statements allegedly made at the site and area managers' meetings, Dady denies telling Reckseik (or any client in the New York region) that "things would run more smoothly now that Steve had left the company." (Dady Dep. at 67-68). Again, Simas was not present for the conversation and relies solely on third party information (another former employee - Bill Vernon) to support his defamation claim. (Simas Dep. at 200-02). Nothing else in the record, however, supports plaintiff's claim that Dady made the statements at issue.

Again, when "challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made." *Albert v. Loksen, 239 F.3d 256, 266 (2d Cir. 2001) quoting, Snyder v. Sony Music Entm't, Inc., 252 A.D.2d 294, 298, 684 N.Y.S.2d 235 (N.Y. App. Div. 1st Dep't 1999)*. The parties, moreover, have had ample time to complete discovery and there is no reason to believe that any further discovery will allow plaintiff to uncover further [*27] evidence.

The final statement at issue - Al McNee's reference to plaintiff as a "scumbag" - is also insufficient to withstand summary judgment. First, plaintiff failed to plead with any specificity this statement in the initial complaint. Indeed, Al McNee is not even named as an individual defendant. In any event, calling plaintiff a "scumbag" is nothing more then an epithet that is insufficient to maintain an action for defamation.

CONCLUSION

Plaintiff may proceed on his labor law and contract claims with respect to the CIBC and Lockheed Martin accounts as well as the second half of his signing

2004 U.S. Dist. LEXIS 1415, *27

bonuses. In all other respects, defendant's motion for summary judgment is granted.

SO ORDERED

Dated: January 29, 2004

KEVIN THOMAS DUFFY

UNITED STATES DISTRICT JUDGE

LEXSEE 1996 US DIST LEXIS 14198

**W.S.A., INC. d/b/a HARMON CONTRACT, Plaintiff, -against- ACA CORPORATION AND WESTCHESTER FIRE INSURANCE COMPANY, Defendants. ACA CORPORATION, Plaintiff, -against- W.S.A., INC. d/b/a HARMON CONTRACT, AMERICAN HOME ASSURANCE COMPANY and ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendants.**

**94 Civ. 1868 (CSH), 94 Civ. 1493 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 14198*

**September 25, 1996, Decided
September 27, 1996, FILED**

**DISPOSITION:**    [*1] Harmon's *Rule 15(a)* motion for dismissal of ACA's Second Amended Complaint denied, and ACA granted leave to add St. Paul and American Home as defendants. Harmon's *Rule 12(b)(6)* motion mooted in part, granted as to ACA's claims for tortious interference with economic relations and breach of the covenant of good faith and fair dealing, and denied as to ACA's fraud in the inducement claim.

**COUNSEL:** For ACA CORPORATION, plaintiff (94-CV-1868): Stephen Powers, Ober, Kaler, Grimes & Shriver, New York, NY.

For W.S.A., INC. dba Harmon Contract, defendant (94-CV-1868): Thomas F. Cohen, Goetz, Fitzpatrick & Flynn, NY, NY.

For W.S.A., INC. dba Harmon Contract, plaintiff (94-CV-1493): Thomas F. Cohen, Goetz, Fitzpatrick & Flynn, NY, NY. Kathleen M. McGeehin, c/o Goetz, Fitzpatrick & Flynn, New York, NY.

For ACA CORPORATION, defendant (94-CV-1493): Robert W. Biddle, Ober, Kaler, Grimes & Shriver, Baltimore, MD.

For WESTCHESTER FIRE INSURANCE COMPANY, defendant (94-CV-1493): Stephen R. Powers, Ober, Kaler, Grimes & Shriver, New York, NY.

**JUDGES:** CHARLES S. HAIGHT, JR., U. S. S. D. J.

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

*MEMORANDUM OPINION AND ORDER*

*HAIGHT, Senior District Judge:*

[*2] In these consolidated breach of contract actions, W.S.A. Inc. d/b/a Harmon Contract ("Harmon") moves under *Rule 15(a), Fed. R. Civ. P.*, to dismiss the second amended complaint filed by ACA Corporation ("ACA"), and to dismiss five counts of ACA's original complaint under *Rule 12(b)(6)*. ACA opposes both motions, which the other named parties have neither joined nor opposed. There is diversity jurisdiction, under U.S.C. § 1332, in each of the consolidated actions. In the first action, Harmon, a Minnesota corporation, has brought suit against ACA, a Connecticut corporation, and Westchester Fire Insurance Company ("Westchester"), a New York corporation with its principal place of business in New Jersey. The second action has been brought by ACA against Harmon, and ACA seeks to add as defendants American Home Assurance Company ("American Home"), a New York corporation, and St. Paul Fire and Marine Insurance Company ("St. Paul"), a Minnesota corporation.

*BACKGROUND*

1996 U.S. Dist. LEXIS 14198, *2

*A. Factual History*

These actions are the result of the souring of a sub-contractual relationship between Harmon and ACA. The account of this rupture contained in ACA's complaint, [1] which I must accept as true for [*3] purposes of Harmon's *Rule 12(b)(6)* motion, is as follows:

> 1    As discussed *infra*, the question of which complaint should properly be the subject of the *Rule 12(b)(6)* motion is in some dispute. To avoid any confusion, the facts set forth below may be found in both ACA's initial complaint and its second amended complaint.

In April, 1992, the City of New York hired Morse Diesel International ("MDI") as the general contractor of a project to construct a 500 cell addition to the Otis Bantum Correctional Center on Rikers Island (the "Project"). (ACA Compl. P 7; Second Am. Compl. P 9). On June 15, 1993, MDI sub-contracted with Harmon for the design and construction of the exterior wall panel system (the "curtainwall") for the Project. (ACA Compl. P 8; Second Am. Compl. P 10). Harmon, in turn, solicited a bid from ACA for the installation of this curtainwall. (ACA Compl. PP 9-10; Second Am. Compl. P 11). ACA's bid of $ 1,112,238, was based on a novel and allegedly "easier" curtainwall design provided by Harmon. The [*4] bid was accepted by Harmon in a contract dated July 23, 1993. (ACA Compl. Ex. 5; Second Am. Compl. P 6). In discussions between the parties, Harmon agreed to provide the materials and specifications necessary for ACA to complete the task in a timely fashion. (ACA Compl. P 15; Second Am. Compl. P 17).

Problems between Harmon and ACA developed as soon as the job commenced. Harmon decreed that work was to begin at 8:00 A.M. on July 19, 1993. When ACA's team arrived, however, the requisite materials had not yet been delivered. When the materials did arrive a few days later, they were insufficient to sustain continuous work. (ACA Compl. PP 18-19; Second Am. Compl. P 22). Over the course of ACA's work, this pattern continued. In a fax sent to Harmon on July 27, 1993, ACA complained that it had been delayed two weeks from the original schedule, and was nearly out of work due to the lack of materials and design drawings. (ACA Compl. P 20; Second Am. Compl. P 23). ACA continued to complain on a regular basis that its work was being delayed because of a lack of

readiness on the worksite by other non-ACA crews; lack of timely delivery of the necessary design drawings from Harmon; intermittent [*5] delay-causing changes in Harmon's designs; lack of timely delivery of the requisite building materials; and, delivery of the wrong size or quality of certain materials. (*See* ACA Compl. PP 21-24; Second Am. Compl. PP 24-27).

For its part, Harmon complained that ACA's workers were not devoting sufficient hours to the task, and it threatened to terminate the contract if this situation was not corrected. (ACA Compl. P 31; Second Am. Compl. P 35). By letter dated January 6, 1994, after the targeted completion date, Harmon notified ACA that it was in default, and that payments would be withheld until "performance in the field immediately improved." (ACA Compl. P 32; Second Am. Compl. P 36).

Ultimately, the relationship could not be salvaged. Under a Harmon directive, ACA boosted manpower to 20 for the weekend of January 22-23, 1994. (ACA Compl. PP 38, 40; Second Am. Compl. PP 44, 46). This effort was fruitful and by Monday, January 24, 1994, the job was virtually complete. (ACA Compl. P 41; Second. Am. Compl. P 47). Nevertheless, ACA's on-site supervisor was notified on January 24, 1994 that the contract had been terminated by Harmon, and that ACA was no longer allowed on the project [*6] site. (ACA Compl. PP 42-43; Second Am. Compl. PP 48-49). On that same date ACA received a letter, dated January 21, 1994 -- prior to the weekend's work -- stating that ACA was being "terminated from [its] obligations at Rikers Island project due to breach of contract . . . ." [2] (ACA Compl. P 42; Second Am. Compl. P 48). Harmon's lockout prevented ACA from retrieving some of its equipment and tools. (ACA Compl. P43; Second Am. Compl. P 49).

> 2    According to Harmon, it also demanded payment from Westchester on ACA's performance bond. In the bond, Westchester had accepted liability in the event that ACA should fail to perform its contractual obligations. (Harmon Compl. PP 16, 26).

*B. Procedural History*

The contentious nature of the dispute at issue is manifested in this case's convoluted procedural history. A complaint was first filed by Harmon on March 14, 1994, naming ACA and Westchester, ACA's surety, as co-defendants. That complaint presented claims for

1996 U.S. Dist. LEXIS 14198, *6

breach of contract and failure by Westchester [*7] to pay moneys owed, and demanded compensatory relief. On March 17, 1994, ACA filed its own complaint against Harmon, raising claims for breach of contract, quantum meruit, negligence, intentional misrepresentation, negligent misrepresentation, conversion, breach of implied bailment, tortious interference with economic relations, and breach of the implied covenant of good faith and fair dealing. ACA sought compensatory damages on all claims, as well as punitive damages for the tort claims. The two actions were consolidated by stipulation of the parties which was signed by this Court on April 28, 1994. [3]

> 3   The stipulation reads:
>
>> It is hereby stipulated and agreed by and between counsel for the parties in Action No. 1 and Action No. 2, as the two actions share common issues of fact and law, Action No. 2 shall be and is hereby consolidated with Action No. 1 pursuant to *Rule 42(a), Fed. R. Civ. Pro.*, and that the claims of both parties shall be hereafter determined in a single consolidated proceeding bearing the caption as set forth in Action No. 1.

[*8] On April 20, 1994, Harmon filed an answer to ACA's complaint. Less than a week later, on April 26, 1994, ACA purported to serve an amended complaint, adding a single claim on Harmon's bond against Harmon's sureties, American Home and St. Paul. (ACA Am. Compl. PP 108-111). In direct correspondence between the parties, Harmon objected to ACA's Amended Complaint, arguing that under *Fed. R. Civ. P. 15(a)*, ACA was required to seek permission to file an amended complaint after an answer had been submitted. (Cohen Aff. Ex. A). Harmon and ACA then agreed between themselves that the parties would stipulate to the filing of a second amended complaint on the condition that ACA would voluntarily withdraw the Amended Complaint. (Cohen Aff. Ex. B). In short order, the parties signed a stipulation to a second amended complaint, which was approved by this Court on June 28, 1994. (ACA Mem. Opp. Mot. to Dismiss Second Compl. Ex. A). That stipulation labeled ACA -- which had begun the

action as plaintiff -- as "Counterclaim Plaintiff." It also characterized defendant Harmon as the "Counterclaim Defendant." (ACA Mem. Opp. Dismiss Second Compl. Ex. A).

ACA sent a second amended complaint to Harmon on [*9] June 10, 1994, (Harmon Rep. to ACA Mem. in Opp. at n. 1), but it was never filed with the Court. According to ACA, the Court Clerk rejected the pleading on the ground that ACA had titled the parties in the second action as "Plaintiff" and "Defendant," and therefore the pleading did not match the titles of "Counterclaim Plaintiff" and "Counterclaim Defendant" specified in the stipulation. [4] (ACA Mem. Opp. Dismiss Second Compl. at 7).

> 4   ACA and Harmon have corresponded voluminously on the question of whether the parties in the second action should be titled, "Plaintiff" and "Defendant," as originally designated, or "Counterclaim Plaintiff" and "Counterclaim Defendant" as designated in the Stipulation to a Second Amended Complaint. (*See, e.g.,* ACA Mem. Opp. Mot. to Dismiss at 17 n.4). ACA maintained that the names should remain as originally designated, while Harmon insisted on the designations noted in the Stipulation. Because consolidated cases do not lose their separate identities, *see infra* n.5, ACA's argument appears correct. In any event, for reasons discussed *infra* at 11-12, the proper caption is of no import to the motion at hand.

[*10] As if all this were not sufficiently unkempt, on September 23, 1994, ACA's bank filed an involuntary petition against ACA under Chapter 7 of the U.S. Bankruptcy Code. (ACA Second Compl. P 51). As a result of that filing, Harmon's claims against ACA were automatically stayed, as this Court acknowledged by order dated December 5, 1994. The stay was ultimately lifted by the bankruptcy court, and the proceedings in this Court were ordered resumed on May 8, 1995.

The litigation has since rekindled. Even before the stay was lifted, on May 1, 1995, Harmon filed a Motion for Partial Dismissal pursuant to *Rule 12(b)(6)*. In that motion, Harmon sought dismissal of ACA's claims for negligence, intentional misrepresentation, negligent misrepresentation, tortious interference with economic relations, and implied covenant of good faith and fair dealing. On May 26, 1995, ACA filed a second amended

1996 U.S. Dist. LEXIS 14198, *10

complaint with the Court -- now with the parties in the second action titled, "Counterclaim Plaintiff" and "Counterclaim Defendant" to match the stipulation. The Second Amended Complaint, like the original complaint, includes claims against Harmon for breach of contract, quantum meruit, conversion, breach [*11] of implied bailment, tortious interference with economic relations, and breach of the implied covenant of good faith and fair dealing. The Second Amended Complaint does not include the claims for negligence and negligent misrepresentation raised in ACA's initial complaint, and reformulates the claim of intentional misrepresentation as fraud in the inducement. Finally, the Second Amended Complaint adds a claim for monies purportedly owed to ACA by Harmon's sureties, American Home and St. Paul. 5

5    ACA's additional claim against American Home, a New York company, and St. Paul, a Minnesota company, does not destroy diversity. Cases consolidated pursuant to *Fed. R. Civ. P. 42(a)* do not lose their separate identity, *Garber v. Randell, 477 F.2d 711, 716 (2d Cir. 1973)* (citing *Johnson v. Manhattan Ry. Co., 289 U.S. 479, 497, 77 L. Ed. 1331, 53 S. Ct. 721 (1933))*, and thus diversity is evaluated in terms of each individual case. *Continental Airlines v. Goodyear Tire & Rubber Co., 819 F.2d 1519, 1523 n.1 (9th Cir. 1987)*; *Webb v. Just in Time, Inc., 769 F. Supp. 993, 996 (E.D.Mich. 1991)* (in a consolidated case, "when determining whether diversity of citizenship exists, the claims must be addressed separately . . . ."). *See* 9 Wright, Miller & Kane, *Federal Practice and Procedure* § 2382 (1990).

[*12] Harmon now moves for dismissal of this Second Amended Complaint on grounds that under *Fed. R. Civ. P. 15(a)*, ACA did not procure permission to file the pleading, and that in any case such permission should not be granted because the Second Amended Complaint is prejudicial, untimely in adding new parties, and ultimately futile.

I will first consider Harmon's Motion to Dismiss the Second Amended Complaint, and will then proceed to the *Rule 12(b)(6)* motion.

*DISCUSSION*

A. *Motion to Dismiss the Second Amended Complaint*

A party may amend its pleadings after a responsive pleading has been filed "by leave of court or by written consent of the adverse party." *Fed. R. Civ. P. 15(a)*. Once the adverse party has consented to an amendment of a pleading, the court has no control over the matter under *Rule 15(a)*. The pleader's right to amend is not subject to the court's discretion and the court must permit the amendment to be filed. *Bilmar Drilling, Inc. v. IFG Leasing Co., 795 F.2d 1194, 1199 (5th Cir. 1986)*; *Fern v. U.S., 15 Alaska 31, 213 F.2d 674, 677 (9th Cir. 1954)*; 6 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1490 at 700 (1990).

The underlying [*13] policy of the Federal Rules of Civil Procedure, as evidenced in their liberal approach to pleading and amendment, is to have cases decided on the merits. *Foman v. Davis, 371 U.S. 178, 181-82, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; *U.S. v. Hougham, 364 U.S. 310, 317, 5 L. Ed. 2d 8, 81 S. Ct. 13 (1960)*. Thus, a mere technical mistake in an amended pleading will not defeat an otherwise valid amendment: "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson, 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*.

ACA's entitlement to file a Second Amended Complaint turns on the interpretation given the Stipulation to a Second Amended Complaint of June 28, 1994. The Stipulation reads:

It is hereby stipulated and agreed, by and between the undersigned attorneys for the parties hereto, that Counterclaim Plaintiff ACA Corporation may file a Second Amended Complaint.

(ACA Mem. Opp. Dismiss Second Compl. Ex. A)

The plain wording of this stipulation gives ACA the right, [*14] free from the interference or oversight of the Court, to submit a Second Amended Complaint on any chosen date.

Harmon attempts to negate the force of this stipulation by insisting that it refers only to the June 10, 1994 Second Amended Complaint. Toward this end, Harmon states that the June 10 Complaint was

specifically "referenced in the June 28, 1994 stipulation." (Harmon Reply Second Am. Compl. at 3). However, there is no mention of any particular second amended complaint in, on, or around the stipulation. (*See* ACA Mem. Opp. Dismiss Second Compl. Ex. A). Harmon's argument therefore fails. Harmon goes on to insist that the May 26, 1995 Second Amended Complaint "was *never* supplied to Harmon before it was filed and therefore, *could not* have been consented to." (Harmon Reply Second Am. Compl. at 3) (emphasis in original). This argument is also without merit. Harmon misinterprets *Rule 15(a)* as stating that a party can only consent to an amendment after having that amendment in hand. (Harmon Reply Second Am. Compl. at 3). There is no such requirement apparent in the text of the Rule. Rather, *Rule 15(a)* leaves the parties to consent to amend as they so choose, without the [*15] interference of the court. Moreover, it is not alleged anywhere that the May 26, 1995, Second Amended Complaint differs, except in the caption names, from the June 10, 1994 edition. [6] Thus, Harmon gives no indication that it did not have notice of any of the claims to be raised in the May 26, 1995, Second Amended Complaint by dint of receiving the failed June 10, 1994 version thereof.

> [6] Both parties recognize that the bankruptcy proceeding against ACA was the cause of the bulk of the delay between the stipulation on June 28, 1994, and the receipt of ACA's Second Amended Complaint on May 26, 1995. (Harmon Mem. Reply Second Am. Compl. at n.7; ACA Mem. Opp. Second Am. Compl. at 8).

In any case, even if the two versions of the Second Amended Complaint were different, it would be contrary to the spirit of the Federal Rules to bar ACA's May 26, 1995, Second Amended Complaint on merely technical grounds. ACA's June 10, 1994 version of the Second Amended Complaint was rejected by the Court Clerk for the sole reason [*16] that the caption did not match the caption of the stipulation. (*supra* at 6-7). These titles have no bearing on the merits of the case and should not be dispositive of whether ACA can submit a properly captioned second amended complaint. *Cf. Speed Products Co. v. Tinnerman Products, Inc., 222 F.2d 61, 68 (2d Cir. 1955)* (where two actions had been consolidated, "it made no difference whether [a] claim should be stated by an amendment in the first action or by complaint in the second action").

There is one obstacle to the filing of ACA's amended complaint, however, which is not so easily surmounted. Although Harmon consented to the complaint's filing, the two sureties which WSA seeks to name as additional defendants were not parties to the stipulation, and thus have never agreed to permit ACA's amendment. Moreover, Harmon contends that ACA's complaint is untimely as to these defendants.

The fact that one defendant has agreed to permit the filing of an amended complaint is not binding on any additional defendants that the complaint seeks to add. *CFTC v. American Metal Exchange Corp., 693 F. Supp. 168, 189 (D.N.J. 1988); Madery v. Int'l Sound Technicians, Local 695,* [*17] *79 F.R.D. 154, 156 (C.D. Cal. 1978)*. Rather, leave of the court must be obtained as to the newly added parties. [7] *See Fed. R. Civ. P. 21* ("Parties may be dropped or added by order of the court . . . .").

> [7] There is some dispute as to whether leave is required if a party is added before service of a responsive pleading. *Compare McClelan v. Mississippi Power & Light Co., 526 F.2d 870, 872-73)(1976)* (no leave required), *vacated in part on other grounds, 545 F.2d 919 (5th Cir. 1977)* (en banc) *with La Batt v. Twomey, 513 F.2d 641, 651 n.9 (7th Cir. 1975)* (leave required). I need not resolve this conflict, as Harmon answered ACA's first complaint.

Neither American Home nor St. Paul has objected to the filing of the amended complaint, although they have both received notice of its submission. Moreover, while Harmon contends that the complaint is untimely as to these parties, it has no standing to raise the affirmative defense of statute of limitations on their behalf, nor may I consider its application [*18] *sua sponte. See Davis v. Bryan, 810 F.2d 42, 44 (2d Cir. 1987)*.

Thus, to the extent that leave of this Court is necessary before ACA may add the two sureties as defendants, such leave is hereby granted. [8] For the reasons stated above, I deny Harmon's motion to dismiss ACA's Second Amended Complaint.

> [8] Although ACA has not sought leave to amend its complaint, this Court may grant that remedy on its own initiative, if circumstances of the case make that appropriate. *See Webb v. District of Columbia, 864 F. Supp. 175, 187 (D.D.C. 1994);*

1996 U.S. Dist. LEXIS 14198, *18

*Acme Printing Ink Co. v. Menard, Inc., 812 F. Supp. 1498, 1513 n.8 (E.D. Wis. 1992). See also Springer-Penguin, Inc. v. Jugoexport, 648 F. Supp. 468, 470 (S.D.N.Y. 1986)* (amended complaint can be viewed as motion to add defendant); *Fed. R. Civ. P. 21* (court may add party "on its own initiative").

B. *Motion for Partial Dismissal under Rule 12(b)(6)*

On a motion to dismiss under *Rule 12(b)(6)*, the trial court's function "is merely to assess the legal [*19] feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980); see Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 124 (2d Cir. 1991).* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* The district court should grant a *Rule 12(b)(6)* motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)* (citing *Conley, 355 U.S. at 45-46*).

Except in certain circumstances, consideration of a motion to dismiss the complaint must focus on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d. Cir. 1991), cert. denied, 112 S. Ct. 1561 (1992); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).* On a motion to dismiss, a district court must accept plaintiff's [*20] well-pleaded factual allegations as true, *Papasan v. Allain, 478 U.S. 265, 283, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986),* but the court need not accept the pleader's "legal conclusions [and] characterizations." *United States v. Weisz, 914 F. Supp. 1050, 1053 (S.D.N.Y. 1996)* (citing *Madonna v. United States, 878 F.2d 62 (2d Cir. 1989)).* The allegations made by the pleader must be "construed favorably to the plaintiff." *LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991).* "[A] *Rule 12(b)(6)* motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982).*

Harmon has moved, under *Rule 12(b)(6)*, to dismiss five of ACA's claims: negligence, intentional

misrepresentation, negligent misrepresentation, tortious interference with economic relations, and breach of the implied covenant of good faith and fair dealing. (Harmon Mem. Dismiss at 1). Harmon claims that its *Rule 12(b)(6)* motion is made against ACA's Second Amended Complaint. (*Id.* at 4). ACA's Second Amended Complaint was not filed with the court, however, until May 26, 1995, [*21] while Harmon's 12(b)(6) motion was filed with the court on May 1, 1995. Further, not all the claims Harmon moves to dismiss are contained in ACA's May 26, 1995 Second Amended Complaint. Therefore, Harmon's motion to dismiss is mooted as to ACA's claims of negligence and negligent misrepresentation upon the Court's receipt and acceptance of the May 26, 1995 Second Amended Complaint. As ACA continues to raise claims for fraud in the inducement (or intentional misrepresentation), tortious interference with economic relations and breach of implied covenant of good faith and fair dealing in the latest incarnation of its complaint, Harmon's dismissal motion may be considered as to these three claims. *Cf. In re Agent Orange Product Liability Litigation, 635 F.2d 987, 989 (2d Cir. 1980)*(where complaint was amended after motion to dismiss was filed, district court treated motion as brought against amended complaint), *cert. denied, 454 U.S. 1128 (1981)*.

1. *Fraud in the Inducement*

To state a claim for fraud in the inducement [9] under New York Law, the plaintiff must show: 1) that the defendant made a representation; 2) as to a material fact; 3) which was false; 4) and known to be [*22] false by the defendant; 5) that the representation was made for the purpose of inducing the other party to rely upon it; 6) that the other party did rightly so rely; 7) in ignorance of its falsity; 8) to its injury. *U.S. v. Rodolitz, 786 F.2d 77 (2d Cir. 1986); Brown v. Lockwood, 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (A.D.2d 1986).*

[9] ACA's Original Complaint included a claim for intentional misrepresentation. Harmon moved to dismiss this claim in its *Rule 12(b)(6)* motion. In ACA's Second Amended Complaint, ACA restated the claim of intentional misrepresentation as a claim of fraud in the inducement. In actuality, the two claims amount to the same thing. *See Black's Law Dictionary* (6th ed. 1990). Since the parties are in agreement as to the elements of the claim, this semantic shift is unimportant.

In order to avoid inflating every breach of contract

action into a fraud action, fraud in the inducement cannot be sustained when the only fraud charged relates to a breach of contract. *Hargrave v. Oki* [*23] *Nursery, Inc. 636 F.2d 897, 899, reh'g denied, 646 F.2d 716 (2d Cir. 1980); DePinto v. Ashley Scott, Inc., 635 N.Y.S.2d 215, 216 (A.D. 1st 1995); Metropolitan Trans. Auth. v. Triumph Advertising Prod., 116 A.D.2d 526, 497 N.Y.S.2d 673, 675 (A.D.1st 1986).* This does not mean, however, that a party cannot plead actions for breach of contract and fraud in the inducement at the same time. Fraud in the inducement can be maintained separately from a breach of contract action when a plaintiff alleges a material misrepresentation of *present* fact, rather than promises of future action, [10] which is collateral or extraneous to the terms of the parties' agreement and which induced the plaintiff to contract with the defendant. *Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992).*

> [10] "No cause of action for fraud arises when the only fraud alleged is, in essence, a failure to fulfill promises to perform acts in the future, since failure to fulfill such promises, even where relied upon to the promisee's detriment, is a breach of contract, not fraud." *Rubenstein v. East River Tenants Corp., 139 A.D.2d 451, 527 N.Y.S.2d 29, 32 (A.D.1st 1988).*

[*24] If a promise is collateral or extraneous to the contract and was made with the *undisclosed* present intention of not performing that promise, the intent to breach the promise can be a misrepresentation of material fact upon which an action for damages may be based. *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (Ct.App. 1986). See Stewart, 976 F.2d at 89; Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1043 (2d Cir.) cert. denied, 479 U.S. 950, 93 L. Ed. 2d 385, 107 S. Ct. 436 (1986); Channel Master v. Aluminium Sales Ltd., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (Ct.App. 1958)*("a person's intent, his state of mind, it has long been recognized, is capable of ascertainment and a statement of present intention is deemed a statement of material existing fact, sufficient to support a fraud action"). However, if the misrepresentation says "nothing which is not legally embraced by [a] cause of action for breach of contract," then no fraud action exists. *Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1294 (S.D.N.Y. 1989)* (quoting *L. Fatato, Inc. v. Decrescente Distrib.*

[*25] *Co., 86 A.D.2d 600, 446 N.Y.S.2d 120, 121 (A.D.2d 1982)).*

ACA has sufficiently pled a cause of action for fraud in the inducement. In ACA's Second Amended Complaint, ACA alleges that Harmon stated that:

> Its new design provided for a curtainwall system that utilized a maximum of twenty (20) different sizes of pilasters and infills and, thus, was of a nature that made it easier, faster and less costly to install and erect . . . . In fact, the new design required installation of nearly three hundred (300) different sizes of pilasters and infills, making installation much more difficult, time-consuming and costly. (ACA Second Am. Compl. P 72).

ACA alleges that Harmon intentionally made the misrepresentation in order to induce ACA to enter the Contract for a lesser amount and with the intention that ACA would rely thereon; ACA did so rely; Harmon knew its representation was false or alternatively was made with reckless disregard for the truth; ACA would not have entered that Contract but for Harmon's false representations; and ACA sustained damages as a result. (ACA Second Am. Compl. PP 73-78). ACA has thus alleged the essential elements of a claim for fraud in the inducement.

[*26] ACA's claim does not, as Harmon contends, "relate solely to an alleged breach of contract." (Harmon Mot. Dismiss at 12). According to the fraud allegation, Harmon induced ACA to sign a contract for an amount reflecting one level of work effort, when, in fact, and to Harmon's knowledge, the level of effort required was to be much greater. The breach of contract claim, in contrast, centers on Harmon's failure to provide adequate support, scheduling and compensation under the terms of the contract signed by Harmon and ACA. (*See* ACA Second Am. Compl PP 53-66). In addition, the fraud claim does not pertain to a future promise. ACA does not solely allege that Harmon failed to meet an obligation undertaken under the contract; rather, it contends that Harmon's characterization of the nature of that project was misleading in the first instance. Therefore, Harmon's *Rule 12(b)(6)* motion is denied as to this count.

*2. Tortious Interference with Economic Relations*

To prove tortious interference with economic relations [11] under New York State Law, a plaintiff must show "1) business relations with a third party; 2) defendants' interference with those business relations; 3) defendants [*27] acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and 4) injury to the relationship." *Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)*; *Robbins v. Ogden Corp., 490 F. Supp. 801, 811 (S.D.N.Y. 1980)*; *Burba v. Rochester Gas & Elec. Corp., 139 A.D.2d 939, 528 N.Y.S.2d 241 (A.D.4th 1988)*. "The interference must be intentional, not merely negligent or incidental to some other, lawful, purpose." *Alvord and Swift v. Stewart M. Muller Const. Co., 46 N.Y.2d 276, 413 N.Y.S.2d 309, 313, 385 N.E.2d 1238 (Ct.App. 1978)*. Furthermore, "if the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct." *PPX Enterprises, 818 F.2d 266, 269 (2d Cir. 1987)*. See *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co., 614 F.2d 832, 838 (2d Cir. 1980)*. Finally, courts are always wary of attempts to "dress up a contract claim in a [tort] suit of clothes." *Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 747 (2d Cir. 1979)*.

> [11] ACA's claim is titled "tortious interference with economic relations," but in setting forth its allegations ACA also refers to this claim as tortious interference with prospective business relations and/or economic advantage. (ACA Second Am. Compl. at PP 91-98). The specific title of these various torts is irrelevant. In *PPX Enterprises v. Audio Fidelity Enterprises, 818 F.2d 266, 269 (2d Cir. 1987)*, the Court noted that whether the plaintiff is alleging "tortious interference with: prospective economic advantage, beneficial business relations, prospective business advantage, and business of economic relations . . . the elements necessary to establish such a claim remain constant."

[*28] ACA alleges that Harmon tortiously interfered with its economic relations by demanding payment from ACA's surety, Westchester, when Harmon knew that ACA had substantially completed the required work. (ACA Second Am. Compl. P 88-99). Moreover, ACA contends that Harmon knew or should have known that this untimely action would have ill effects on ACA's ability to secure future surety bonds, and therefore that ACA's economic stability would be harmed thereby.

(ACA Second Am. Compl. PP 90, 91, 97).

Harmon, however, was an obligee of the performance bond. (Del Bello Aff. Ex. B). The bond states in part:

> Whenever Principal shall be, and declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder: . . . (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein . . . . (Harmon Mot. Dismiss at 24).

Thus, Harmon clearly had competing economic interests in making its demand on Westchester. It hoped to receive full benefit of its contract with ACA so that it could [*29] receive full expected compensation in its contract with MDI. As a result, ACA cannot prevail on this claim absent a showing that Harmon acted in a "criminal or fraudulent manner."

ACA states that Harmon's actions were taken "for the express and improper purpose of pressuring ACA to concede on its claims and to accept a lesser amount of money than that due ACA under the Contract." (ACA Second Am. Compl. P 96). While this motive may be improper, it does not rise to the level of fraud or criminal activity. ACA's remaining contentions are entirely conclusory in this regard. In paragraphs 92-94 and in paragraph 96 of the Second Amended Complaint, ACA repeats the phrase "employing unlawful means and without legal justification" to describe those actions by Harmon which gave rise to a claim of tortious interference with economic relations, without stating the precise nature of those unlawful means. (ACA Second Am. Compl. PP 92-94).

In light of Harmon's contractual rights under the performance bond, ACA's contentions do not meet the standard for tortious interference, and this claim must be dismissed.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing

Under New York Law, [*30] there is an implied

1996 U.S. Dist. LEXIS 14198, *30

covenant of good faith and fair dealing implicit in every contract. *M/A Com Security Corporation v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).* "The covenant of good faith and fair dealing 'precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.'" *Leberman v. John Blair & Co., 880 F.2d 1555 (2d Cir. 1989)* (quoting *Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir. 1980)).* An implied obligation cannot, however, be inconsistent with the explicit terms of the contractual relationship. *Murphy v. American Home Products Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86 (Ct.App. 1983).*

Because the duty of good faith is an implied contractual term, "breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co., Inc. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)* (citation omitted). Raising both claims in a single complaint is, therefore, redundant. As a result, every court confronted with such a complaint brought under New York law has dismissed the claim for breach of the covenant of fair dealing. *See Canstar v. J.A. Jones Construction Co.,* [*31] *212 A.D.2d 452, 622 N.Y.S.2d 730, 731 (1st Dep't 1995); Apfel v. Prudential Bache Securities, Inc., 183 A.D.2d 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992), aff'd as modifed on other grounds, 600 N.Y.S.2d 433 (Ct. App. 1993); NFL Properties, Inc. v. Dallas Cowboys Football Club, Ltd., 922 F. Supp. 849, 855 (S.D.N.Y. 1996); In re Houbigant, Inc., 914 F. Supp. 964, 989 (S.D.N.Y. 1995).*

ACA contends that the allegations underlying its breach of contract and breach of covenant of fair dealing claims are entirely different. (ACA Mem. Opp. Dism. at 31-32). This is far from apparent. ACA's Second Amended Complaint bases its breach of covenant claim, in part, on the assertions that Harmon wrongfully withheld payments, and "wrongfully violated the Contract," allegations also presented in support the breach of contract claim. *Compare* Second Am. Compl. PP 103, 105 *with id. PP 58, 65.* In any event, ACA's argument is off target. The fact that it has bifurcated its breach of contract claim, so as to place some of the allegations in support thereof in the category of "breach of covenant of fair dealing," does not grant it two separate causes of action. Rather, the latter [*32] claim must be dismissed.

## CONCLUSION

Harmon's *Rule 15(a)* motion for dismissal of ACA's Second Amended Complaint is denied, and ACA is granted leave to add St. Paul and American Home as defendants. ACA is directed to file and serve its amended complaint, consistent with this opinion, within twenty (20) days of the date of this opinion.

Harmon's *Rule 12(b)(6)* motion is mooted in part, granted as to ACA's claims for tortious interference with economic relations and breach of the covenant of good faith and fair dealing, and denied as to ACA's fraud in the inducement claim.

Counsel are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:00 P.M. on November 8, 1996.

It is SO ORDERED.

Dated: New York, New York

September 25, 1996

CHARLES S. HAIGHT, JR.

U. S. S. D. J.